# EXHIBIT A

# STATE OF NORTH CAROLINA

Mecklenburg _____ County

File No.

18 CVS ___

In The General Court Of Justice
☐ District  ☒ Superior Court Division

| | |
|---|---|
| **Name Of Plaintiff**<br>Chester Taylor III, Ronda and Brian Warlock, et al. | |
| **Address**<br>c/o ROBINSON ELLIOTT & SMITH | **CIVIL SUMMONS** |
| **City, State, Zip**<br>800 East Boulevard, Ste. 100 Charlotte, NC  .  28203 | ☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)** |

**VERSUS**

G.S. 1A-1, Rules 3 and 4

| | |
|---|---|
| **Name Of Defendant(s)**<br>BANK OF AMERICA, N.A. | **Date Original Summons Issued** |
| | **Date(s) Subsequent Summons(es) Issued** |

## To Each Of The Defendant(s) Named Below:

| **Name And Address Of Defendant 1**<br>Bank of America, N.A., by and through its Registered Agent<br>CT Corporation System<br>160 Mine Lake Ct., Ste. 200<br>Raleigh, NC 27615-6417 | **Name And Address Of Defendant 2** |
|---|---|

### A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| **Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff)**<br>William C. Robinson<br>ROBINSON ELLIOTT & SMITH<br>800 East Boulevard, Ste. 100<br>Charlotte, NC 28203  704-343-0061 | **Date Issued** 5-1-18  **Time** 11 30  ☐ AM ☐ PM |
|---|---|
| | **Signature**<br>☐ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court |

---

| ☐ **ENDORSEMENT (ASSESS FEE)**<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days.  . | **Date Of Endorsement**  **Time**  ☐ AM ☐ PM |
|---|---|
| | **Signature** |
| | ☐ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court |

**NOTE TO PARTIES:** *Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

.(Over)

AOC-CV-100, Rev. 6/16
© 2016 Administrative Office of the Courts

| | | | RETURN OF SERVICE | |
|---|---|---|---|---|

I certify that this Summons and a copy of the complaint were received and served as follows:

## DEFENDANT 1

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

## DEFENDANT 2

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid | Signature Of Deputy Sheriff Making Return |
|---|---|
| $ | |
| Date Received | Name Of Sheriff (type or print) |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 6/16
© 2016 Administrative Office of the Courts

**STATE OF NORTH CAROLINA**

**COUNTY OF MECKLENBURG**

**IN THE GENERAL COURT OF JUSTICE SUPERIOR COURT DIVISION**

Case No.: 18 CVS 8266

| | | |
|---|---|---|
| CHESTER TAYLOR III, RONDA and BRIAN WARLICK, LORI MENDEZ, LORI MARTINEZ, CRYSTAL PRICE, JEANETTE and ANDREW ALESHIRE, MARQUITA PERRY, WHITNEY WHITESIDE, KIMBERLY STEPHAN, KEITH PEACOCK, ZELMON MCBRIDE, | : : : : : : : : : : | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Plaintiffs, | : : | |
| v. | : : | |
| | : | |
| BANK OF AMERICA, N.A., | : : | |
| Defendant. | : | |

NOW COME the Plaintiffs, by and through undersigned counsel, to file this Complaint against Defendant, Bank of America, N.A. as follows:

## PARTIES

1.      Plaintiffs are citizens and residents of New Hanover County, North Carolina; San Diego County, California; Kern County, California; Wayne County, Michigan; Polk County, Wisconsin; Maricopa County, Arizona; Stafford County, Virginia; Macomb County, Michigan; Sacramento County, California; and Clark County, Nevada.

2.      Defendant, Bank of America, N.A. (hereinafter "BOA"), is a Delaware Corporation, with its principal place of business located at 101 S. Tryon Street, Charlotte, North Carolina.

## JURISDICTION and VENUE

3. The Court has personal jurisdiction of the Defendant under N.C. Gen. Stat. §1-75.4.

4. The Court has subject matter jurisdiction under, inter alia, N.C. Gen. Stat. § 7A-240. The amount in controversy is in excess of $25,000 under N.C. Gen. Stat. § 7A-243.

5. Venue, in this Court over this cause, is proper under N.C. Gen. Stat. § 1-80.

## GENERAL FACTUAL ALLEGATIONS

6. This complaint chronicles the fraudulent scheme exacted by BOA on homeowners seeking Home Affordable Modification Program ("HAMP") modifications. Plaintiffs were victims of this fraud.

7. In late 2008 and early 2009, the United States Government provided a total of $45 billion dollars to BOA pursuant to the Troubled Asset Relief Program ("TARP"). It also extended to BOA an additional guarantee of over $100 billion dollars. Having concluded that the costs of allowing BOA to fail were too high, the U.S. Government decided taxpayers would save the life of BOA, and they did.[1]

8. As the Congressional Oversight Panel ("Panel") described it, "almost overnight" U.S. taxpayers provided to several large financial institutions, including BOA, an infusion of over $200 billion dollars.[2] This massive bailout allowed the continued existence of several institutions including BOA.

### BOA Agrees to the Home Affordable Modification Program ("HAMP") in Exchange for Billions from Taxpayers

---

[1] United States Department ·of Treasury, Troubled Asset Relief Program Transactions Report, ("Treasury Transaction Report"), available at: https://www.treasury.gov/initiatives/financial-stability/reports/Pages/default.aspx

[2] Congressional Oversight Panel, The Final Report of the Congressional Oversight Panel, March 16, 2011, ("Final Report"), available at http://www.senate.gov/general/common/generic/COP_redirect.htm.

9.     Because the stated purpose of the financial bailout was to help the American people, HAMP was implemented in March of 2009 to assist the millions of American homeowners facing foreclosure.

10.     Knowing all eyes were on it and the billions of dollars it had been given by the government, on April 17, 2009, BOA, the nation's largest mortgage servicer, signed a "Servicer Participation Agreement" (the "Agreement" or "HAMP Agreement") with the Federal Government requiring it to use "reasonable efforts" to "effectuate any modification of a mortgage loan under the Program." *See* **Exhibit 1** at Sec. 2A.

11.     BOA signed the Agreement in exchange for a commitment by the Federal Government to provide BOA hundreds of millions of taxpayer dollars for its promise and obligation to comprehensively provide HAMP screening for all homeowners serviced by BOA.[3]

12.     Once approved for HAMP modification, a homeowner who agrees to participate typically begins a three-month Trial Payment Period during which mortgage payments are made under the terms of the modification. If timely payments are made during those three months (i.e., not more than 30 days overdue during any month), the homeowner must be offered a permanent modification, with the terms in effect during the Trial Payment Period extended for 5 years.

13.     After a homeowner completes a period of 5 years under the terms of the modification, lenders may increase the interest rate on the loan by 1% annually up to the prevailing Freddie Mac interest rate at the time the modification was made.

14.     The Agreement indicates that BOA "shall perform the services for all mortgage loans it services, whether it services such mortgage loans for its own account or for the account of another party," and "shall use reasonable efforts to remove all prohibitions or impediments to

---

[3] Treasury Transaction Report at 27.

its authority, and use reasonable efforts to obtain all third-party consents and waivers that are required, by contract or in law, in order to effectuate any modification of a mortgage loan under the Program." *See* **Exhibit 1** at Sec. 2A. Servicers, including BOA, received incentive payments to complete HAMP modifications and, in March 2010, the incentive was increased to $2,000.00.

### BOA Develops and Orchestrates a Fraudulent Scheme to Avoid HAMP Modifications in Order to Increase Profits

15.     Despite signing the Agreement and accepting billions of dollars, BOA knew conforming to the requirements of the Agreement in providing screening for HAMP applications and accepting homeowners who meet the requirements would cost the bank millions of dollars.

16.     For that reason, instead of honoring its contract with the Federal Government to, in good faith, help as many distressed homeowners as possible, it made a calculated decision. BOA decided to permit just enough HAMP modifications to occur to create a defense (however untenable) against Federal Government agencies, Congressional skeptics and the public that it was making best efforts to comply with its Agreement. Simultaneously, however, BOA chose to develop secretive business practices designed to intentionally prevent thousands of eligible applicants from receiving permanent HAMP modifications.

### Former BOA Employees Sign Sworn Declarations Outlining the Fraudulent HAMP Scheme

17.     Only after Plaintiffs retained their attorneys in this matter did Plaintiffs learn of the facts contained in this section and in the sworn declaration of former BOA employees. Plaintiffs did not know and could not have reasonably discovered these facts until they retained their attorneys.

18.     According to the February 22, 2017, Declaration of Rodrigo Heinle, (**Exhibit 2**) who worked for BOA in Charlotte, North Carolina from 2011 through 2012:

a. Bank of America employed a common strategy of delaying HAMP applications. Delay was achieved using tactics including claiming that documents were incomplete and/or missing when they were not, or simply claiming files were "under review" when they were not.

b. Homeowner applications were routinely shredded with no review by Bank of America and at times taken home by managers in order to conceal the fact they had been received by Bank of America.

c. Upon the instruction of my manager Jamal Brown, and other managers, I deleted thousands of homeowner HAMP application files from Bank of America computer databases, as many as six thousand (6,000) in one day.

19. According to the June 5, 2013 Declaration of William E. Wilson, Jr., (Exhibit 3)

who worked for BOA in Charlotte, North Carolina from 2010 through 2012:

a. Individual BOA employees were given "approximately 400 HAMP files" at any given time.

b. "Though BOA required that applicants immediately provide financial documents, often on short notice, the bank intentionally allowed these documents to sit for months without ever reviewing them."

c. Bank of America instructed its employees to employ a common strategy of delaying HAMP applications, "claiming that documents were incomplete or missing when they were not, or simply claiming the file was 'under review' when it was not." This delay tactic allowed BOA to falsely claim homeowners had not provided the required documentation when in fact, the homeowner had sent in documents months earlier, often multiple times, and had made payments under a Trial Payment Period plan, but had not gotten a permanent modification or even a decision regarding their modification.

d. Next, BOA regularly employed a procedure called a "blitz." "Approximately twice a month, BOA ordered case managers and underwriters to 'clean out' the backlog of HAMP applications by denying any file in which the financial documents were more than 60 days old. These included files in which the homeowner had provided all required financial documents and fully complied with the terms of a Trial Period Plan" and was entitled to a HAMP modification.

e. "During a blitz, a single team would decline between 600 and 1,500 modification files at a time for no reason other than that the documents were more than 60 days old. BOA instructed its employees to enter into its computer systems a reason that would justify declining the modification to the Treasury Department. The justifications commonly included claiming that the homeowner had failed to return

requested documents or had failed to make payments. In reality, these justifications were untrue."

f.  The "homeowners, who did not receive the permanent HAMP modification they were entitled to, ultimately lost their homes to foreclosure."

20.  · According to the May 23, 2013 Declaration of former BOA Senior Collector of

Loss Mitigation employee, Simone Gordon (Exhibit 4):

a.  Employees were given quotas for placing a specific number of accounts into foreclosure, including accounts in which the borrower fulfilled a HAMP Trial Period Plan. Employees who met quotas for placing "ten or more accounts into foreclosure in a given month received a $500 bonus. Bank of America also gave employees gift cards to retail stores like Target or Bed Bath and Beyond as rewards for placing accounts into foreclosure."·

b.  And that Employees were closely monitored by BOA "Team Leaders and Site Leaders who walked the call room floor throughout the day wearing headsets that they would use to plug in and listen into a call without warning. Employees who were caught not carrying out the delay strategies that BOA instituted were subject to discipline and termination."

c.  "Employees who were caught admitting that BOA had received financial documents or that the borrower was actually entitled to a permanent loan modification were disciplined and often terminated without warning."

21.  According to the May 15, 2013 Declaration of former BOA collection employee,

Theresa Terrelonge (Exhibit 5):

a.  BOA "was trying to prevent as many homeowners as possible from obtaining permanent HAMP loan modifications while leading the public and the government to believe that it was making efforts to comply with HAMP. It was well known among managers and many employees that the overriding goal was to extend as few HAMP loan modifications to homeowners as possible."

b.  BOA employees "were called into group meetings with our supervisors on a regular basis. The information we received in group meetings showed me that Bank of America's deliberate practice was to string homeowners along with no intention of providing permanent modifications. We were instructed to inform every homeowner who called in that their file was "under review" - even where the computer system showed that the file had not been accessed in months or when the homeowner had been rejected for a modification."

c. BOA employees "were instructed to inform homeowners that modification documents were not received on time, not received at all, or that documents were missing, even when, in fact, all documents were received in full and on time."

d. She "witnessed employees and managers change and falsify information in the systems of record, and remove documents from homeowners' files to make the account appear ineligible for a loan modification. This included falsifying electronic records so that the records would no longer show that the homeowner had sent in required documents or had made required payments. This was done so that the file could be closed, the homeowner's effort to obtain a loan modification could be rejected, and the manager could meet Bank of America's production goal for the given week or month."

e. She also observed that "Bank of America often avoided extending HAMP modifications by sending non- HAMP modifications to homeowners who had applied for a HAMP modification. These non- HAMP modifications were typically on worse terms for the homeowner than what they were eligible to receive under HAMP - but they were at higher interest rates and more profitable for Bank of America. I fielded dozens of calls from homeowners who had waited months for a HAMP modification and were confused, and often in tears, when they received a modification that appeared nothing like what they were led to expect."

22. According to the May 13, 2013 Declaration of former BOA underwriter Steven

Cupples (Exhibit 6):

a. "Bank of America retained outside vendors to manage the documents being sent to and received from borrowers applying for HAMP modifications. Urban Lending Solutions was one of the vendors tasked to receive and upload financial documents from borrowers." Mr. Cupples "quickly realized that if the loan had documents that were sent to Urban, those documents would be scattered over various links in the computer systems. The documents were present, but they often could not be viewed using a single system. An underwriter would need to know to go to other systems such as IPORTAL, LMA, LMF, or HomeSaver to review documents the borrower had sent. Most underwriters did not know that they needed to look for documents in multiple systems and often assumed documents had not been sent. As a result, many borrowers were declined loan modifications they should have received."

b. Mr. Cupples "observed that Bank of America reported to the Treasury Department and made public statements regarding the volume of loans it was successfully modifying, and the efforts it was making to catch up with the volume. Often this involved double counting loans that were in different stages of the modification process. It also involved counting loans that were entitled to modifications as having been modified - only to foreclose on those same loans later. It was well

known among Bank of America employees that the numbers Bank of America was reporting to the government and to the public were simply not true."

23.     BOA and its agents never properly hired, trained, or equipped a workforce to handle its obligation to provide HAMP modifications to the customers whose mortgages it serviced.

24.     BOA contracted with Urban Lending Solutions, ("Urban") to handle a variety of services relating to its participation in HAMP under the Agreement.

25.     Urban is a privately held company based in Pittsburgh, providing services to the mortgage industry.  On its website, Urban indicates it is an industry leader in providing "a wide variety of outsourced services to its clients including mortgage fulfillment services, home retention solutions, appraisals and valuation services, title and settlement services, document fulfillment, call center and collection services."

26.     However, the processes and procedures employed by BOA and Urban were diametrically opposed to the intent and purpose of HAMP, and Urban agreed and conspired to frustrate HAMP applicants.

27.     As part of its complex scheme to defraud the Federal Government and taxpayers, BOA folded Urban employees into its HAMP operations and gave these employees misleading BOA titles.  To the outside world of homeowners and regulators, Urban's workforce appeared indistinguishable from BOA's own employees and BOA's customers reasonably relied on Urban's employees as if they were BOA employees or agents.

28.     BOA used this workforce to solicit and direct homeowners to return documents, via FedEx to Urban.  HAMP modification applicants sent hundreds of thousands of FedEx packages to Urban.  Urban hired scores of employees to accept and scan millions of pages of original documents, including homeowner financials, to be saved on the Urban Portal.

Unfortunately for the applicants, as explained in this Complaint and declarations by former BOA employees, the Urban Portal was designed to be and became a "black hole" for all those documents.

29.     BOA's fraudulent scheme worked as intended. A January 27, 2017 Inspector General Report to Congress found BOA "[w]rongfully denying homeowners admission into HAMP" and "denied 79% of all who applied for HAMP" concluding in its report to Congress that "[t]his should be unacceptable given that Bank of America has already received about $2 billion from [the] Treasury for HAMP." **Exhibit 7.**

### U.S. Department of Justice Sues BOA for the Fraudulent HAMP Scheme

30.     Servicers, including BOA, received incentive payments to complete HAMP modifications and in March 2010, the incentive was increased to $2,000.00. Accordingly, the incentive for BOA to fraudulently report completed HAMP modifications is clear.

31.     In a lawsuit by the Federal Government against BOA in the Eastern District of New York, initiated by a whistleblower, BOA agreed to pay back $1 billion under the Federal False Claims Act. *U.S. v. Bank of America NA et al.,* case number 1:11-cv-03270, (E.D.N.Y.) The August 2014 settlement also included BOA agreeing to "pay $7 billion in relief to struggling homeowners, borrowers and communities affected by the bank's conduct."[4]

### Class Action Claims Denied in Favor of Individual Claims

32.     The Multi District Litigation case *In re Bank of America Home Affordable Modification Program (HAMP) Contract Litigation,* M.D.L. No. 10–2193–RWZ was filed in

---

[4] August 21, 2014, U.S. Justice Department News Release dated August 21, 2014. ("Justice Department News Release"), available at https://www.justice.gov/opa/pr/bank-america-pay-1665-billion-historic-justice-department settlement-financial-fraud-leading.

2011 and included class action cases from across the country. In denying class certification of

the multi-district class, the Massachusetts District Court concluded:

> This case demonstrates the vast frustration that many Americans have felt over the
> mismanagement of the HAMP modification process. Plaintiffs have plausibly
> alleged that Bank of America utterly failed to administer its HAMP modifications
> in a timely and efficient way; that in many cases it lost documents, or pretended it
> had not received them, or arbitrarily denied permanent modifications. *See* Third
> Am. Compl., ¶¶ 135–473 (describing the different experiences of each named
> plaintiff). Plaintiffs' claims may well be meritorious; but they rest on so many
> individual factual questions that they cannot sensibly be adjudicated on a
> classwide basis. Because plaintiffs have failed to meet the predominance and
> superiority requirements of Rule 23(b)(3), their motion for class certification
> (Docket # 208) is DENIED. *Goldman v. Bank of America, NA, et al.*, 2013 WL
> 4759649. **Exhibit 8.**

33.     It is now up to individual borrowers to file individual lawsuits to recover damages

resulting from the systematic fraudulent practices of BOA with regard to HAMP.

## FACTUAL ALLEGATIONS
## PLAINTIFF # 1 CHESTER TAYLOR, III

34.     Plaintiff is a citizen New Hanover County, North Carolina, residing at 330

Causeway Drive, Wrightsville Beach, North Carolina.

35.     On June 16, 2005, Plaintiff, Chester W. Taylor III, executed a mortgage and note

for his home located at 608 Spencer Farlow Drive, Carolina Beach, North Carolina, in the amount

of $196,875.00, with regular monthly payments of $1,406.14. The lender was Bank of America.

36.     Subsequently, BOA began servicing the Plaintiff's home mortgage and the loan

was assigned number: (redacted but known to BOA and available by request).

37.     After experiencing financial hardship, due in part to the state of the economy,

Plaintiffs contacted BOA by phone in February 2010 requesting a HAMP modification.

38.     Although default was imminent, at all relevant times, Plaintiff had viable and

reasonable alternatives to foreclosure including but not necessarily limited to or alternative

financing that were eliminated as a direct and proximate cause of Defendant's wrongful acts alleged in this Complaint.

<center>False Statements of Fact Concerning HAMP Eligibility by Defendant</center>

39.     On or about February 1, 2010, BOA loan representative, Michael Sanchez, advised Plaintiff by phone to refrain from making his regular mortgage payments. Michael Sanchez specifically told Plaintiff he "had to be two to three months behind" on his mortgage loan to be eligible for a HAMP modification and directed Plaintiff to refrain from making mortgage payments if he wanted to obtain a HAMP modification. Relying on Michael's statement, Plaintiff remained in default and/or stopped making regular monthly mortgage payments. Plaintiff was told to remain in default and/or to stop making regular monthly mortgage payments on more than one occasion throughout the application process. Although the Plaintiff did not know it until he contacted an attorney in December 2016, this statement was false as default was not required for HAMP eligibility. BOA loan representative, Michael Sanchez, omitted the fact that eligibility was available for HAMP to borrowers if default was reasonably foreseeable. Sanchez told Plaintiff this false information as part of BOA's scheme, as outlined above, and in an effort to prevent him from receiving a HAMP modification.

40.     BOA representative Michael Sanchez knew the statement was false when made and intentionally omitted that only imminent default was required for HAMP eligibility. The statements and omission were made to induce the Plaintiff to rely on them. The statements were specifically designed by BOA to set Plaintiff up for foreclosure, so BOA could benefit by, *inter alia*, receiving HAMP payments and acquiring the Plaintiff's home by foreclosure. Plaintiff believed he was required to be in default on his mortgage because this is what BOA employees

told him and was misled into believing that fact because the fact that only imminent default was required was intentionally omitted.

41. Relying on the false statement and omission, Plaintiff refrained from making his regular mortgage payment and fell into default status. Thereafter, Plaintiff made HAMP trial payments, as set forth elsewhere in the Complaint, but BOA used Plaintiff's default status as an excuse to refuse to apply these payments to Plaintiff's account. BOA's actions resulted in further default and foreclosure of Plaintiff's home. Plaintiff lost his home, the equity in his home and money paid as trial payments as a direct result of BOA's fraudulent statements of fact. BOA profited by retaining Plaintiff's trial payments and foreclosing on Plaintiff's home.

42. Plaintiff did not know, and could not have reasonably discovered, that these statements were false until he retained his attorneys in this matter in December 2016, nor could Plaintiff know or reasonably have discovered the orchestrated fraudulent scheme set forth in this Complaint until he retained his attorneys. Plaintiff reasonably relied on the statements of Defendant's employees that Plaintiff must be in default in order to qualify for HAMP. Plaintiff contacted Defendant repeatedly throughout this process to ensure proper compliance with HAMP's requirements, and there were no resources reasonably available to a non-attorney borrower such as Plaintiff to contradict Defendant's false statements.

**False Statements of Fact Concerning Plaintiff's HAMP Application by Defendant**

43. In March 2010, BOA provided Plaintiff a HAMP application and he properly completed the application and returned it to BOA with the requested supporting financial documents. BOA employee, Michael Sanchez, confirmed receipt of his documents via fax on May 26, 2010.

Case 3:18-cv-00288-MOC-DSC   Document 1-1   Filed 06/01/18   Page 15 of 177

44.     However, as part of BOA's fraudulent scheme, on August 6, 2010 Plaintiff was falsely informed by BOA employee Michael Sanchez, that his documents were "not current." The same or similar statements were made on subsequent phone calls with BOA employees. For example, on October 1, 2010, BOA employee Michael Sanchez falsely informed Plaintiff his documents were "incomplete." On November 7, 2010, BOA employee Lennie falsely informed Plaintiff his documents "were missing." Michael Sanchez, Lennie, and other BOA employees knew these representations were false and this practice was policy and procedure at BOA. See Exhibits 2, 3, 4, 5 and 6.

45.     These false statements were made by BOA employees, Michael Sanchez, Lennie, and others for the purpose of inducing Plaintiff to resend his modification application over and over in order to frustrate the application process.

46.     These misrepresentations were made to Plaintiff by BOA representatives Michael Sanchez, Lennie, and others, not for the purpose of processing Plaintiff's application in good faith; but instead for the specific purpose of frustrating the HAMP application process to ensure a modification was ultimately declined, resulting in foreclosure. BOA employees knew these statements were false and some employees were awarded cash incentives as well as restaurant and retail gift cards for meeting quotas for declining modification applications in a given day or week. See Exhibits 2, 3, 4, 5 and 6. In fact, Plaintiff's applications were intentionally lost within BOA's databases or destroyed in order to prevent Plaintiff from receiving a HAMP modification.

47.     Plaintiff believed these statements were true, relied on them, and as a result, unnecessarily resubmitted his application and supporting information via U. S. Mail, fax, and Federal Express more than thirty (30) times. As a direct result, Plaintiff was damaged and

suffered a loss of the costs and time spent sending and resending their HAMP application on multiple occasions when BOA had no intention of reviewing it.

48.  Plaintiff did not know, and could not have reasonably discovered, that these statements were false until he retained his attorneys in this matter in December 2016. Plaintiff reasonably relied on the statements of Defendant's employees that Plaintiff's HAMP application was not complete. Plaintiff contacted Defendant repeatedly throughout this process to ensure proper compliance with HAMP as evidenced by his repeated submission of the application, and there were no resources reasonably available to a non-attorney borrower such as Plaintiff to contradict Defendant's false statements. Michael Sanchez, Lennie, and others falsely told Plaintiff that his application was not current or missing, even though the application was proper and complete, to further the scheme to delay the HAMP modification to ultimately deny it. Defendant's subsequent false statement on March 1, 2010 that the HAMP application was approved also caused Plaintiff to believe that these submissions were incomplete.

49.  By making these misrepresentations, BOA profited by avoiding the administrative costs of a good faith processing of Plaintiff's modification application as was required under the Agreement the bank executed with the Federal Government. See Exhibit 1 at Sec. 2A. BOA further profited by denying the modification and proceeding to foreclose on Plaintiff's property.

**False Statements of Fact of Approval and Request for Trial Payments by BOA**

50.  On March 1, 2010 BOA sent Plaintiff a letter stating his application was "approved" and requested he make "trial payments" in the amount of $371.99 pursuant to the Federal Government's Home Affordable Modification Program. This was false as the application wasn't approved. Instead, BOA had no intention of approving the application and this fact was fraudulently omitted from the Plaintiffs.

51.     This false statement of fact and intentional omission was intended to cause Plaintiff to make trial payments to BOA, not for the purpose of compliance with HAMP or processing his HAMP application, but to cause Plaintiff to send trial payments so BOA could retain those funds in an unapplied account for profit after foreclosure or apply the funds to fraudulent inspection and other fees the bank charged. *See* **Exhibits 2, 3, 4, 5 and 6.**

52.   :   It was and is BOA's practice to place "trial period payments...into an **unapplied account** until" BOA made a decision on the borrowers' HAMP application. *See* July 20, 2016 Deposition of BOA Representative, Lonnie S. Mills, pursuant to Rule 1.310(b)6), *Noelia Ramirez v. Bank of America, N.A.*, Hillsborough County File No.: 16-CA-722. BOA employees fraudulently omitted this fact when requesting the Plaintiff make trial payments. .

53.     Relying on BOA's misrepresentations, Plaintiff made fourteen (14) payments of more than $371.99, in 2010 and 2011, hoping to save his home. Further, as a direct result of relying on BOA's misrepresentations and intentional omissions, on September 25, 2012, Plaintiff's home was foreclosed by BOA, NA. As a result of the foreclosure, a judgment in the amount of $117,130.00 was entered against Mr. Taylor. Plaintiff filed bankruptcy as a result of the foreclosure on October 5, 2012. Then, on December 29, 2014, Plaintiff was forced to short sale his home. Plaintiff moved out of his home in 2014.

54.     Plaintiff suffered damages in the amount of the trial payments when BOA placed those payments in an unapplied account and refused to credit his account, the loss of his home and the equity in that home, as well as damage to his credit and the loss of some or all of the funds paid to BOA for trial payments.

55.     By making these misrepresentations, BOA profited by retaining Plaintiff's trial payments for profit. BOA further profited by forcing Plaintiffs into foreclosure and avoiding the

administrative costs of a good faith processing of Plaintiff's modification application as was required under the Agreement the bank executed with the Federal Government. *See* **Exhibit 1** at Sec. 2A. BOA also profited since Plaintiff expended time and money and lost the opportunity to pursue other loss mitigation options reasonably available to Plaintiff to prevent foreclosure like alternative financing while awaiting BOA's decision on the modification application. Plaintiff's lost opportunity was a direct and proximate cause of the subsequent foreclosure from which Defendant benefited, as set forth herein.

56. Plaintiffs did not know and could not have reasonably discovered that the statements herein were false and/or that his trial payments were not applied to his account until he retained his attorneys in this matter in December 2016. Plaintiff contacted Defendant repeatedly throughout this process to ensure proper compliance with HAMP as evidenced by his repeated submission of the application and repeated contact with Defendant, and there were no resources reasonably available to a non-attorney borrower such as Plaintiff to contradict Defendant's false statements.

**Fraudulent Omission of the Application of Inspection Fees by BOA**

57. Despite the fact that Plaintiff lived in his home until 2013, BOA charged their account for a "Property Inspection" on fifteen (15) occasions from 2010 to 2012, all while he was living in the home. More specifically, he was charged for a Property Inspection fee on May 28, 2010, July 1, 2010, November 3, 2010, May 30, 2011, and various other occasions with the last fee being on March 29, 2012. These inspection fees are impermissible under the *HUD Servicing Guidelines* and are but one example of the fraudulent charges for which BOA applied to Plaintiff's account and added to the foreclosure judgment amount.

58. BOA committed common law fraud upon Plaintiff when throughout the HAMP application process BOA employees omitted the fact that the bank was conducting unnecessary and improper inspections on his home and charging his account inspection fees.

59. BOA committed common law fraud upon Plaintiff when the bank requested he make trial payments during the HAMP application and omitted the fact that it had no intention of approving the application and intended to apply some of the funds sent by Plaintiff for trial payments to fraudulent inspection fees.

60. The fraudulent omission of the bank's practice of applying trial payments to continuing inspection fees mislead the Plaintiff into believing his trial payments would be applied to his mortgage and were for the purpose of final approval of his HAMP application. BOA had a duty inform Plaintiff of this practice and intentionally refused to do so.

61. As a direct result of the omission, Plaintiff lost some of the funds sent to BOA for trial payments he believed were for final approval of his HAMP application. BOA profited by charging Plaintiff's account for the inspection fees and applying some of the trial payments received from Plaintiff and retaining those funds for profit.

62. Plaintiff did not know the inspections were taking place, nor did he know that he was being charged for these inspections. Even if Plaintiff could have known about the inspections or the charges, he did not know and could not have known that the inspections and consequent charges were not permitted and were unlawful.

63. Plaintiff did not know and could not have reasonably discovered that BOA was charging improper inspection fees and diverting a portion of his trial payments to pay those fees until he retained his attorneys in this matter in December 2016.

64.     Upon information and belief, BOA further profited by using Plaintiff's HAMP application to make false claims for incentive payments to the United State Department of Treasury in the amount of $1,000.00 or $2,000.00, effectively using Plaintiff as a pawn to defraud the Federal Government. *U.S. v. Bank of America NA et al.*, case number 1:11-cv-03270, (E.D.N.Y.).

## FACTUAL ALLEGATIONS
### PLAINTIFFS #2 RONDA & BRIAN WARLICK

65.     Plaintiffs, Ronda and Brian Warlick, are citizens of San Diego County, California, residing at 9272 Briette Place, El Cajon, California.

66.     On March 9, 2006, Plaintiffs executed a mortgage and note for their home located at 9272 Briette Place, El Cajon, California in the amount of $552,000.00 with regular monthly payments set at $3,162.50. The lender was GreenPoint Mortgage Funding, Inc.

67.     Subsequently, BOA began servicing the mortgage and the loan was assigned number: (redacted but known to BOA and available by request).

68.     After experiencing financial hardship, due in part to the state of the economy, Plaintiffs contacted BOA by phone in May 2009 requesting a HAMP modification.

69.     Although Plaintiffs were in imminent default, at all relevant times, they had viable and reasonable alternatives to foreclosure including but not necessarily limited to a short sale, deed in lieu of foreclosure, or alternative financing that were eliminated as a direct and proximate cause of Defendant's wrongful acts alleged in this Complaint.

### False Statements of Fact Concerning HAMP Eligibility by Defendant

70.     On or about May 15, 2009, a BOA loan representative advised Plaintiffs by phone to refrain from making their regular mortgage payments. This BOA representative specifically told Plaintiff being "past due" and "in default" on their mortgage loan was a prerequisite for a

HAMP modification eligibility.[5] Relying on this statement, Plaintiff remained in default and/or stopped making regular monthly mortgage payments. Plaintiff was told to remain in default and/or to stop making regular monthly mortgage payments on more than one occasion throughout the application process. Although the Plaintiffs did not know it until they contacted an attorney in January 2017, this statement was false as default was not required for HAMP eligibility. This BOA loan representative omitted the fact that eligibility was available for HAMP to borrowers if default was reasonably foreseeable. Plaintiffs were told this false information as part of BOA's scheme, as outlined above, in an effort to prevent them from receiving a HAMP modification.

71. This BOA representative knew the statement was false when made and intentionally omitted that only imminent default was required for HAMP eligibility. The statements and omissions were made to induce the Plaintiffs to rely on them. The statements were specifically designed by BOA to set Plaintiff up for foreclosure so BOA could benefit by, *inter alia*, receiving HAMP payments and acquiring the Plaintiffs' home by foreclosure. Plaintiffs believed they were required to be in default on their mortgage because this is what BOA employees told them and were misled into believing that fact because the fact that only imminent default was required was intentionally omitted.

72. Relying on the false statement and omission, Plaintiffs refrained from making their regular mortgage payment and fell into default status. Thereafter, Plaintiffs made HAMP trial payments, as set forth elsewhere in the Complaint, but BOA used Plaintiffs' default status as an excuse to refuse to apply these payments to Plaintiffs' account. BOA's actions resulted in further default and foreclosure of Plaintiffs' home. Plaintiffs lost their home, the equity in their home

---

[5] The name of this BOA employee is within the exclusive possession of the Defendant and can be specifically identified through the bank's computer programs known as SIEBEL, LAMP, Homesaver, IPORTAL and AS/400 system, which logs all calls from borrowers and identifies the BOA employee taking the call by name.

and money paid as trial payments as a direct result of BOA's fraudulent statements of fact. BOA profited by retaining Plaintiffs' trial payments and foreclosing on Plaintiffs' home.

73.     Plaintiffs did not know, and could not have reasonably discovered, that these statements were false until they retained their attorneys in this matter in January 2017 nor could. Plaintiffs know or reasonably have discovered the orchestrated fraudulent scheme set forth in this Complaint until they retained their attorneys. Plaintiffs reasonably relied on the statements of Defendant's employees that Plaintiffs must be in default in order to qualify for HAMP. Plaintiff. contacted Defendant repeatedly throughout this process to ensure proper compliance with HAMP's requirements, and there were no resources reasonably available to a non-attorney. borrower such as Plaintiffs to contradict Defendant's false statements.

## False Statements of Fact Concerning Plaintiffs' HAMP Application by Defendant

74.     On or around July 2009 BOA provided Plaintiffs a HAMP application and they properly completed the application and returned it to BOA with the requested supporting financial documents.

75.     However, as part of BOA's fraudulent scheme, on or between August 1, 2009 and June 15, 2010, Plaintiffs were falsely informed by multiple BOA employees that the documents were "not received," were "incomplete," or were "not current."[6] The same or similar statements. were made on subsequent phone calls with BOA employees. For example, On January 15, 2014 BOA employee Susan Rusater, falsely told Plaintiffs that their "tax returns were not received". This was false, as Plaintiffs had resent their tax returns on more than two (2) occasions, both of. which were received by BOA. Susan Rusater and other BOA employees knew these

---

[6] The name of this BOA employee is within the exclusive possession of the Defendant and can be specifically identified through the bank's computer programs known as SIEBEL, LAMP, Homesaver, IPORTAL and AS/400 system, which logs all calls from borrowers and identifies the BOA employee taking the call by name.

representations were false and this practice was policy and procedure at BOA. *See* **Exhibits 2, 3, 4, 5 and 6.** In fact, Plaintiffs' applications were intentionally lost within BOA's databases or destroyed in order to prevent Plaintiffs' from receiving a HAMP modification.

76.   These false statements were made by BOA employees, including Susan Rusater, and others for the purpose of inducing Plaintiffs to resend their modification application over and over in order to frustrate the application process.

77.   These misrepresentations were made to Plaintiffs by BOA representative Susan Rusater, and others, not for the purpose of processing Plaintiffs' application in good faith, but instead for the specific purpose of frustrating the HAMP application process to ensure a modification was ultimately declined, resulting in foreclosure. BOA employees knew these statements were false and some employees were awarded cash incentives as well as restaurant and retail gift cards for meeting quotas for declining modification applications in a given day or week. *See* **Exhibits 2, 3, 4, 5 and 6.** In fact, Plaintiffs' applications were intentionally lost within BOA's databases or destroyed in order to prevent Plaintiffs from receiving a HAMP modification.

78.   Plaintiffs believed these statements were true, relied on them, and as a result, unnecessarily resubmitted their application and supporting information via U. S. Mail, fax, and Federal Express more than eight (8) times. As a direct result, Plaintiffs were damaged and suffered a loss of the costs and time spent sending and resending their HAMP application on multiple occasions when BOA had no intention of reviewing it.

79.   Plaintiffs did not know, and could not have reasonably discovered, that these statements were false until they retained their attorneys in this matter in January 2017. Plaintiffs reasonably relied on the statements of Defendant's employees that Plaintiffs' HAMP application was not complete. Plaintiffs contacted Defendant repeatedly throughout this process to ensure

proper compliance with HAMP as evidenced by their repeated submission of the application, and there were no resources reasonably available to a non-attorney borrower such as Plaintiff to contradict Defendant's false statements. BOA representative Susan Rusater and others falsely told Plaintiffs that their application was not current or missing, even though the application was proper and complete, to further the scheme to delay the HAMP modification to ultimately deny it. Plaintiff continued to apply for a HAMP modification after BOA filed a Notice of Intent of Foreclosure. Defendant's subsequent false statement on October 26, 2009 that the HAMP application was approved also caused Plaintiffs to believe that these submissions were incomplete.

80.    By making these misrepresentations, BOA profited by avoiding the administrative costs of a good faith processing of Plaintiffs' modification application as was required under the Agreement the bank executed with the Federal Government. *See* **Exhibit 1** at Sec. 2A. BOA further profited by denying the modification and proceeding to foreclose on Plaintiffs' property.

**False Statements of Fact of Approval and Request for Trial Payments by BOA**

81.    On October 26, 2009, BOA sent Plaintiffs a letter stating their application was "approved" and requested they make "trial payments" in the amount of $2,283.67 pursuant to the Federal Government's Home Affordable Modification Program. This was false as the application wasn't approved. Instead, BOA had no intention of approving the application and this fact was fraudulently omitted from the Plaintiffs.

82.    This false statement of fact and intentional omission was intended to cause Plaintiffs to make trial payments to BOA, not for the purpose of compliance with HAMP or processing their HAMP application, but to cause Plaintiffs to send trial payments so BOA could

retain those funds in an unapplied account for profit after foreclosure or apply the funds to fraudulent inspection and other fees the bank charged. *See* **Exhibits 2, 3, 4, 5 and 6.**

83. It was and is BOA's practice to place "trial period payments....into an **unapplied account** until" BOA made a decision on the borrowers' HAMP application. See July 20, 2016 Deposition of BOA Representative, Lonnie S. Mills, pursuant to Rule 1.310(b)6), *Noelia Ramirez v. Bank of America, N.A.*, Hillsborough County File No.: 16-CA-722. BOA employees fraudulently omitted this fact when requesting the Plaintiffs make trial payments.

84. Relying on BOA's misrepresentations, Plaintiffs made nine (9) payments of than $2,283.67, in 2009 and 2010, hoping to save their home. Further, as a direct result of relying on BOA's misrepresentations and intentional omissions, on September 2, 2011, Plaintiffs received a Notice of Foreclosure from Recontrust on behalf of BOA. As a result, and as to avoid losing the home to foreclosure, Plaintiffs filed bankruptcy on September 21, 2011.

85. Plaintiffs reapplied for a HAMP modification two more times in 2011 and 2014, but BOA denied Plaintiffs' applications.

86. Plaintiffs suffered damages in the amount of the trial payments when BOA placed those payments in an unapplied account and refused to credit their account, filing bankruptcy to avoid losing their home and the equity in that home, as well as damage to their credit and the loss of some or all of the funds paid to BOA for trial payments.

87. By making these misrepresentations, BOA profited by retaining Plaintiffs' trial payments for profit. BOA further profited by forcing Plaintiffs into foreclosure and bankruptcy and avoiding the administrative costs of a good faith processing of Plaintiffs' modification application as was required under the Agreement the bank executed with the Federal Government. *See* **Exhibit 1** at Sec. 2A. BOA also profited since Plaintiffs expended time and money and lost

the opportunity to pursue other loss mitigation options reasonably available to Plaintiffs to prevent foreclosure, or alternative financing while awaiting BOA's decision on the modification application. Plaintiffs lost opportunity was a direct and proximate cause of the subsequent notice foreclosure from which Defendant benefited, as set forth herein.

88. Plaintiffs did not know and could not have reasonably discovered that the statements herein were false and/or that their payments were not applied to their account until they retained their attorneys in this matter in January 2017. Plaintiffs contacted Defendant repeatedly throughout this process to ensure proper compliance with HAMP as evidenced by his repeated submission of the application and repeated contact with Defendant, including reapplying for a HAMP modification in 2011 and 2014, and there were no resources reasonably available to a non-attorney borrower such as Plaintiff to contradict Defendant's false statements.

**Fraudulent Omission of the Application of Inspection Fees by BOA**

89. Despite the fact that Plaintiffs continue to live their home, BOA charged their account for a "Property Inspection" on nine (9) occasions from 2010 to 2014, all while they were living in the home. More specifically, they were charged for a Property Inspection fee on February 25, 2010, May 3, 2010, May 24, 2010, and December 25, 2010, and various other occasions with the last fee being on April 1, 2014. These inspection fees are impermissible under the *HUD Servicing Guidelines* and are but one example of the fraudulent charges for which BOA applied to Plaintiffs' account and added to the foreclosure judgment amount.

90. BOA committed common law fraud upon Plaintiffs when throughout the HAMP application process BOA employees omitted the fact that the bank was conducting unnecessary and improper inspections on their home and charging their account inspection fees.

91. BOA committed common law fraud upon Plaintiffs when the bank requested they make trial payments during the HAMP application and omitted the fact that it had no intention of approving the application and intended to apply some of the funds sent by Plaintiff for trial payments to fraudulent inspection fees.

92. The fraudulent omission of the bank's practice of applying trial payments to continuing inspection fees mislead the Plaintiffs into believing their trial payments would be applied to their mortgage and were for the purpose of final approval of their HAMP application. BOA had a duty inform Plaintiffs of their practice and intentionally refused to do so.

93. As a direct result of the omission, Plaintiffs lost some of the funds sent to BOA for trial payments they believed were for final approval of their HAMP application. BOA profited by charging Plaintiffs' account for the inspection fees and applying some of the trial payments received from Plaintiffs and retaining those funds for profit.

94. Plaintiffs did not know the inspections were taking place, nor did they know that they were being charged for these inspections. Even if Plaintiffs could have known about the inspections or the charges, they did not know and could not have known that the inspections and consequent charges were not permitted and were unlawful.

95. Plaintiffs did not know and could not have reasonably discovered that BOA was charging improper inspection fees and diverting a portion of their trial payments to pay those fees until they retained their attorneys in this matter in January 2017.

96. Upon information and belief, BOA further profited by using Plaintiffs' HAMP application to make false claims for incentive payments to the United State Department of Treasury in the amount of $1,000.00 or $2,000.00, effectively using Plaintiffs as a pawn to

defraud the Federal Government. *U.S. v. Bank of America NA et al.,* case number 1:11-cv-03270, (E.D.N.Y.).

### FACTUAL ALLEGATIONS
### PLAINTIFF # 3 LORI MENDEZ

97.    Plaintiff is a citizen Kern County, California, residing at 11603 Darlington Avenue, Bakersfield, California.

98.    On August 1, 2005, Plaintiff Lori Mendez, executed a mortgage and note for her home located at 1603 Darlington Avenue, Bakersfield, California in the amount of $320,000.00 with regular monthly payments of $2,363.09. The lender was Countrywide Home Loans.

99.    Subsequently, BOA began servicing the Plaintiff's home mortgage and the loan was assigned a loan number: (redacted but known to BOA and available by request).

100.    After experiencing financial hardship, due in part to the state of the economy, Plaintiff contacted BOA by phone on or about August 3, 2009 requesting a HAMP modification.

101.    Although Plaintiff was in imminent default, at all relevant times, she had viable and reasonable alternatives to foreclosure including alternative financing that were eliminated as a direct and proximate cause of Defendant's wrongful acts alleged in this Complaint.

### False Statements of Fact Concerning Plaintiff's HAMP Application by Defendant

102.    On or about August 3, 2009, BOA provided Plaintiff a HAMP application and she properly completed the application and returned it to BOA with the requested supporting financial documents.

103.    However, as part of BOA's fraudulent scheme, on or about March 3, 2010, Plaintiff was falsely informed by BOA employee, Justin Rich, that her documents were "not current", "not received", or were "incomplete." The same or similar statements were made on

107. Plaintiff did not know, and could not have reasonably discovered, that these statements were false until she retained her attorneys in this matter in February 2017. Plaintiff reasonably relied on the statements of Defendant's employees that Plaintiff's HAMP application was not complete. Plaintiff contacted Defendant repeatedly throughout this process to ensure proper compliance with HAMP as evidenced by her repeated submission of the application, and there were no resources reasonably available to a non-attorney borrower such as Plaintiff to contradict Defendant's false statements. Justin Rich, Michael Barlow, Lupe, Charlene, and others falsely told Plaintiff that her application was not current or missing, even though the application was proper and complete, to further the scheme to delay the HAMP modification to ultimately deny it. Defendant's subsequent false statement in December 2009 that the HAMP application was approved also caused Plaintiff to believe that these submissions were incomplete.

108. By making these misrepresentations, BOA profited by avoiding the administrative costs of a good faith processing of Plaintiff's modification application as was required under the Agreement the bank executed with the Federal Government. *See* **Exhibit 1** at Sec. 2A. BOA further profited by denying the modification and proceeding to foreclose on Plaintiff's property.

**False Statements of Fact of Approval and Request for Trial Payments by BOA**

109. On December 2009, BOA sent Plaintiff a letter stating her application was "approved" and requested she make "trial payments" in the amount of $1,568.73 pursuant to the Federal Government's Home Affordable Modification Program. This was false as the application wasn't approved. Instead, BOA had no intention of approving the application and this fact was fraudulently omitted from the Plaintiff.

110. This false statement of fact and intentional omission was intended to cause Plaintiff to make trial payments to BOA, not for the purpose of compliance with HAMP or

processing his HAMP application, but to cause Plaintiff to send trial payments so BOA could retain those funds in an unapplied account for profit after foreclosure or apply the funds to fraudulent inspection and other fees the bank charged. *See* **Exhibits 2, 3, 4, 5 and 6.**

111. On December 31, 2009, Plaintiff spoke with BOA loan representative Cynthia, and scheduled electronic payments for the HAMP "trial payment" amounts. Cynthia provided Claimant confirmation numbers for each four months of "trial payments."

112. It was and is BOA's practice to place "trial period payments....into an **unapplied account** until" BOA made a decision on the borrowers' HAMP application. See July 20, 2016 Deposition of BOA Representative, Lonnie S. Mills, pursuant to Rule 1.310(b)6), *Noelia Ramirez v. Bank of America, N.A.*, Hillsborough County File No.: 16-CA-722. BOA employees fraudulently omitted this fact when requesting the Plaintiffs make trial payments.

113. Relying on BOA's misrepresentations, Plaintiff made eight (8) payments of more than $1,568.73 in 2009 and 2010, hoping to save her home.

114. Despite timely making her trial payments, BOA denied Plaintiff's HAMP modification in May 2010, falsely stating "you did not make all of the required payments." This was false, as BOA representative "Cynthia" had confirmed her timely TPP payments. Subsequently, Plaintiff reapplied for a HAMP modification two more times. Despite her efforts, BOA refused to respond to Ms. Mendez concerning her HAMP application.

115. Further, as a direct result of relying on BOA's misrepresentations and intentional omissions, on November 7, 2011, Plaintiff received a Notice of Intent to Accelerate her mortgage from BOA. On August 22, 2012, to avoid foreclosure, Ms. Mendez conducted a short sale of her home in the amount of $212,000.00. Ms. Mendez moved out of her home in 2012.

116. Plaintiff suffered damages in the amount of the trial payments when BOA placed those payments in an unapplied account and refused to credit her account, the loss of her home and the equity in that home, as well as damage to her credit and the loss of some or all of the funds paid to BOA for trial payments.

117. By making these misrepresentations, BOA profited by retaining Plaintiff's trial payments for profit. BOA further profited by forcing Plaintiffs into foreclosure and short sale and avoiding the administrative costs of a good faith processing of Plaintiff's modification application as was required under the Agreement the bank executed with the Federal Government. *See* **Exhibit 1** at Sec. 2A. BOA also profited since Plaintiff expended time and money and lost the opportunity to pursue other loss mitigation options reasonably available to Plaintiff to prevent foreclosure like, alternative financing while awaiting BOA's decision on the modification application. Plaintiff's lost opportunity was a direct and proximate cause of the subsequent foreclosure from which Defendant benefited, as set forth herein.

118. Plaintiff did not know and could not have reasonably discovered that the statements herein were false and/or that her trial payments were not applied to her account until she retained her attorneys in this matter in February 2017. Plaintiff contacted Defendant repeatedly throughout this process to ensure proper compliance with HAMP as evidenced by her repeated submission of the application and repeated contact with Defendant, and there were no resources reasonably available to a non-attorney borrower such as Plaintiff to contradict Defendant's false statements.

**Fraudulent Omission of the Application of Inspection Fees by BOA**

119. Despite the fact that Plaintiff lived in her home until 2012, BOA charged her account for a "Property Inspection" on five (5) occasions from 2011 to 2012, all while she was

living in the home. More specifically, she was charged for a Property Inspection fee on October 27, 2010, November 25, 2011, January 5, 2012, April 2, 2012, and May 13, 2012. These inspection fees are impermissible under the *HUD Servicing Guidelines* and are but one example of the fraudulent charges for which BOA applied to Plaintiff's account and added to the foreclosure judgment amount.

120. BOA committed common law fraud upon Plaintiff when throughout the HAMP application process BOA employees omitted the fact that the bank was conducting unnecessary and improper inspections on his home and charging her account inspection fees.

121. BOA committed common law fraud upon Plaintiff when the bank requested she make trial payments during the HAMP application and omitted the fact that it had no intention of approving the application and intended to apply some of the funds sent by Plaintiff for trial payments to fraudulent inspection fees.

122. The fraudulent omission of BOA's practice of applying trial payments to continuing inspection fees mislead the Plaintiff into believing her trial payments would be applied to her mortgage and were for the purpose of final approval of her HAMP application. BOA had a duty inform Plaintiff of this practice and intentionally refused to do so.

123. As a direct result of the omission, Plaintiff lost some of the funds sent to BOA for trial payments she believed were for final approval of her HAMP application. BOA profited by charging Plaintiff's account for the inspection fees and applying some of the trial payments received from Plaintiff and retaining those funds for profit.

124. Plaintiff did not know the inspections were taking place, nor did she know that she was being charged for these inspections. Even if Plaintiff could have known about the inspections

or the charges, she did not know and could not have known that the inspections and consequent charges were not permitted and were unlawful.

125. Plaintiff did not know and could not have reasonably discovered that BOA was charging improper inspection fees and diverting a portion of her trial payments to pay those fees until she retained her attorneys in this matter in February 2017.

126. Upon information and belief, BOA further profited by using Plaintiff's HAMP application to make false claims for incentive payments to the United State Department of Treasury in the amount of $1,000.00 or $2,000.00, effectively using Plaintiff as a pawn to defraud the Federal Government. *U.S. .v. Bank of America NA et al.,* case number 1:11-cv-03270, (E.D.N.Y.).

## FACTUAL ALLEGATIONS
## PLAINTIFF # 4 LORI MARTINEZ

127. Plaintiff, Lori Martinez is a citizen of Riverside County, California, residing at 37185 Wakefield Street, Indio, California.

128. On April 24, 2000, Plaintiff executed a mortgage and note for her home located at 68680 Senora Road, Cathedral City, California. Plaintiff subsequently refinanced the property on February 29, 2008, in the amount of $195,000.00, with regular monthly payments set at $1,329.94. The lender was Countrywide Home Loans, Inc.

129. Subsequently, BOA began servicing the Plaintiff's home mortgage and the loan was assigned number: (redacted but known to BOA and available by request).

130. After experiencing financial hardship, due in part to the state of the economy, Plaintiff contacted BOA by phone in July 7, 2009 requesting a HAMP modification.

131. Although Plaintiff was in imminent default, at all relevant times, she had viable and reasonable alternatives to foreclosure including but not necessarily limited to alternative

financing that were eliminated as a direct and proximate cause of Defendant's wrongful acts alleged in this Complaint.

### False Statements of Fact Concerning HAMP Eligibility by Defendant

132. On or about July 7, 2009, a BOA loan representative advised and directed Plaintiff by phone to refrain from making her regular mortgage payments. The BOA loan representative specifically told Plaintiff being past due and in default was a prerequisite for a HAMP modification. This BOA loan representative specifically told Plaintiff "[she] had to be late" on her mortgage loan to be eligible for a HAMP modification. [7] Relying on this statement, Plaintiff remained in default and/or stopped making regular monthly mortgage payments. Plaintiff was told to remain in default and/or to stop making regular monthly mortgage payments on more than one occasion throughout the application process. Although the Plaintiff did not know it until she contacted an attorney in December 2016, this statement was false as default was not required for HAMP eligibility. This BOA loan representative omitted the fact that eligibility was available for HAMP to borrowers if default was reasonably foreseeable. Plaintiff was told this false information as part of BOA's scheme, as outlined above, in an effort to prevent them from receiving a HAMP modification.

133. This BOA representative knew the statement was false when made and intentionally omitted that only imminent default was required for HAMP eligibility. The statement and omission was made to induce the Plaintiff to rely on them. The statements were specifically designed by BOA to set Plaintiff up for foreclosure so BOA could benefit by, *inter alia*, receiving HAMP payments and acquiring the Plaintiff's home by foreclosure. Plaintiff

---

[7] The name of this BOA employee is within the exclusive possession of the Defendant and can be specifically identified through the bank's computer programs known as SIEBEL, LAMP, Homesaver, IPORTAL and AS/400 system, which logs all calls from borrowers and identifies the BOA employee taking the call by name.

believed she was required to be in default on her mortgage because this is what BOA employees told her and was misled into believing that fact because the fact that only imminent default was required was intentionally omitted.

134. Relying on the false statement and omission, Plaintiff refrained from making her regular mortgage payment and fell into default status. Thereafter, Plaintiff made HAMP trial payments, as set forth elsewhere in the Complaint, but BOA used Plaintiff's default status as an excuse to refuse to apply these payments to Plaintiff's account. BOA's actions resulted in further default and foreclosure of Plaintiff's home. Plaintiff lost her home, the equity in her home and money paid as trial payments as a direct result of BOA's fraudulent statements of fact. BOA profited by retaining Plaintiff's trial payments and foreclosing on Plaintiff's home.

135. Plaintiff did not know, and could not have reasonably discovered, that these statements were false until she retained her attorneys in this matter in December 2016, nor could Plaintiff know or reasonably have discovered the orchestrated fraudulent scheme set forth in this Complaint until she retained her attorneys. Plaintiff reasonably relied on the statements of Defendant's employees that Plaintiff must be in default in order to qualify for HAMP. Plaintiff contacted Defendant repeatedly throughout this process to ensure proper compliance with HAMP's requirements, and there were no resources reasonably available to a non-attorney borrower such as Plaintiff to contradict Defendant's false statements.

**False Statements of Fact Concerning Plaintiff's HAMP Application by Defendant**

136. Subsequently, BOA provided Plaintiff a HAMP application and she properly completed the application and returned it to BOA with the requested supporting financial documents on or around August 11, 2009.

Case 3:18-cv-00288-MOC-DSC   Document 1-1   Filed 06/01/18   Page 36 of 177

137. However, as part of BOA's fraudulent scheme, once the application was submitted, on or about November 30, 2009 Plaintiff received a letter from BOA employee "Ken Scheller" falsely stating the "documents have been sent to us with missing or incorrect information" and requested she resubmit the documents Plaintiff had previously provided in August 2009. The same or similar statements were made on subsequent phone calls with BOA employees Ken and Jamall, that Plaintiff's documents were "incomplete", "missing" or "stale." Ken, Jamall, and other BOA employees knew these representations were false and this practice was policy and procedure at BOA. *See* **Exhibits 2, 3, 4, 5 and 6.**

138. These false statements were made by BOA employees, Ken, Jamall, and others for the purpose of inducing Plaintiff to resend her modification application over and over in order to frustrate the application process.

139. These misrepresentations were made to Plaintiff by BOA representatives Michael Sanchez, Lennie, and others, not for the purpose of processing Plaintiff's application in good faith, but instead for the specific purpose of frustrating the HAMP application process to ensure a modification was ultimately declined, resulting in foreclosure. BOA employees knew these statements were false and some employees were awarded cash incentives as well as restaurant and retail gift cards for meeting quotas for declining modification applications in a given day or week. *See* **Exhibits 2, 3, 4, 5 and 6.** In fact, Plaintiff's applications were intentionally lost within BOA's databases or destroyed in order to prevent Plaintiff from receiving a HAMP modification.

140. Plaintiff believed these statements were true, relied on them, and as a result, unnecessarily resubmitted their application and supporting information via U. S. Mail, fax, and Federal Express more than eight (8) times. As a direct result, Plaintiff was damaged and suffered

a loss of the costs and time spent sending and resending their HAMP application on multiple occasions when BOA had no intention of reviewing it.

141.    Plaintiff did not know, and could not have reasonably discovered, that these statements were false until she retained her attorneys in this matter in December 2016. Plaintiff reasonably relied on the statements of Defendant's employees that Plaintiff's HAMP application was not complete.  Plaintiff contacted Defendant repeatedly throughout this process to ensure proper compliance with HAMP as evidenced by her repeated submission of the application, and there were no resources reasonably available to a non-attorney borrower such as Plaintiff to contradict Defendant's false statements.  Ken, Jamall, and others falsely told Plaintiff that her application was not current or missing, even though the application was proper and complete, to further the scheme to delay the HAMP modification to ultimately deny it.  Defendant's subsequent false statement on September 1, 2009 that the HAMP application was approved also caused Plaintiff to believe that these submissions were incomplete.

142.    By making these misrepresentations, BOA profited by avoiding the administrative costs of a good faith processing of Plaintiff's modification application as was required under the Agreement the bank executed with the Federal Government. *See* **Exhibit 1** at Sec. 2A.  BOA further profited by denying the modification and proceeding to foreclose on Plaintiff's property.

**False Statements of Fact of Approval and Request for Trial Payments by BOA**

143.    On or about September 1, 2009, BOA sent Plaintiff a letter stating her application was "approved" and requested she make "trial payments" in the amount of $930.00 pursuant to the Federal Government's Home Affordable Modification Program.  This was false as the application wasn't approved. Instead, BOA had no intention of approving the application and this fact was fraudulently omitted from the Plaintiffs.

144. This false statement of fact and intentional omission was intended to cause Plaintiff to make trial payments to BOA, not for the purpose of compliance with HAMP or processing her HAMP application, but to cause Plaintiff to send trial payments so BOA could retain those funds in an unapplied account for profit after foreclosure or apply the funds to fraudulent inspection and other fees the bank charged. *See* **Exhibits 2, 3, 4, 5 and 6.**

145. It was and is BOA's practice to place "trial period payments....into an **unapplied account** until" BOA made a decision on the borrowers' HAMP application. See July 20, 2016. Deposition of BOA Representative, Lonnie S. Mills, pursuant to Rule 1.310(b)6), *Noelia Ramirez v. Bank of America, N.A.*, Hillsborough County File No.: 16-CA-722. BOA employees fraudulently omitted this fact when requesting the Plaintiffs make trial payments.

146. Relying on BOA's misrepresentations, Plaintiff made at least ten (10) payments of $930.00 from 2009 through 2011, hoping to save her home.

147. On September 23, 2010, BOA employee "Jamall" told Plaintiff that her modification was still "under review" and requested the documentation which Plaintiff had previously submitted. Relying on this misrepresentation, Plaintiff again resubmitted the documentation to BOA as requested, as it was the same documentation she had previously provided.

148. Further, as a direct result of relying on BOA's misrepresentations and intentional omissions, on August 4, 2011, Plaintiff's home was foreclosed by BOA, NA. As a result of the foreclosure, a judgment in the amount of $159,000.00 was entered against Plaintiff. Plaintiff moved out of her home in 2011.

149. Plaintiff suffered damages in the amount of the trial payments when BOA placed those payments in an unapplied account and refused to credit her account, the loss of her home

and the equity in that home, as well as damage to her credit and the loss of some or all of the funds paid to BOA for trial payments.

150. By making these misrepresentations, BOA profited by retaining Plaintiff's trial payments for profit. BOA further profited by forcing Plaintiff into foreclosure and avoiding the administrative costs of a good faith processing of Plaintiff's modification application as was required under the Agreement the bank executed with the Federal Government. *See* **Exhibit 1** at Sec. 2A. BOA also profited since Plaintiff expended time and money and lost the opportunity to pursue other loss mitigation options reasonably available to Plaintiff to prevent foreclosure, like alternative financing, while awaiting BOA's decision on the modification application. Plaintiff's lost opportunity was a direct and proximate cause of the subsequent foreclosure from which Defendant benefited, as set forth herein.

151. Plaintiffs did not know and could not have reasonably discovered that the statements herein were false and/or that her trial payments were not applied to her account until she retained her attorneys in this matter in December 2016. Plaintiff contacted Defendant repeatedly throughout this process to ensure proper compliance with HAMP as evidenced by her repeated submission of the application and repeated contact with Defendant, and there were no resources reasonably available to a non-attorney borrower such as Plaintiff to contradict Defendant's false statements.

**Fraudulent Omission of the Application of Inspection Fees by BOA**

152. Despite the fact that Plaintiff lived in her home until 2011, BOA charged her account for a "Property Inspection" on eight (8) occasions from 2010 to 2011, all while she was living in the home. she was charged for Property Inspection fees beginning on October 27, 2010 through June 8, 2011. These inspection fees are impermissible under the *HUD Servicing*

*Guidelines* and are but one example of the fraudulent charges for which BOA applied to Plaintiff's account and added to the foreclosure judgment amount.

153. BOA committed common law fraud upon Plaintiff when throughout the HAMP application process BOA employees omitted the fact that the bank was conducting unnecessary and improper inspections on her home and charging her account inspection fees.

154. BOA committed common law fraud upon Plaintiff when the bank requested she make trial payments during the HAMP application and omitted the fact that it had no intention of approving the application and intended to apply some of the funds sent by Plaintiff for trial payments to fraudulent inspection fees.

155. The fraudulent omission of the bank's practice of applying trial payments to continuing inspection fees mislead the Plaintiff into believing her trial payments would be applied to her mortgage and were for the purpose of final approval of her HAMP application. BOA had a duty inform Plaintiff of this practice and intentionally refused to do so.

156. As a direct result of the omission, Plaintiff lost some of the funds sent to BOA for trial payments she believed were for final approval of her HAMP application. BOA profited by charging Plaintiff's account for the inspection fees and applying some of the trial payments received from Plaintiff and retaining those funds for profit.

157. Plaintiff did not know the inspections were taking place, nor did she know that she was being charged for these inspections. Even if Plaintiff could have known about the inspections or the charges, she did not know and could not have known that the inspections and consequent charges were not permitted and were unlawful.

158.     Plaintiff did not know and could not have reasonably discovered that BOA was charging improper inspection fees and diverting a portion of her trial payments to pay those fees until she retained her attorneys in this matter in December 2016.

159.     Upon information and belief, BOA further profited by using Plaintiff's HAMP application to make false claims for incentive payments to the United State Department of Treasury in the amount of $1,000.00 or $2,000.00, effectively using Plaintiff as a pawn to defraud the Federal Government. *U.S. v. Bank of America NA et al.*, case number 1:11-cv-03270, (E.D.N.Y.).

## FACTUAL ALLEGATIONS
## PLAINTIFFS # 5 JEANETTE and ANDREW ALESHIRE

160.     Plaintiffs, Jeanette and Andrew Aleshire, are citizens of citizen of Polk County, Wisconsin, residing at 1704 300th Avenue, Frederic, Wisconsin.

161.     On June 17, 2004 Plaintiffs executed a mortgage and note for their home located at 8667 Meadown Lane, Pine City, Minnesota, in the amount of $162,578.00.    Plaintiffs subsequently refinanced their mortgage on August 4, 2005 with Summit Mortgage Corporation.

162.     Subsequently, BOA began servicing the Plaintiffs' home mortgage and the loan was assigned number 2655140000.

163.     After experiencing financial hardship, due in part to the state of the economy, Plaintiffs contacted BOA by phone on September 9, 2009 requesting a HAMP modification.

164.     Although Plaintiffs were in imminent default, at all relevant times, they had viable and reasonable alternatives to foreclosure including but not necessarily limited to alternative financing that were eliminated as a direct and proximate cause of Defendant's wrongful acts alleged in this Complaint.

### False Statements of Fact Concerning HAMP Eligibility by Defendant

165.    On or about March 18, 2009, a BOA loan representative advised and directed Plaintiff by phone to refrain from making their regular mortgage payments. This BOA representative specifically told Plaintiffs, "stop making your mortgage payment for three months in order to be approved for a HAMP modification.".[8] Relying on this statement, Plaintiffs remained in default and/or stopped making regular monthly mortgage payments. Plaintiffs were told to remain in default and/or to stop making regular monthly mortgage payments on more than one occasion throughout the application process. Although the Plaintiffs did not know it until they contacted an attorney in January 2017, this statement was false as default was not required for HAMP eligibility. BOA loan representatives omitted the fact that eligibility was available for HAMP to borrowers if default was reasonably foreseeable. Plaintiffs were told this false information as part of BOA's scheme, as outlined above, in an effort to prevent them from receiving a HAMP modification.

166.    BOA representatives knew the statement was false when made and intentionally omitted that only imminent default was required for HAMP eligibility. The statement and omission was made to induce the Plaintiffs to rely on them. The statements were specifically designed by BOA to set Plaintiffs up for foreclosure so BOA could benefit by, *inter alia*, receiving HAMP payments and acquiring the Plaintiffs' home by foreclosure. Plaintiffs believed they were required to be in default on their mortgage because this is what BOA employees told them and was misled into believing that fact because the fact that only imminent default was required was intentionally omitted.

---

[8] The name of this BOA employee is within the exclusive possession of the Defendant and can be specifically identified through the bank's computer programs known as SIEBEL, LAMP, Homesaver, IPORTAL and AS/400 system, which logs all calls from borrowers and identifies the BOA employee taking the call by name.

167. Relying on the false statement and omission, Plaintiffs refrained from making their regular mortgage payment and fell into default status. Thereafter, Plaintiffs made HAMP trial payments, as set forth elsewhere in the Complaint, but BOA used Plaintiffs' default status as an excuse to refuse to apply these payments to Plaintiffs' account. BOA's actions resulted in further default and foreclosure of Plaintiffs' home. Plaintiffs lost their home, the equity in their home and money paid as trial payments as a direct result of BOA's fraudulent statements of fact. BOA profited by retaining Plaintiffs' trial payments and foreclosing on Plaintiffs' home.

168. Plaintiffs did not know, and could not have reasonably discovered, that these statements were false until they retained their attorneys in this matter in January 2017, nor could Plaintiffs know or reasonably have discovered the orchestrated fraudulent scheme set forth in this Complaint until they retained their attorneys. Plaintiffs reasonably relied on the statements of Defendant's employees that Plaintiffs must be in default in order to qualify for HAMP. Plaintiffs contacted Defendant repeatedly throughout this process to ensure proper compliance with HAMP's requirements, and there were no resources reasonably available to a non-attorney borrower such as Plaintiffs to contradict Defendant's false statements.

**False Statements of Fact Concerning Plaintiffs' HAMP Application by Defendant**

169. On or around March 2009, BOA provided Plaintiffs a HAMP application and they properly completed the application and returned it to BOA with the requested supporting financial documents.

170. However, as part of BOA's fraudulent scheme, on November 23, 2009 Plaintiff was falsely informed by BOA employees, over the phone, that the documents were "not received" or were "not current." The same or similar statements were made on subsequent phone calls with BOA employees. Then, on or about March 17, 2010, BOA employee Kristy Grisham again

falsely informed Plaintiffs that their documents were "incomplete" and that BOA had had no contact with Plaintiffs since December 22, 2009. This was false, as Plaintiffs had spoken with BOA employee "Maggie" on February 25, 2009 who had falsely informed them their documents were "incomplete." Kristy Grisham, Maggie, and other BOA employees knew these representations were false and this practice was policy and procedure at BOA. *See* **Exhibits 2, 3, 4, 5 and 6.** In fact, Plaintiffs' applications were intentionally lost within BOA's databases or destroyed in order to prevent Plaintiffs' from receiving a HAMP modification.

171.   These false statements were made by BOA employees, Kristy Grisham, Maggie, and others for the purpose of inducing Plaintiffs to resend their modification application over and over in order to frustrate the application process.

172.   These misrepresentations were made to Plaintiffs by BOA representatives Kristy Grisham, Maggie, and others, not for the purpose of processing Plaintiffs' application in good faith, but instead for the specific purpose of frustrating the HAMP application process to ensure a modification was ultimately declined, resulting in foreclosure. BOA employees knew these statements were false and some employees were awarded cash incentives as well as restaurant and retail gift cards for meeting quotas for declining modification applications in a given day or week. *See* **Exhibits 2, 3, 4, 5 and 6.** In fact, Plaintiffs' applications were intentionally lost within BOA's databases or destroyed in order to prevent Plaintiffs from receiving a HAMP modification.

173.   Plaintiffs believed these statements were true, relied on them, and as a result, unnecessarily resubmitted their application and supporting information via U. S. Mail, fax, and Federal Express more than three (3) times. As a direct result, Plaintiffs were damaged and suffered a loss of the costs and time spent sending and resending their HAMP application on multiple occasions when BOA had no intention of reviewing it.

174. Plaintiffs did not know, and could not have reasonably discovered, that these statements were false until they retained their attorneys in this matter in January 2017. Plaintiffs reasonably relied on the statements of Defendant's employees that Plaintiff's HAMP application was not complete. Plaintiffs contacted Defendant repeatedly throughout this process to ensure proper compliance with HAMP as evidenced by their repeated submission of the application, and there were no resources reasonably available to a non-attorney borrower such as Plaintiff to contradict Defendant's false statements... Kristy Grisham, Maggie, and others falsely told Plaintiffs that their application was not current or missing, even though the application was proper and complete, to further the scheme to delay the HAMP modification to ultimately deny it. Defendant's subsequent false statement on December 11, 2009 that the HAMP application was approved also caused Plaintiffs to believe that these submissions were incomplete.

175. By making these misrepresentations, BOA profited by avoiding the administrative costs of a good faith processing of Plaintiffs' modification application as was required under the Agreement the bank executed with the Federal Government. *See* **Exhibit 1** at Sec. 2A. BOA further profited by denying the modification and proceeding to foreclose on Plaintiffs' property.

**False Statements of Fact of Approval and Request for Trial Payments by BOA**

176. On December 11, 2009, BOA sent Plaintiffs a letter stating their application was "approved" and requested they make "trial payments" in the amount of $766.01 pursuant to the Federal Government's Home Affordable Modification Program. This was false as the application wasn't approved. Instead, BOA had no intention of approving the application and this fact was fraudulently omitted from the Plaintiffs.

177. This false statement of fact and intentional omission was intended to cause Plaintiffs to make trial payments to BOA, not for the purpose of compliance with HAMP or

processing their HAMP application, but to cause Plaintiffs to send trial payments so BOA could retain those funds in an unapplied account for profit after foreclosure or apply the funds to fraudulent inspection and other fees the bank charged. *See* **Exhibits 2, 3, 4, 5 and 6.**

178.   It was and is BOA's practice to place "trial period payments....into an **unapplied account** until" BOA made a decision on the borrowers' HAMP application. See July 20, 2016 Deposition of BOA Representative, Lonnie S. Mills, pursuant to Rule 1.310(b)6), *Noelia Ramirez v. Bank of America, N.A.*, Hillsborough County File No.: 16-CA-722. BOA employees fraudulently omitted this fact when requesting the Plaintiffs make trial payments.

179.   Relying on BOA's misrepresentations, Plaintiffs made seven (7) payments of more than $766.01 in 2009 and 2010, hoping to save their home. Further, as a direct result of relying on BOA's misrepresentations and intentional omissions, on August 31, 2011, Plaintiffs' home was foreclosed by BOA. As a result of the foreclosure, a judgment in the amount of $217,082.08 was entered against Plaintiffs, $33,082.08 more than their original mortgage. Plaintiffs moved out of their home in July 2012.

180.   Plaintiffs suffered damages in the amount of the trial payments when BOA placed those payments in an unapplied account and refused to credit their account, the loss of their home and the equity in that home, as well as damage to their credit and the loss of some or all of the funds paid to BOA for trial payments.

181.   By making these misrepresentations, BOA profited by retaining Plaintiffs' trial payments for profit. BOA further profited by forcing Plaintiffs into foreclosure and avoiding the administrative costs of a good faith processing of Plaintiffs' modification application as was required under the Agreement the bank executed with the Federal Government. *See* **Exhibit 1** at Sec. 2A. BOA also profited since Plaintiffs expended time and money and lost the opportunity

to pursue other loss mitigation options reasonably available to Plaintiff to prevent foreclosure, like alternative financing, while awaiting BOA's decision on the modification application. Plaintiffs' lost opportunity was a direct and proximate cause of the subsequent foreclosure from which Defendant benefited, as set forth herein.

182. Plaintiffs did not know and could not have reasonably discovered that the statements herein were false and/or that their trial payments were not applied to their account until they retained their attorneys in this matter in January. 2017. Plaintiff contacted Defendant repeatedly throughout this process to ensure proper compliance with HAMP as evidenced by their repeated submission of the application and repeated contact with Defendant, and there were no resources reasonably available to a non-attorney borrower such as Plaintiffs to contradict Defendant's false statements.

**Fraudulent Omission of the Application of Inspection Fees by BOA**

183. Despite the fact that Plaintiff lived in his home until 2012, BOA charged their account for a "Property Inspection" on thirty-five (35) occasions from 2010 to 2011, all while they were living in the home. More specifically, they were charged $15.00 and $10.00 "Property Inspection" fees on January 2, 2008, July 2, 2009, October 27, 2010, and various other occasions with the last fee being on May 23, 2012. These inspection fees are impermissible under the *HUD Servicing Guidelines* and are but one example of the fraudulent charges for which BOA applied to Plaintiffs' account and added to the foreclosure judgment amount.

184. BOA committed common law fraud upon Plaintiffs when throughout the HAMP application process BOA employees omitted the fact that the bank was conducting unnecessary and improper inspections on their home and charging their account inspection fees.

185.    BOA committed common law fraud upon Plaintiffs when the bank requested they make trial payments during the HAMP application and omitted the fact that it had no intention of approving the application and intended to apply some of the funds sent by Plaintiffs for trial payments to fraudulent inspection fees.

186.    The fraudulent omission of the bank's practice of applying trial payments to continuing inspection fees mislead the Plaintiffs into believing their trial payments would be applied to their mortgage and were for the purpose of final approval of their HAMP application. BOA had a duty inform Plaintiffs of this practice and intentionally refused to do so.

187.    As a direct result of the omission, Plaintiffs lost some of the funds sent to BOA for trial payments they believed were for final approval of their HAMP application. BOA profited by charging Plaintiffs' account for the inspection fees and applying some of the trial payments received from Plaintiffs and retaining those funds for profit.

188.    Plaintiffs did not know the inspections were taking place, nor did they know that they were being charged for these inspections. Even if Plaintiffs could have known about the inspections or the charges, they did not know and could not have known that the inspections and consequent charges were not permitted and were unlawful.

189.    Plaintiffs did not know and could not have reasonably discovered that BOA was charging improper inspection fees and diverting a portion of their trial payments to pay those fees until they retained their attorneys in this matter in January 2017.

190.    Upon information and belief, BOA further profited by using Plaintiffs' HAMP application to make false claims for incentive payments to the United State Department of Treasury in the amount of $1,000.00 or $2,000.00, effectively using Plaintiffs as a pawn to

defraud the Federal Government. *U.S. v. Bank of America NA et al.,* case number 1:11-cv-03270, (E.D.N.Y.).

## FACTUAL ALLEGATIONS
### PLAINTIFF # 6 MARQUITA PERRY

191. Plaintiff, Marquita Perry, Maricopa County, Arizona, residing at 4129 West Park Street, Phoenix, Arizona.

192. On August 4, 2008, Plaintiff, Marquita Perry, executed a mortgage and note for her home located at 57434 West Carter Road, Laveen Village, Arizona in the amount of $231,664.00 with regular monthly payments of $1,696.32. The lender was CTX Mortgage Company, LLC.

193. Subsequently, BOA began servicing the Plaintiff's home mortgage and the loan was assigned a number: (redacted but known to BOA and available by request).

194. After experiencing financial hardship, due in part to the state of the economy, Plaintiff contacted BOA by phone in August 19, 2009 requesting a HAMP modification.

195. Although Plaintiff was in imminent default, at all relevant times, she had viable and reasonable alternatives to foreclosure including but not necessarily limited alternative financing that were eliminated as a direct and proximate cause of Defendant's wrongful acts alleged in this Complaint.

### False Statements of Fact Concerning HAMP Eligibility by Defendant

196. On or about August 14, 2009, a BOA loan representative advised and directed Plaintiff by phone to refrain from making her regular mortgage payments. The BOA loan representative specifically told Plaintiff she had to be "sixty days past due" on her mortgage loan

to be eligible for a HAMP modification.[9] Relying on this statement, Plaintiff remained in default and/or stopped making regular monthly mortgage payments. Plaintiff was told to remain in default and/or to stop making regular monthly mortgage payments on more than one occasion throughout the application process. Although the Plaintiff did not know it until she contacted an attorney in December 2016, this statement was false as default was not required for HAMP eligibility. This BOA loan representative omitted the fact that eligibility was available for HAMP to borrowers if default was reasonably foreseeable. Plaintiff was told this false information as part of BOA's scheme, as outlined above, in an effort to prevent her from receiving a HAMP modification.

197. This BOA representative knew the statement was false when made and intentionally omitted that only imminent default was required for HAMP eligibility. The statements and omissions were made to induce the Plaintiff to rely on them. The statements were specifically designed by BOA to set Plaintiff up for foreclosure so BOA could benefit by, *inter alia*, receiving HAMP payments and acquiring the Plaintiff's home by foreclosure. Plaintiff believed she was required to be in default on her mortgage because this is what BOA employees told her and was misled into believing that fact because the fact that only imminent default was required was intentionally omitted.

198. Relying on the false statement and omission, Plaintiff refrained from making her regular mortgage payment and fell into default status. Thereafter, Plaintiff made HAMP trial payments, as set forth elsewhere in the Complaint, but BOA used Plaintiff's default status as an excuse to refuse to apply these payments to Plaintiff's account. BOA's actions resulted in further default and foreclosure of Plaintiff's home. Plaintiff lost her home, the equity in her home and

---

[9] The name of this BOA employee is within the exclusive possession of the Defendant and can be specifically identified through the bank's computer programs known as SIEBEL, LAMP, Homesaver, IPORTAL and AS/400 system, which logs all calls from borrowers and identifies the BOA employee taking the call by name.

money paid as trial payments as a direct result of BOA's fraudulent statements of fact. BOA profited by retaining Plaintiff's trial payments and foreclosing on Plaintiff's home.

199.  Plaintiff did not know, and could not have reasonably discovered, that these statements were false until she retained her attorneys in this matter in December 2016, nor could Plaintiff know or reasonably have discovered the orchestrated fraudulent scheme set forth in this Complaint until she retained her attorneys.  Plaintiff reasonably relied on the statements of Defendant's employees that Plaintiff must be in default in order to qualify for HAMP. Plaintiff contacted Defendant repeatedly throughout this process to ensure proper compliance with HAMP's requirements, and there were no resources reasonably available to a non-attorney borrower such as Plaintiff to contradict Defendant's false statements.

### False Statements of Fact Concerning Plaintiffs' HAMP Application by Defendant

200.  On or about December 2009, BOA provided Plaintiff a HAMP application and she properly completed the application and returned it to BOA with the requested supporting financial documents.

201.  However, as part of BOA's fraudulent scheme, once the application was submitted, on or about December 2009 Plaintiffs were falsely informed by multiple BOA employees over the phone that the documents were "not current", "missing", or "never received."[10] The same or similar statements were made on subsequent phone calls with BOA employees and communication with the Neighborhood Assistance Corporation of America (NACA). BOA employees knew these representations were false and this practice was policy and

---

[10] The name of this BOA employee is within the exclusive possession of the Defendant and can be specifically identified through the bank's computer programs known as SIEBEL, LAMP, Homesaver, IPORTAL and AS/400 system, which logs all calls from borrowers and identifies the BOA employee taking the call by name.

procedure at BOA. *See* **Exhibits 2, 3, 4, 5 and 6.** In fact, Plaintiff's applications were intentionally lost within BOA's databases or destroyed in order to prevent Plaintiff's from receiving a HAMP modification.

202. These false statements were made by BOA employees for the purpose of inducing Plaintiff to resend her modification application over and over in order to frustrate the application process.

203. These misrepresentations were made to Plaintiff by BOA representatives not for the purpose of processing Plaintiff's application in good faith, but instead for the specific purpose of frustrating the HAMP application process to ensure a modification was ultimately declined, resulting in foreclosure. BOA employees knew these statements were false and some employees were awarded cash incentives as well as restaurant and retail gift cards for meeting quotas for declining modification applications in a given day or week. *See* **Exhibits 2, 3, 4, 5 and 6.** In fact, Plaintiff's applications were intentionally lost within BOA's databases or destroyed in order to prevent Plaintiff from receiving a HAMP modification.

204. Plaintiff believed these statements was true, relied on them, and as a result, unnecessarily resubmitted their application and supporting information via U. S. Mail, NACA submission, and Federal Express more than five (5) times. As a direct result, Plaintiff was damaged and suffered a loss of the costs and time spent sending and resending her HAMP application on multiple occasions when BOA had no intention of reviewing it.

205. Plaintiff did not know, and could not have reasonably discovered, that these statements were false until she retained her attorneys in this matter in December 2016. Plaintiff reasonably relied on the statements of Defendant's employees that Plaintiff's HAMP application was not complete. Plaintiff contacted Defendant repeatedly throughout this process to ensure

proper compliance with HAMP as evidenced by her repeated submission of the application, and there were no resources reasonably available to a non-attorney borrower such as Plaintiff to contradict Defendant's false statements. BOA employees falsely told Plaintiff that her application was not current or missing, even though the application was proper and complete, to further the scheme to delay the HAMP modification to ultimately deny it. Defendant's subsequent false statement on July 28, 2010 that the HAMP application was approved also caused Plaintiff to believe that these submissions were incomplete.

206. By making these misrepresentations, BOA profited by avoiding the administrative costs of a good faith processing of Plaintiff's modification application as was required under the Agreement the bank executed with the Federal Government. *See* **Exhibit 1** at Sec. 2A. BOA further profited by denying the modification and proceeding to foreclose on Plaintiff's property.

**False Statements of Fact of Approval and Request for Trial Payments by BOA**

207. On or about July 28, 2010, BOA sent Plaintiff a letter stating her application was "approved" and requested she make "trial payments" in the amount of $1,463.77 pursuant to the Federal Government's Home Affordable Modification Program. This was false as the application wasn't approved. Instead, BOA had no intention of approving the application and this fact was fraudulently omitted from the Plaintiff.

208. This false statement of fact and intentional omission was intended to cause Plaintiff to make trial payments to BOA, not for the purpose of compliance with HAMP or processing her HAMP application, but to cause Plaintiff to send trial payments so BOA could retain those funds in an unapplied account for profit after foreclosure or apply the funds to fraudulent inspection and other fees the bank charged. *See* **Exhibits 2, 3, 4, 5 and 6.**

209.    It was and is BOA's practice to place "trial period payments....into an **unapplied account** until" BOA made a decision on the borrowers' HAMP application. See July 20, 2016 Deposition of BOA Representative, Lonnie S. Mills, pursuant to Rule 1.310(b)6), *Noelia Ramirez v. Bank of America, N.A.*, Hillsborough County File No.: 16-CA-722. BOA employees fraudulently omitted this fact when requesting the Plaintiff make trial payments.

210.    Relying on BOA's misrepresentations, Plaintiff made at least five (5) payments of $1,464.00 in 2010, hoping to save her home.

211.    Further, as a direct result of relying on BOA's misrepresentations and intentional omissions, on January 7, 2014, Plaintiff's home was foreclosed by BOA. Plaintiff moved out of her home in February 2014.

212.    Plaintiff suffered damages in the amount of the trial payments when BOA placed those payments in an unapplied account and refused to credit her account, the loss of her home and the equity in that home, as well as damage to her credit and the loss of some or all of the funds paid to BOA for trial payments.

213.    By making these misrepresentations, BOA profited by retaining Plaintiff's trial payments for profit. BOA further profited by forcing Plaintiff into foreclosure and avoiding the administrative costs of a good faith processing of Plaintiff's modification application as was required under the Agreement the bank executed with the Federal Government. *See* **Exhibit 1** at Sec. 2A. BOA also profited since Plaintiff expended time and money and lost the opportunity to pursue other loss mitigation options reasonably available to Plaintiff to prevent foreclosure, like alternative financing, while awaiting BOA's decision on the modification application. Plaintiff's lost opportunity was a direct and proximate cause of the subsequent foreclosure from which Defendant benefited, as set forth herein.

believed she was required to be in default on her mortgage because this is what BOA employees told her and was misled into believing that fact because the fact that only imminent default was required was intentionally omitted.

223. Relying on the false statement and omission, Plaintiff refrained from making her regular mortgage payment and fell into default status. Thereafter, Plaintiff made HAMP trial payments, as set forth elsewhere in the Complaint, but BOA used Plaintiff's default status as an excuse to refuse to apply these payments to Plaintiff's account. BOA's actions resulted in further default and foreclosure of Plaintiff's home. Plaintiff lost her home, the equity in her home and money paid as trial payments as a direct result of BOA's fraudulent statements of fact. BOA profited by retaining Plaintiff's trial payments and foreclosing on Plaintiff's home.

224. Plaintiff did not know, and could not have reasonably discovered, that these statements were false until she retained her attorneys in this matter in March 2017, nor could Plaintiff know or reasonably have discovered the orchestrated fraudulent scheme set forth in this Complaint until she retained her attorneys. Plaintiff reasonably relied on the statements of Defendant's employees that Plaintiff must be in default in order to qualify for HAMP. Plaintiff contacted Defendant repeatedly throughout this process to ensure proper compliance with HAMP's requirements, and there were no resources reasonably available to a non-attorney borrower such as Plaintiff to contradict Defendant's false statements.

**False Statements of Fact Concerning Plaintiff's HAMP Application by Defendant**

225. On or about April 1, 2009, BOA provided Plaintiff a HAMP application and she properly completed the application and returned it to BOA with the requested supporting financial documents.

226. However, as part of BOA's fraudulent scheme, once the application was submitted, on or about July 9, 2009, Plaintiff was falsely informed by BOA employee "Monice" the phone that her documents were "not complete." The same or similar statements were made on subsequent phone calls with BOA employees. For example, on October 9, 2009, BOA employee "Eric" falsely informed Plaintiff that her documents she had sent, and received by BOA, were "incomplete". Eric, Monice, and other BOA employees knew these representations were false and this practice was policy and procedure at BOA. *See* **Exhibits 2, 3, 4, 5 and 6.** In fact, Plaintiff's applications were intentionally lost within BOA's databases or destroyed in order to prevent Plaintiff's from receiving a HAMP modification.

227. These false statements were made by BOA employees Eric, Monice, and others for the purpose of inducing Plaintiff to resend her modification application over and over in order to frustrate the application process.

228. These misrepresentations were made to Plaintiff by BOA representatives Eric, Monice, and others, not for the purpose of processing Plaintiff's application in good faith, but instead for the specific purpose of frustrating the HAMP application process to ensure a modification was ultimately declined, resulting in foreclosure. BOA employees knew these statements were false and some employees were awarded cash incentives as well as restaurant and retail gift cards for meeting quotas for declining modification applications in a given day or week. *See* **Exhibits 2, 3, 4, 5 and 6.** In fact, Plaintiff's applications were intentionally lost within BOA's databases or destroyed in order to prevent Plaintiff from receiving a HAMP modification.

229. Plaintiff believed these statements were true, relied on them, and as a result, unnecessarily resubmitted their application and supporting information via U. S. Mail, fax, and Federal Express more than nine (9) times. As a direct result, Plaintiff was damaged and suffered

a loss of the costs and time spent sending and resending their HAMP application on multiple occasions when BOA had no intention of reviewing it.

230. Plaintiff did not know, and could not have reasonably discovered, that these statements were false until she retained her attorneys in this matter in March 2017. Plaintiff reasonably relied on the statements of Defendant's employees that Plaintiff's HAMP application was not complete. Plaintiff contacted Defendant repeatedly throughout this process to ensure proper compliance with HAMP as evidenced by her repeated submission of the application, and there were no resources reasonably available to a non-attorney borrower such as Plaintiff to contradict Defendant's false statements. Eric, Monice, and others falsely told Plaintiff that her application was not current or missing, even though the application was proper and complete, to further the scheme to delay the HAMP modification to ultimately deny it. Defendant's subsequent false statement on August 2, 2009 that the HAMP application was approved also caused Plaintiff to believe that these submissions were incomplete.

231. By making these misrepresentations, BOA profited by avoiding the administrative costs of a good faith processing of Plaintiff's modification application as was required under the Agreement the bank executed with the Federal Government. *See* **Exhibit 1** at Sec. 2A. BOA further profited by denying the modification and proceeding to foreclose on Plaintiff's property.

**False Statements of Fact of Approval and Request for Trial Payments by BOA.**

232. On or about August 2, 2009, BOA sent Plaintiff a letter stating her application was "approved" and requested she make "trial payments" in the amount of $1,834.17 pursuant to the Federal Government's Home Affordable Modification Program. This was false as the application wasn't approved. Instead, BOA had no intention of approving the application and this fact was fraudulently omitted from the Plaintiffs.

233. This false statement of fact and intentional omission was intended to cause Plaintiff to make trial payments to BOA, not for the purpose of compliance with HAMP or processing her HAMP application, but to cause Plaintiff to send trial payments so BOA could retain those funds in an unapplied account for profit after foreclosure or apply the funds to fraudulent inspection and other fees the bank charged. *See* **Exhibits 2, 3, 4, 5 and 6:**

234. It was and is BOA's practice to place "trial period payments....into an **unapplied account** until" BOA made a decision on the borrowers' HAMP application. See July 20, 2016 Deposition of BOA Representative, Lonnie S. Mills, pursuant to Rule 1.310(b)6), *Noelia Ramirez v. Bank of America, N.A.*, Hillsborough County File No.: 16-CA-722. BOA employees fraudulently omitted this fact when requesting the Plaintiffs make trial payments.

235. Relying on BOA's misrepresentations, Plaintiff made sixteen (16) payments of $1,834.17 from 2009 through 2010, hoping to save her home.

236. Further, as a direct result of relying on BOA's misrepresentations and intentional omissions, on October 6, 2010, BOA sent Plaintiff a notice of foreclosure. As a result of this notice, Plaintiff was forced to short sale her home on February 7, 2011 in the amount of $207,000.00, $97,000.00 less than her original mortgage amount. Plaintiff moved out of her home in 2010.

237. Plaintiff suffered damages in the amount of the trial payments when BOA placed those payments in an unapplied account and refused to credit her account, the loss of her home and the equity in that home, as well as damage to her credit and the loss of some or all of the funds paid to BOA for trial payments.

238. By making these misrepresentations, BOA profited by retaining Plaintiff's trial payments for profit. BOA further profited by forcing Plaintiff into foreclosure and avoiding the

administrative costs of a good faith processing of Plaintiff's modification application as was required under the Agreement the bank executed with the Federal Government. *See* **Exhibit 1** at Sec. 2A. BOA also profited since Plaintiff expended time and money and lost the opportunity to pursue other loss mitigation options reasonably available to Plaintiff to prevent foreclosure, like alternative financing, while awaiting BOA's decision on the modification application. Plaintiff's lost opportunity was a direct and proximate cause of the subsequent foreclosure and short sale from which Defendant benefited, as set forth herein.

239. Plaintiffs did not know and could not have reasonably discovered that the statements herein were false and/or that her trial payments were not applied to her account until she retained her attorneys in this matter in March 2017. Plaintiff contacted Defendant repeatedly throughout this process to ensure proper compliance with HAMP as evidenced by her repeated submission of the application and repeated contact with Defendant, and there were no resources reasonably available to a non-attorney borrower such as Plaintiff to contradict Defendant's false statements.

### Fraudulent Omission of the Application of Inspection Fees by BOA

240. Despite the fact that Plaintiff lived in her home until 2010, BOA charged her account for a "Property Inspection" on two (2) occasions in 2009 while she was living in the home. More specifically, she was charged for a Property Inspection on March 2, 2009 and again on April 27, 2009. These inspection fees are impermissible under the *HUD Servicing Guidelines* and are but one example of the fraudulent charges for which BOA applied to Plaintiff's account and added to the foreclosure judgment amount.

241.    BOA committed common law fraud upon Plaintiff when throughout the HAMP application process BOA employees omitted the fact that the bank was conducting unnecessary and improper inspections on her home and charging her account inspection fees.

242.    BOA committed common law fraud upon Plaintiff when the bank requested she make trial payments during the HAMP application and omitted the fact that it had no intention of approving the application and intended to apply some of the funds sent by Plaintiff for trial payments to fraudulent inspection fees.

243.    The fraudulent omission of the bank's practice of applying trial payments to continuing inspection fees mislead the Plaintiff into believing her trial payments would be applied to her mortgage and were for the purpose of final approval of her HAMP application. BOA had a duty inform Plaintiff of this practice and intentionally refused to do so.

244.    As a direct result of the omission, Plaintiff lost some of the funds sent to BOA for trial payments she believed were for final approval of her HAMP application. BOA profited by charging Plaintiff's account for the inspection fees and applying some of the trial payments received from Plaintiff and retaining those funds for profit.

245.    Plaintiff did not know the inspections were taking place, nor did she know that she was being charged for these inspections. Even if Plaintiff could have known about the inspections or the charges, she did not know and could not have known that the inspections and consequent charges were not permitted and were unlawful.

246.    Plaintiff did not know and could not have reasonably discovered that BOA was charging improper inspection fees and diverting a portion of her trial payments to pay those fees until she retained her attorneys in this matter in December 2016.

247. Upon information and belief, BOA further profited by using Plaintiff's HAMP application to make false claims for incentive payments to the United State Department of Treasury in the amount of $1,000.00 or $2,000.00, effectively using Plaintiff as a pawn to defraud the Federal Government. *U.S. v. Bank of America NA et al.,* case number 1:11-cv-03270, (E.D.N.Y.).

## FACTUAL ALLEGATIONS
## PLAINTIFF #9 KIMBERLY STEPHAN

248. Plaintiff is a citizen of Macomb County, Michigan, residing at 37753 Agar Drive, Sterling Heights, Michigan.

249. On September 8, 1998, Plaintiff, Kimberly (Carpenter) Stephan, executed a mortgage and note for her home located at 557 East Oakridge, Ferndale, Michigan in the amount of $71,500.00 with regular monthly payments of $731.50. The lender was Countrywide. Plaintiff subsequently refinanced her mortgage.

250. Subsequently, BOA began servicing the Plaintiff's home mortgage and the loan was assigned a number: (redacted but known to BOA and available by request).

251. After experiencing financial hardship, due in part to the state of the economy, Plaintiff contacted BOA by phone in January 2010 requesting a HAMP modification.

252. Although Plaintiff was in imminent default, at all relevant times, she had viable and reasonable alternatives to foreclosure including but not necessarily limited to alternative financing that were eliminated as a direct and proximate cause of Defendant's wrongful acts alleged in this Complaint.

### False Statements of Fact Concerning HAMP Eligibility by Defendant

253. On or about January 2, 2010, a BOA loan representative advised Plaintiff by phone to refrain from making her regular mortgage payments. This BOA loan representative specifically

told Plaintiff being "stop making her complete mortgage payments" on her mortgage loan as default was a prerequisite for HAMP modification eligibility.[12] Relying on this statement, Plaintiff remained in default and/or stopped making regular monthly mortgage payments. Plaintiff was told to remain in default and/or to stop making regular monthly mortgage payments on more than one occasion throughout the application process. Although the Plaintiff did not know it until she contacted an attorney in February 2017, this statement was false as default was not required for HAMP eligibility. This BOA loan representative omitted the fact that eligibility was available for HAMP to borrowers if default was reasonably foreseeable. Plaintiff was told this false information as part of BOA's scheme, as outlined above, in an effort to prevent her from receiving a HAMP modification.

254. This BOA representative knew the statement was false when made and intentionally omitted that only imminent default was required for HAMP eligibility. The statement and omission was made to induce the Plaintiff to rely on them. The statements were specifically designed by BOA to set Plaintiff up for foreclosure so BOA could benefit by, *inter alia*, receiving HAMP payments and acquiring the Plaintiff's home by foreclosure. Plaintiff believed she was required to be in default on her mortgage because this is what BOA employees told her and was misled into believing that fact because the fact that only imminent default was required was intentionally omitted.

255. Relying on the false statement and omission, Plaintiff refrained from making her regular mortgage payment and fell into default status. Thereafter, Plaintiff made HAMP trial payments, as set forth elsewhere in the Complaint, but BOA used Plaintiff's default status as an

---

[12] The name of this BOA employee is within the exclusive possession of the Defendant and can be specifically identified through the bank's computer programs known as SIEBEL, LAMP, Homesaver, IPORTAL and AS/400 system, which logs all calls from borrowers and identifies the BOA employee taking the call by name.

Case 3:18-cv-00288-MOC-DSC   Document 1-1   Filed 06/01/18   Page 63 of 177

Page | 63

excuse to refuse to apply these payments to Plaintiff's account. BOA's actions resulted in further default and foreclosure of Plaintiff's home. Plaintiff lost her home, the equity in her home and money paid as trial payments as a direct result of BOA's fraudulent statements of fact. BOA profited by retaining Plaintiff's trial payments and foreclosing on Plaintiff's home.

256. Plaintiff did not know, and could not have reasonably discovered, that these statements were false until she retained her attorneys in this matter in February 2017, nor could Plaintiff know or reasonably have discovered the orchestrated fraudulent scheme set forth in this Complaint until she retained her attorneys. Plaintiff reasonably relied on the statements of Defendant's employees that Plaintiff must be in default in order to qualify for HAMP. Plaintiff contacted Defendant repeatedly throughout this process to ensure proper compliance with HAMP's requirements, and there were no resources reasonably available to a non-attorney borrower such as Plaintiff to contradict Defendant's false statements.

**False Statements of Fact Concerning Plaintiff's HAMP Application by Defendant**

257. On or about January 2010 BOA provided Plaintiff a HAMP application and she properly completed the application and returned it to BOA with the requested supporting financial documents.

258. However, as part of BOA's fraudulent scheme, once the application was submitted, on or about February 2, 2010, Plaintiff was falsely informed by BOA employees over the phone that the documents were "incomplete," "not current," or "stale."[13] The same or similar statements were made on subsequent phone calls with BOA employees. BOA employees knew

---

[13] The name of this BOA employee is within the exclusive possession of the Defendant and can be specifically identified through the bank's computer programs known as SIEBEL, LAMP, Homesaver, IPORTAL and AS/400 system, which logs all calls from borrowers and identifies the BOA employee taking the call by name.

these representations were false and this practice was policy and procedure at BOA. · *See* **Exhibits 2, 3, 4, 5 and 6.** In fact, Plaintiff's applications were intentionally lost within BOA's databases or destroyed in order to prevent Plaintiff's from receiving a HAMP modification.

259. · These false statements were made by BOA employees for the purpose of inducing Plaintiff to resend her modification application over and over in order to frustrate the application process.

... 260. . These misrepresentations were made to Plaintiff by BOA representatives not for· the purpose of processing Plaintiff's application in good faith, but instead for the specific purpose of frustrating the HAMP application process to ensure a modification was ultimately declined, resulting in foreclosure. BOA employees knew these statements were false and some employees were awarded cash incentives as well as restaurant and retail gift cards for meeting quotas for declining modification applications in a given day or week. *See* **Exhibits 2, 3, 4, 5 and 6.** In fact, Plaintiff's applications were intentionally lost within BOA's databases or destroyed in order to prevent Plaintiff from receiving a HAMP modification.

261. Plaintiff believed these statements was true, relied on them, and as a result, unnecessarily resubmitted her application and supporting information via U. S. Mail, fax, and · Federal Express more than six (6) times. As a direct result, Plaintiff was damaged and suffered a loss of the costs and time spent sending and resending their HAMP application on multiple occasions when BOA had no intention of reviewing it.

262. Plaintiff did not know, and could not have reasonably discovered, that these statements were false until she retained her attorneys in this matter in February 2017. Plaintiff reasonably relied on the statements of Defendant's employees that Plaintiff's HAMP application was not complete. Plaintiff contacted Defendant repeatedly throughout this process to ensure

proper compliance with HAMP as evidenced by her repeated submission of the application, and there were no resources reasonably available to a non-attorney borrower such as Plaintiff to contradict Defendant's false statements. BOA employees falsely told Plaintiff that her application was not current or missing, even though the application was proper and complete, to further the scheme to delay the HAMP modification to ultimately deny it. Defendant's subsequent false statement on April 1, 2010 that the HAMP application was approved also caused Plaintiff to believe that these submissions were incomplete.

263. By making these misrepresentations, BOA profited by avoiding the administrative costs of a good faith processing of Plaintiff's modification application as was required under the Agreement the bank executed with the Federal Government. *See* **Exhibit 1** at Sec. 2A. BOA further profited by denying the modification and proceeding to foreclose on Plaintiff's property.

### False Statements of Fact of Approval and Request for Trial Payments by BOA

264. On or about April 1, 2010, BOA sent Plaintiff a letter stating her application was "approved" and requested she make "trial payments" in the amount of $585.28 pursuant to the Federal Government's Home Affordable Modification Program. This was false as the application wasn't approved. Instead, BOA had no intention of approving the application and this fact was fraudulently omitted from the Plaintiffs.

265. This false statement of fact and intentional omission was intended to cause Plaintiff to make trial payments to BOA, not for the purpose of compliance with HAMP or processing her HAMP application, but to cause Plaintiff to send trial payments so BOA could retain those funds in an unapplied account for profit after foreclosure or apply the funds to fraudulent inspection and other fees the bank charged. *See* **Exhibits 2, 3, 4, 5 and 6.**

266. It was and is BOA's practice to place "trial period payments....into an **unapplied**

account until" BOA made a decision on the borrowers' HAMP application. See July 20, 2016 Deposition of BOA Representative, Lonnie S. Mills, pursuant to Rule 1.310(b)6), *Noelia Ramirez v. Bank of America, N.A.*, Hillsborough County File No.: 16-CA-722. BOA employees fraudulently omitted this fact when requesting the Plaintiffs make trial payments.

267. Relying on BOA's misrepresentations, Plaintiff made six (6) payments of $585.28 in 2010, hoping to save her home.

268. Further, as a direct result of relying on BOA's misrepresentations and intentional omissions, on June 7, 2011, Plaintiff's home was foreclosed by BOA. As a result of the foreclosure, a judgment in the amount of $89,096.00 was entered against Plaintiff, $17,596.00 more than her original mortgage. Plaintiff moved out of her home in 2010.

269. Plaintiff suffered damages in the amount of the trial payments when BOA placed those payments in an unapplied account and refused to credit her account, the loss of her home and the equity in that home, as well as damage to her credit and the loss of some or all of the funds paid to BOA for trial payments.

270. By making these misrepresentations, BOA profited by retaining Plaintiff's trial payments for profit. BOA further profited by forcing Plaintiff into foreclosure and avoiding the administrative costs of a good faith processing of Plaintiff's modification application as was required under the Agreement the bank executed with the Federal Government. *See* **Exhibit 1** at Sec. 2A. BOA also profited since Plaintiff expended time and money and lost the opportunity to pursue other loss mitigation options reasonably available to Plaintiff to prevent foreclosure, like alternative financing, while awaiting BOA's decision on the modification application. Plaintiff's lost opportunity was a direct and proximate cause of the subsequent foreclosure and short sale from which Defendant benefited, as set forth herein.

Case 3:18-cv-00288-MOC-DSC   Document 1-1   Filed 06/01/18   Page 67 of 177

271.     Plaintiffs did not know and could not have reasonably discovered that the statements herein were false and/or that her trial payments were not applied to her account until she retained her attorneys in this matter in February 2017.    Plaintiff contacted Defendant repeatedly throughout this process to ensure proper compliance with HAMP as evidenced by her repeated submission of the application and repeated contact with Defendant, and there were no resources reasonably available to a non-attorney borrower such as Plaintiff to contradict Defendant's false statements.

**Fraudulent Omission of the Application of Inspection Fees by BOA**

272.    Despite the fact that Plaintiff lived in her home until 2012, BOA charged her account for a "Property Inspection" on October 28, 2010 while she was living in the home. These inspection fees are impermissible under the *HUD Servicing Guidelines* and are but one example of the fraudulent charges for which BOA applied to Plaintiff's account and added to the foreclosure judgment amount.

273.    BOA committed common law fraud upon Plaintiff when throughout the HAMP application process BOA employees omitted the fact that the bank was conducting unnecessary and improper inspections on her home and charging her account inspection fees.

274.    BOA committed common law fraud upon Plaintiff when the bank requested she make trial payments during the HAMP application and omitted the fact that it had no intention of approving the application and intended to apply some of the funds sent by Plaintiff for trial payments to fraudulent inspection fees.

275.    The fraudulent omission of the bank's practice of applying trial payments to continuing inspection fees mislead the Plaintiff into believing her trial payments would be applied

to her mortgage and were for the purpose of final approval of her HAMP application. BOA had a duty inform Plaintiff of this practice and intentionally refused to do so.

276. As a direct result of the omission, Plaintiff lost some of the funds sent to BOA for trial payments she believed were for final approval of her HAMP application. BOA profited by charging Plaintiff's account for the inspection fees and applying some of the trial payments received from Plaintiff and retaining those funds for profit.

277. Plaintiff did not know the inspections were taking place, nor did she know that she was being charged for these inspections. Even if Plaintiff could have known about the inspections or the charges, she did not know and could not have known that the inspections and consequent charges were not permitted and were unlawful.

278. Plaintiff did not know and could not have reasonably discovered that BOA was charging improper inspection fees and diverting a portion of her trial payments to pay those fees until she retained her attorneys in this matter in February 2017.

279. Upon information and belief, BOA further profited by using Plaintiffs' HAMP application to make false claims for incentive payments to the United State Department of Treasury in the amount of $1,000.00 or $2,000.00, effectively using Plaintiffs as a pawn to defraud the Federal Government. *U.S. v. Bank of America NA et al.,* case number 1:11-cv-03270, (E.D.N.Y.).

## FACTUAL ALLEGATIONS
## PLAINTIFF #10 KEITH PEACOCK

280. Plaintiff is a citizen of Sacramento County, California, residing at 101 Ted Ford Court, Folsom, California

281. On November 6, 2007, Plaintiff, Keith Peacock, executed a mortgage and note for his home located at 8209 Terraland Court, Citrus Heights, California, in the amount of $285,000.00 with regular monthly payments set at $2,498.04. The lender was Plaza Home Mortgage, Inc.

282. Subsequently, BOA began servicing the Plaintiff's home mortgage and the loan was assigned a number: (redacted but known to BOA and available by request).

283. After experiencing financial hardship, due in part to the state of the economy, Plaintiffs contacted BOA by phone in February 2009 requesting a HAMP modification.

284. Although Plaintiff was in imminent default, at all relevant times, he had viable and reasonable alternatives to foreclosure including but not necessarily limited to a short sale, deed in lieu of foreclosure, or alternative financing that were eliminated as a direct and proximate cause of Defendant's wrongful acts alleged in this Complaint.

**False Statements of Fact Concerning HAMP Eligibility by Defendant**

285. On or about February 8, 2009, BOA loan representative, Andrew, advised Plaintiff by phone to refrain from making his regular mortgage payments. BOA representative Andrew specifically told Plaintiff being "he had to be at least 30 days past due to apply for a HAMP modification." Relying on this statement, Plaintiff remained in default and/or stopped making regular monthly mortgage payments. Plaintiff was told to remain in default and/or to stop making regular monthly mortgage payments on more than one occasion throughout the application process. Although the Plaintiff did not know it until he contacted an attorney in April 2017, this statement was false as default was not required for HAMP eligibility. BOA loan representative, Andrew, omitted the fact that eligibility was available for HAMP to borrowers if default was

reasonably foreseeable. Plaintiff was told this false information as part of BOA's scheme, as outlined above, in an effort to prevent them from receiving a HAMP modification.

286. BOA representative Andrew knew the statement was false when made and intentionally omitted that only imminent default was required for HAMP eligibility. The statements and omissions were made to induce the Plaintiff to rely on them. The statements were specifically designed by BOA to set Plaintiff up for foreclosure so BOA could benefit by, *inter alia*, receiving HAMP payments and acquiring the Plaintiff's home by foreclosure. Plaintiff believed he was required to be in default on his mortgage because this is what BOA employees told him and was misled into believing that fact because the fact that only imminent default was required was intentionally omitted.

287. Relying on the false statement and omission, Plaintiff refrained from making his regular mortgage payment and fell into default status. Thereafter, Plaintiff made HAMP trial payments, as set forth elsewhere in the Complaint, but BOA used Plaintiff's default status as an excuse to refuse to apply these payments to Plaintiff's account. BOA's actions resulted in further default and foreclosure of Plaintiff's home. Plaintiff lost his home, the equity in his home and money paid as trial payments as a direct result of BOA's fraudulent statements of fact. BOA profited by retaining Plaintiff's trial payments and foreclosing on Plaintiff's home.

288. Plaintiff did not know, and could not have reasonably discovered, that these statements were false until he retained his attorneys in this matter in February 2009, nor could Plaintiff know or reasonably have discovered the orchestrated fraudulent scheme set forth in this Complaint until he retained his attorneys. Plaintiff reasonably relied on the statements of Defendant's employees that Plaintiff must be in default in order to qualify for HAMP. Plaintiff contacted Defendant repeatedly throughout this process to ensure proper compliance with

Case 3:18-cv-00288-MOC-DSC   Document 1-1   Filed 06/01/18   Page 71 of 177

HAMP's requirements, and there were no resources reasonably available to a non-attorney borrower such as Plaintiff to contradict Defendant's false statements.

**False Statements of Fact Concerning Plaintiff's HAMP Application by Defendant**

289. In April 2009, BOA provided Plaintiff a HAMP application and he properly completed the application and returned it to BOA via fax with the requested supporting financial documents.

290. However, as part of BOA's fraudulent scheme, on September 1, 2009 Plaintiff was falsely informed by a BOA employee over the phone that the documents he had submitted were "misplaced" and that he would need "to start the entire process all over again".[14] The same or similar statements were made on subsequent phone calls with BOA employees. BOA employees knew these representations were false and this practice was policy and procedure at BOA. *See* **Exhibits 2, 3, 4, 5 and 6.** In fact, Plaintiff's applications were intentionally lost within BOA's databases or destroyed in order to prevent Plaintiff from receiving a HAMP modification.

291. These false statements were made by BOA employees for the purpose of inducing Plaintiff to resend his modification application over and over in order to frustrate the application process.

292. Plaintiff was routinely assigned a new account representative unfamiliar with the previous representative's work and were forced to resubmit the application. Between February 2, 2009 and February 20, 2010, Plaintiff spoke with fifty-seven (57) BOA Customer Relation Managers, and sixteen (16) BOA Supervisors. Each BOA CRM or supervisor would tell Plaintiff

---

[14] The name of this BOA employee is within the exclusive possession of the Defendant and can be specifically identified through the bank's computer programs known as SIEBEL, LAMP, Homesaver, IPORTAL and AS/400 system, which logs all calls from borrowers and identifies the BOA employee taking the call by name.

something different. For example, on March 3, 2010 BOA Supervisor "Troy Davis" told Plaintiff to make "trial payments of $1919.82." However, four weeks later on April 5, 2010, BOA employee "Rosie" advised Plaintiff to make "trial payments of $1891.61." These misrepresentations were made to Plaintiff by BOA representatives for the specific purpose of frustrating the HAMP application process and to ensure a modification was ultimately declined resulting in foreclosure or short sale.

293. These misrepresentations were made to Plaintiff by BOA representatives not for the purpose of processing Plaintiff's application in good faith, but instead for the specific purpose of frustrating the HAMP application process to ensure a modification was ultimately declined, resulting in foreclosure. BOA employees knew these statements were false and some employees were awarded cash incentives as well as restaurant and retail gift cards for meeting quotas for declining modification applications in a given day or week. *See* **Exhibits 2, 3, 4, 5 and 6.** In fact, Plaintiff's applications were intentionally lost within BOA's databases or destroyed in order to prevent Plaintiff from receiving a HAMP modification.

294. Plaintiff believed these statements were true, relied on them, and as a result, unnecessarily resubmitted his application and supporting information via U. S. Mail, fax, and Federal Express more than fifteen (15) times. As a direct result, Plaintiff was damaged and suffered a loss of the costs and time spent sending and resending his HAMP application on multiple occasions when BOA had no intention of reviewing it.

295. Plaintiff did not know, and could not have reasonably discovered, that these statements were false until he retained his attorneys in this matter in April 2017. Plaintiff reasonably relied on the statements of Defendant's employees that Plaintiff's HAMP application was not complete. Plaintiff contacted Defendant repeatedly throughout this process to ensure

Case 3:18-cv-00288-MOC-DSC   Document 1-1   Filed 06/01/18   Page 73 of 177

proper compliance with HAMP as evidenced by his repeated submission of the application, and there were no resources reasonably available to a non-attorney borrower such as Plaintiff to contradict Defendant's false statements. BOA employees falsely told Plaintiff that his application was not current or missing, even though the application was proper and complete, to further the scheme to delay the HAMP modification to ultimately deny it. Defendant's subsequent false statement on September 2, 2009 that the HAMP application was approved also caused Plaintiff to believe that these submissions were incomplete.

. .296. .. By making these misrepresentations, BOA profited by avoiding the administrative .. ..
costs of a good faith processing of Plaintiffs' modification application as was required under the . . . .
Agreement the bank executed with the Federal Government. *See* **Exhibit 1** at Sec. 2A. BOA further profited by denying the modification and proceeding to foreclose on Plaintiff's property. ·

**False Statements of Fact of Approval and Request for Trial Payments by BOA**

297. On September 2, 2009 a BOA loan representative verbally informed Plaintiff he was "approved" and requested he make "trial payments" of $1600.00 pursuant to the Federal Government's Home Affordable Modification Program.[15] This was false as the application wasn't approved. Instead, BOA had no intention of approving the application and this fact was fraudulently omitted from the Plaintiffs.

298. This false statement of fact and intentional omission was intended to cause Plaintiff to make trial payments to BOA, not for the purpose of compliance with HAMP or processing his HAMP application, but to cause Plaintiff to send trial payments so BOA could

---

[15] The name of this BOA employee is within the exclusive possession of the Defendant and can be specifically identified through the bank's computer programs known as SIEBEL, LAMP, Homesaver, IPORTAL and AS/400 system, which logs all calls from borrowers and identifies the BOA employee taking the call by name.

ase 3:18-cv-00288-MOC-DSC   Document 1-1   Filed 06/01/18   Page 74 of 177

retain those funds in an unapplied account for profit after foreclosure or apply the funds to fraudulent inspection and other fees the bank charged. *See* **Exhibits 2, 3, 4, 5 and 6.**

299.    It was and is BOA's practice to place "trial period payments....into an **unapplied account** until" BOA made a decision on the borrowers' HAMP application. See July 20, 2016 Deposition of BOA Representative, Lonnie S. Mills, pursuant to Rule 1.310(b)6), *Noelia Ramirez v. Bank of America, N.A.*, Hillsborough County File No.: 16-CA-722.    BOA employees fraudulently omitted this fact when requesting the Plaintiffs make trial payments.

300.    After making "trial payments of $1600.00" as directed by the BOA representative, on March 3, 2010 BOA Supervisor "Troy Davis" falsely told Plaintiff to make HAMP "trial payments of $1919.82." However, four weeks later on April 5, 2010, BOA employee "Rosie" falsely advised Plaintiff to make "trial payments of $1891.61."

301.    This false statement of fact and intentional omission was intended to cause Plaintiff to make trial payments to BOA, not for the purpose of compliance with HAMP or processing his HAMP application, but to cause Plaintiff to send trial payments so BOA could retain those funds in an unapplied account for profit after foreclosure or apply the funds to fraudulent inspection and other fees the bank charged.

302.    Relying on BOA's misrepresentations, Plaintiff made five (5) payments of $1,919.82 in 2009 and 2010, hoping to save his home. Further, as a direct result of relying on BOA's misrepresentations and intentional omissions, on October 4, 2012, Plaintiff was forced to short sale his home. Plaintiff moved out of his home in 2012.

303.    Plaintiff suffered damages in the amount of the trial payments when BOA placed those payments in an unapplied account and refused to credit his account, the loss of his home

and the equity in that home, as well as damage to his credit and the loss of some or all of the funds paid to BOA for trial payments.

304.    By making these misrepresentations, BOA profited by retaining Plaintiff's trial payments for profit. BOA further profited by forcing Plaintiffs into foreclosure and avoiding the administrative costs of a good faith processing of Plaintiff's modification application as was required under the Agreement the bank executed with the Federal Government. *See* **Exhibit 1** at Sec. 2A. BOA also profited since Plaintiff expended time and money and lost the opportunity to pursue other loss mitigation options reasonably available to Plaintiff to prevent foreclosure like alternative financing while awaiting BOA's decision on the modification application. Plaintiff's lost opportunity was a direct and proximate cause of the subsequent foreclosure from which Defendant benefited, as set forth herein.

305.    Plaintiff did not know and could not have reasonably discovered that the statements herein were false and/or that his trial payments were not applied to his account until he retained his attorneys in this matter in April 2017. Plaintiff contacted Defendant repeatedly throughout this process to ensure proper compliance with HAMP as evidenced by his repeated submission of the application and repeated contact with Defendant, and there were no resources reasonably available to a non-attorney borrower such as Plaintiff to contradict Defendant's false statements.

### Fraudulent Omission of the Application of Inspection Fees by BOA

306.    Despite the fact that Plaintiff lived in his home until 2012, BOA charged his account for a "Property Inspection" on eight (8) occasions from 2010, all while he was living in the home. More specifically, he was charged for a Property Inspection fees beginning on January 6, 2010 with the last fee being charged July 29, 2010. These inspection fees are impermissible

under the *HUD Servicing Guidelines* and are but one example of the fraudulent charges for which BOA applied to Plaintiffs' account and added to the foreclosure judgment amount.

307. BOA committed common law fraud upon Plaintiff when throughout the HAMP application process BOA employees omitted the fact that the bank was conducting unnecessary and improper inspections on his home and charging his account inspection fees.

308. BOA committed common law fraud upon Plaintiff when the bank requested he make trial payments during the HAMP application and omitted the fact that it had no intention of approving the application and intended to apply some of the funds sent by Plaintiff for trial payments to fraudulent inspection fees.

309. The fraudulent omission of the bank's practice of applying trial payments to continuing inspection fees mislead the Plaintiff into believing his trial payments would be applied to his mortgage and were for the purpose of final approval of his HAMP application. BOA had a duty inform Plaintiff of this practice and intentionally refused to do so.

310. As a direct result of the omission, Plaintiff lost some of the funds sent to BOA for trial payments he believed were for final approval of his HAMP application. BOA profited by charging Plaintiff's account for the inspection fees and applying some of the trial payments received from Plaintiff and retaining those funds for profit.

311. Plaintiff did not know the inspections were taking place, nor did he know that he was being charged for these inspections. Even if Plaintiff could have known about the inspections or the charges, he did not know and could not have known that the inspections and consequent charges were not permitted and were unlawful.

Case 3:18-cv-00288-MOC-DSC   Document 1-1   Filed 06/01/18   Page 77 of 177

312. Plaintiff did not know and could not have reasonably discovered that BOA was charging improper inspection fees and diverting a portion of his trial payments to pay those fees until he retained his attorneys in this matter in April 2017.

313. Upon information and belief, BOA further profited by using Plaintiff's HAMP application to make false claims for incentive payments to the United State Department of Treasury in the amount of $1,000.00 or $2,000.00, effectively using Plaintiffs as a pawn to defraud the Federal Government. *U.S. v. Bank of America NA et al.*, case number 1:11-cv-03270, (E.D.N.Y.).

## FACTUAL ALLEGATIONS
## PLAINTIFF # 11 ZELMON MCBRIDE

314. Plaintiff is a citizen of Clark County, Nevada, residing at 10200 Giles Street, Apartment 1152, Las Vegas, Nevada.

315. On September 28, 2006, Plaintiff, Zelmon McBride, executed a mortgage and note for his home located at 33713 North 23rd Drive, Phoenix, Arizona, in the amount of $417,000.00 with regular monthly payments set at $2,365.93. The lender was Universal American Mortgage Company, LLC.

316. Subsequently, BOA began servicing the Plaintiff's home mortgage and the loan was assigned a number: (redacted but known to BOA and available by request).

317. After experiencing financial hardship, due in part to the state of the economy, Plaintiffs contacted BOA by phone in June 2009 requesting a HAMP modification.

318. Although Plaintiff was in imminent default, at all relevant times, he had viable and reasonable alternatives to foreclosure including but not necessarily limited to an alternative financing that were eliminated as a direct and proximate cause of Defendant's wrongful acts alleged in this Complaint.

ase 3:18-cv-00288-MOC-DSC   Document 1-1   Filed 06/01/18   Page 78 of 177

**False Statements of Fact Concerning HAMP Eligibility by Defendant**

319. On or about June 29, 2009, BOA loan representative, Maria, advised and directed Plaintiff by phone to refrain from making his regular mortgage payments. Maria specifically told Plaintiff "he had to miss three payments to be eligible for a HAMP modification." Relying on this statement, Plaintiff remained in default and/or stopped making regular monthly mortgage payments. Plaintiff was told to remain in default and/or to stop making regular monthly mortgage payments on more than one occasion throughout the application process. Although the Plaintiff did not know it until he contacted an attorney in April 2017, this statement was false as default was not required for HAMP eligibility. BOA loan representative, Maria, omitted the fact that eligibility was available for HAMP to borrowers if default was reasonably foreseeable. Plaintiff was told this false information as part of BOA's scheme, as outlined above, in an effort to prevent them from receiving a HAMP modification.

320. BOA representative Maria knew the statement was false when made and intentionally omitted that only imminent default was required for HAMP eligibility. The statement and omission was made to induce the Plaintiff to rely on them. The statements were specifically designed by BOA to set Plaintiff up for foreclosure so BOA could benefit by, *inter alia*, receiving HAMP payments and acquiring the Plaintiff's home by foreclosure. Plaintiff believed he was required to be in default on his mortgage because this is what BOA employees told him and was misled into believing that fact because the fact that only imminent default was required was intentionally omitted.

321. Relying on the false statement and omission, Plaintiff refrained from making his regular mortgage payment and fell into default status. Thereafter, Plaintiff made HAMP trial payments, as set forth elsewhere in the Complaint, but BOA used Plaintiff's default status as an

Case 3:18-cv-00288-MOC-DSC   Document 1-1   Filed 06/01/18   Page 79 of 177

excuse to refuse to apply these payments to Plaintiff's account. BOA's actions resulted in further default and foreclosure of Plaintiff's home. Plaintiff lost his home, the equity in his home and money paid as trial payments as a direct result of BOA's fraudulent statements of fact. BOA profited by retaining Plaintiff's trial payments and foreclosing on Plaintiff's home.

322. Plaintiff did not know, and could not have reasonably discovered, that these statements were false until he retained his attorneys in this matter in April 2017, nor could Plaintiff know or reasonably have discovered the orchestrated fraudulent scheme set forth in this Complaint until he retained his attorneys. Plaintiff reasonably relied on the statements of Defendant's employees that Plaintiff must be in default in order to qualify for HAMP. Plaintiff contacted Defendant repeatedly throughout this process to ensure proper compliance with HAMP's requirements, and there were no resources reasonably available to a non-attorney borrower such as Plaintiff to contradict Defendant's false statements.

**False Statements of Fact Concerning Plaintiff's HAMP Application by Defendant**

323. On or around November 16, 2009, BOA provided Plaintiff a HAMP application and he properly completed the application and returned it to BOA via mail with the requested supporting financial documents.

324. However, as part of BOA's fraudulent scheme, on or about September 1, 2009 Plaintiff was falsely informed by a BOA employee that his documents were "never received" or "incomplete".[16] The same or similar statements were made on subsequent phone calls with BOA employees. BOA employees knew these representations were false and this practice was policy

---

[16] The name of this BOA employee is within the exclusive possession of the Defendant and can be specifically identified through the bank's computer programs known as SIEBEL, LAMP, Homesaver, IPORTAL and AS/400 system, which logs all calls from borrowers and identifies the BOA employee taking the call by name.

and procedure at BOA. *See* **Exhibits 2, 3, 4, 5 and 6.** In fact, Plaintiff's applications were intentionally lost within BOA's databases or destroyed in order to prevent Plaintiff's from receiving a HAMP modification.

325. These false statements were made by BOA employees for the purpose of inducing Plaintiff to resend his modification application over and over in order to frustrate the application process.

326. These misrepresentations were made to Plaintiff by BOA representatives, not for the purpose of processing Plaintiff's application in good faith, but instead for the specific purpose of frustrating the HAMP application process to ensure a modification was ultimately declined, resulting in foreclosure. BOA employees knew these statements were false and some employees were awarded cash incentives as well as restaurant and retail gift cards for meeting quotas for declining modification applications in a given day or week. *See* **Exhibits 2, 3, 4, 5 and 6.** In fact, Plaintiff's applications were intentionally lost within BOA's databases or destroyed in order to prevent Plaintiff from receiving a HAMP modification.

327. Plaintiffs believed these statements were true, relied on them, and as a result, unnecessarily resubmitted their application and supporting information via U. S. Mail, and Federal Express more than three (3) times. As a direct result, Plaintiffs were damaged and suffered a loss of the costs and time spent sending and resending their HAMP application on multiple occasions when BOA had no intention of reviewing it.

328. Plaintiff did not know, and could not have reasonably discovered, that these statements were false until he retained his attorneys in this matter in April 2017. Plaintiff reasonably relied on the statements of Defendant's employees that Plaintiff's HAMP application was not complete. Plaintiff contacted Defendant repeatedly throughout this process to ensure

proper compliance with HAMP as evidenced by his repeated submission of the application, and there were no resources reasonably available to a non-attorney borrower such as Plaintiff to contradict Defendant's false statements. BOA employees falsely told Plaintiff that his application was not current or missing, even though the application was proper and complete, to further the scheme to delay the HAMP modification to ultimately deny it. Defendant's subsequent false statement on November 16, 2009 that the HAMP application was approved also caused Plaintiff to believe that these submissions were incomplete.

329. By making these misrepresentations, BOA profited by avoiding the administrative costs of a good faith processing of Plaintiff's modification application as was required under the Agreement the bank executed with the Federal Government. *See* **Exhibit 1** at Sec. 2A. BOA further profited by denying the modification and proceeding to foreclose on Plaintiff's property.

**False Statements of Fact of Approval and Request for Trial Payments by BOA**

330. On November 16, 2009 BOA sent Plaintiff a letter stating his application was "approved" and requested he make "trial payments" in the amount of $1,515.31 pursuant to the Federal Government's Home Affordable Modification Program. This was false as the application wasn't approved. Instead, BOA had no intention of approving the application and this fact was fraudulently omitted from the Plaintiffs.

331. This false statement of fact and intentional omission was intended to cause Plaintiff to make trial payments to BOA, not for the purpose of compliance with HAMP or processing his HAMP application, but to cause Plaintiff to send trial payments so BOA could retain those funds in an unapplied account for profit after foreclosure or apply the funds to fraudulent inspection and other fees the bank charged. *See* **Exhibits 2, 3, 4, 5 and 6.**

332. It was and is BOA's practice to place "trial period payments....into an **unapplied**

**account** until" BOA made a decision on the borrowers' HAMP application. See July 20, 2016 Deposition of BOA Representative, Lonnie S. Mills, pursuant to Rule 1.310(b)6), *Noelia Ramirez v. Bank of America, N.A.*, Hillsborough County File No.: 16-CA-722. BOA employees fraudulently omitted this fact when requesting the Plaintiffs make trial payments.

333. Relying on BOA's misrepresentations, Plaintiff made six (6) payments of $1,515.31 in 2009 and 2010, hoping to save his home. Further, as a direct result of relying on BOA's misrepresentations and intentional omissions, on April 15, 2011, Plaintiff's home was foreclosed by Recontrust on behalf of BOA. Plaintiff moved out of his home in 2011.

334. Plaintiff suffered damages in the amount of the trial payments when BOA placed those payments in an unapplied account and refused to credit his account, the loss of his home and the equity in that home, as well as damage to his credit and the loss of some or all of the funds paid to BOA for trial payments.

335. By making these misrepresentations, BOA profited by retaining Plaintiff's trial payments for profit. BOA further profited by forcing Plaintiffs into foreclosure and avoiding the administrative costs of a good faith processing of Plaintiff's modification application as was required under the Agreement the bank executed with the Federal Government. *See* **Exhibit 1** at Sec. 2A. BOA also profited since Plaintiff expended time and money and lost the opportunity to pursue other loss mitigation options reasonably available to Plaintiff to prevent foreclosure like alternative financing while awaiting BOA's decision on the modification application. Plaintiff's lost opportunity was a direct and proximate cause of the subsequent foreclosure from which Defendant benefited, as set forth herein.

336. Plaintiffs did not know and could not have reasonably discovered that the statements herein were false and/or that his trial payments were not applied to his account until

he retained his attorneys in this matter in April 2017. Plaintiff contacted Defendant repeatedly throughout this process to ensure proper compliance with HAMP as evidenced by his repeated submission of the application and repeated contact with Defendant, and there were no resources reasonably available to a non-attorney borrower such as Plaintiff to contradict Defendant's false statements.

### Fraudulent Omission of the Application of Inspection Fees by BOA

337. Despite the fact that Plaintiff lived in his home until 2011, BOA charged his account for a "Property Inspection" on five (5) occasions beginning May 20, 2009 with the last Property Inspection fee being charged on November 23, 2009, all while he was living in the home. These inspection fees are impermissible under the *HUD Servicing Guidelines* and are but one example of the fraudulent charges for which BOA applied to Plaintiffs' account and added to the foreclosure judgment amount.

338. BOA committed common law fraud upon Plaintiff when throughout the HAMP application process BOA employees omitted the fact that the bank was conducting unnecessary and improper inspections on his home and charging his account inspection fees.

339. BOA committed common law fraud upon Plaintiff when the bank requested he make trial payments during the HAMP application and omitted the fact that it had no intention of approving the application and intended to apply some of the funds sent by Plaintiff for trial payments to fraudulent inspection fees.

340. The fraudulent omission of the bank's practice of applying trial payments to continuing inspection fees mislead the Plaintiff into believing his trial payments would be applied to his mortgage and were for the purpose of final approval of his HAMP application. BOA had a duty inform Plaintiff of this practice and intentionally refused to do so.

341.    As a direct result of the omission, Plaintiff lost some of the funds sent to BOA for trial payments he believed were for final approval of his HAMP application. BOA profited by charging Plaintiff's account for the inspection fees and applying some of the trial payments received from Plaintiff and retaining those funds for profit.

342.    Plaintiff did not know the inspections were taking place, nor did he know that he was being charged for these inspections. Even if Plaintiff could have known about the inspections or the charges, he did not know and could not have known that the inspections and consequent charges were not permitted and were unlawful.

343.    Plaintiff did not know and could not have reasonably discovered that BOA was charging improper inspection fees and diverting a portion of his trial payments to pay those fees until he retained his attorneys in this matter in April 2017.

344.    Upon information and belief, BOA further profited by using Plaintiffs' HAMP application to make false claims for incentive payments to the United State Department of Treasury in the amount of $1,000.00 or $2,000.00, effectively using Plaintiffs as a pawn to defraud the Federal Government. *U.S. v. Bank of America NA et al.*, case number 1:11-cv-03270, (E.D.N.Y.).

## BOA FRAUDULENTLY CONCEALED THE FACTS GIVING RISE TO THE PLAINTIFFS' CLAIMS

345.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

346.    The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment as set forth above in this Complaint. Defendants, through their affirmative misrepresentations and omissions, actively concealed from Plaintiffs the series of secretive and

deceptive acts set forth in this Complaint that caused Plaintiffs to be unable to obtain a HAMP mortgage modification, ultimately resulting in a foreclosure, bankruptcy, and/or short sale.

347. Plaintiffs were not aware and could not have reasonably discovered BOA's fraudulent behavior until they retained their attorneys in this matter.

348. Defendant elected to conceal the true nature of its scheme by adopting and implementing procedures to conceal the extent and nature of its HAMP mortgage modification scheme. For example, the February 2017 sworn declaration by former BOA employee, Rodrigo Heinle, explained BOA's strategy of borrowers submitting mortgage modification documents into a black hole' by informing homeowners that modification documents were "incomplete and/or missing when they were not, or simply claiming files were 'under review' when they were not". **Exhibit 2**. Further, this fraudulent scheme of concealment was continued by deleting HAMP applications, sometimes as much as "up to six thousand application files in a single day." **Exhibit 2.**

349. The nature of Plaintiffs' injuries and the relationship of such injuries to BOA's scheme were inherently undiscoverable prior to the time Plaintiffs seeing retained their attorneys in this matter.

350. Because the Plaintiffs did not know and could not have reasonably discovered the facts that formed the basis of their fraud claims against BOA until they retained their attorneys in this matter, the time in which to file their claims under the applicable statute of limitations did not begin to run until Plaintiffs retained their attorneys in this matter.

351. Plaintiffs did not discover, and could not, through the exercise of reasonable care and due diligence, have discovered, BOA's fraudulent scheme that resulted in the notice of

foreclosure and ultimate short sale of Plaintiffs' home until after they retained their attorneys in this matter.

352.    The lack of awareness concerning the causal relationship between BOA's fraudulent scheme and Plaintiffs' foreclosure, short sale, or bankruptcy was not the result of silence or passive concealment. Defendants, engaged in deliberate acts (i.e. affirmative misrepresentations, shredding documents, etc.) to prevent subsequent discovery.

353.    In the alternative, BOA's conduct made it impossible for Plaintiffs to discover the that they had a claim against BOA within the applicable limitations period. In particular, Defendant's intentional misrepresentations, omissions, and systematic destruction of documents constituted active concealment regarding the true nature of BOA's HAMP practices that prevented Plaintiff from discovering the wrongful acts on which the causes of action are based. Plaintiff did not discover the existence of BOA's fraudulent HAMP mortgage modification denial scheme as the cause of her short sale and notice of foreclosure and other damages until around the time Plaintiffs retained their attorneys in this matter. Thus, while Plaintiff acted diligently to determine both the nature and the cause of the injuries, Plaintiff's efforts were thwarted by Defendants' fraudulent concealment. Plaintiff filed this lawsuit within the applicable limitations period of the date Plaintiff knew or through the exercise of reasonable care and due diligence should have known of the claim.

354.    Plaintiffs filed this lawsuit within the applicable limitations period when they had a reasonable basis to bring the claims asserted herein. *See* **Exhibit 8**. Further, per *American Pipe and Construction Co* the statute of limitations is tolled until the denial of class certification. *American Pipe and Construction Co. et al., v. Utah*, 414 U.S. 538, 94 S. Ct. 756 (1974). The Plaintiffs are not attorneys and do not actively monitor the dockets of courts throughout the

country. There was no widespread media coverage of the matter, and BOA, who was uniquely aware of the facts which caused it to pay the government over a billion dollars, failed to provide any additional substantive disclosure to their borrowers who had applied for HAMP of their scheme.

355. The running of any statute of limitations has been tolled by reason of Defendants' fraudulent conduct, as described in the preceding paragraphs. Defendants, through their affirmative misrepresentations and omissions, actively concealed from Plaintiffs their fraudulent scheme to ultimately deny Plaintiffs a HAMP modification to foreclose, short sale and/or force Plaintiff into bankruptcy.

356. As such, the running of any statute of limitations has been tolled by reason of Defendants' affirmative misrepresentations and omissions.

## COUNT I
### (Common Law Fraud)

357. The allegations in the preceding paragraphs of Plaintiffs' Complaint are incorporated herein by reference as if fully set forth herein.

358. BOA made false statements of fact to Plaintiffs through the fraudulent scheme described in this Complaint.

359. The statements made by BOA to Plaintiffs that required default or delinquency on his/her mortgage in order to be eligible for HAMP was false. Neither default nor delinquency was required under HAMP for eligibility, and BOA was aware of this fact.

360. Plaintiffs were falsely informed by BOA employees that their HAMP application documents were not received, were incomplete or were not current, causing Plaintiffs to resubmit the information again and again.

361. BOA made false statements of fact and intentional omissions when Plaintiffs were informed they were "approved" and requested they make "trial payments."

362. BOA employees made these statements with knowledge they were false.

363. BOA made these statements for the purpose of inducing Plaintiffs to rely on them.

364. Plaintiffs believed these statements were true, reasonably relied on them, and as a result, suffered damages when they refrained from making their regular mortgage payments.

365. Plaintiffs believed these statements were true, reasonably relied on them, and as a result, suffered damages when they unnecessarily sent their HAMP application and supporting information via U. S. Mail, fax, and Federal Express more over and over.

366. Plaintiffs believed these statements were true, reasonably relied on them, and as a result, suffered damages when they made trial payments that were either retained for profit or applied to fraudulent inspection fees by BOA.

367. As a direct and proximate cause of the knowing misrepresentations and omissions by BOA described in the Complaint, Plaintiffs suffered damages including but not limited to the costs for sending their HAMP applications and financial documents on multiple occasions when BOA had no intention of reviewing it, the loss of time spent sending and re-sending the HAMP application and financial documents, the loss of their home and the equity in that home, as well as damage to their credit and the loss of some or all of the funds paid to BOA for trial payments for which BOA retained for profit after foreclosure.

368. Due to the intentional omissions, Plaintiffs were unaware their trial payments were being used to pay fraudulent inspection fees by BOA that were impermissible.

369. For example, absent a specific finding of need by a local HUD office, the shortest period between inspections authorized by the HUD servicing guidelines is 25 days:

> Generally, reimbursement will be limited to one inspection for each 30-day cycle. This inspection should not be earlier than 25 days from the last inspection or later than 35 days after the last inspection. A distinction must be made between those items which are required and those which are merely recommended. Only where a local HUD Office has identified a need to inspect more frequently, and has made this a requirement, will a mortgagee be reimbursed for these additional inspections. *HUD Servicing Guidelines, Chapter 9, § 4330.1, 9-9 Inspection, Preservation and Protection Requirements, A. Inspections (c)(2)(a).*

370. Further, multiple inspections are only allowed when the mortgaged property is

vacant:

> Where the mortgage is in default and the mortgagee has established that the mortgaged property is vacant, mortgagees shall inspect the mortgaged property every 25 to 35 days. *HUD Servicing Guidelines, Chapter 9, § 4330.1, 9-9 Inspection, Preservation and Protection Requirements, A. Inspections (c).*

371. However, even before a series of inspections may begin, under HUD servicing

guidelines, the mortgage must be in default, and the mortgagee is required to determine the

Plaintiff's home was vacant/abandoned by making a phone call and performing a visual

inspection to ensure the property had become vacant/abandoned:

> When the mortgage is in default and a payment is not received within 45 days of the due date and efforts to reach the mortgagor or occupant at least by telephone have been unsuccessful, the mortgagee must perform a visual inspection of the mortgaged property to determine if it has become vacant or abandoned. *HUD Servicing Guidelines, Chapter 9, § 4330.1, 9-9 Inspection, Preservation and Protection Requirements, A. Inspections (a)(1).*

372. BOA conducted inspection after inspection, all while Plaintiffs were living in their

home. Although there is no private cause of action under the *Guidelines* for the Plaintiffs, these

fees are but one example of the overall fraudulent mortgage servicing scheme BOA has operated

for years and for which Plaintiffs have been victimized.

373. As a direct and proximate cause of the knowing omissions by BOA described in

the Complaint, Plaintiffs suffered damages in the loss of funds paid to BOA for trial payments

for which BOA applied to fraudulent inspection fees and for loss of equity and future equity, damage to their credit and reputations and other actual, general, incidental and consequential damages to be proven at trial.

## COUNT III
### (Intentional Misrepresentation)

374. The allegations of the preceding and subsequent paragraphs of Plaintiffs' Complaint are incorporated herein by reference as if fully set forth herein.

375. The representations as alleged herein made intentionally by the Defendant.

376. Defendant made these representations without regard for the truth of the representations, when they knew or should have known that the representations were false.

377. Throughout the HAMP process, Defendant intentionally concealed important information from the Plaintiffs. This was done by BOA by providing gift cards and other incentives to BOA employees in an effort to ensure they intentionally lied to and misled the Plaintiffs.

378. More specifically, BOA employees intentionally told Plaintiffs they must be in default in order to be eligible for a HAMP modification, in an effort to convince Plaintiffs to stop making their regular mortgage payments and fall further into default.

379. BOA employees intentionally told Plaintiffs they were approved for TPP when that was also false and said in an effort to further mislead the Plaintiffs.

380. Defendants made the representations intending Plaintiffs to rely on them and knowing that Plaintiffs would rely on them.

381. Plaintiffs could not discover the truth about the condition and true nature of their modification by exercise of reasonable due diligence.

382.    Plaintiffs have been, and continue to be, directly and indirectly injured and damaged as a result of Defendant's intentional misrepresentations concerning their HAMP modification application, and have suffered financial loss and loss of equity and future equity, damage to their credit and reputations and other actual, general, incidental and consequential damages to be proven at trial.

## COUNT III
### (Promissory Estoppel)

383.    The allegations of the preceding and subsequent paragraphs of Plaintiffs' Complaint are incorporated herein by reference as if fully set forth herein.

384.    At all material times, Plaintiffs reasonably relied on the repeated assurances given by BOA's employees, regarding their eligibility for HAMP, the representation that actual default was the only way to qualify for HAMP, the receipt of their HAMP application, and their approval for trial payments as well as the need to make trial payments to obtain a HAMP modification, as set forth above.

385.    As a direct result of these assurances by Defendant, and other conduct on its part to lead Plaintiffs to rely on them, Plaintiffs acted to their substantial detriment in discontinuing their regular mortgage payments and allowing Plaintiff's mortgage to go into default, repeatedly sending in their HAMP application, and making trial payments that were ultimately placed in an unapplied account, as set forth above.

386.    As a result of the conduct of Defendant, Plaintiffs have suffered damages, including but not limited to, the foreclosure of their home, trial payments placed in an unapplied account and not applied to plaintiff's account with BOA, and the costs of repeatedly sending in their HAMP applications, as set forth above and for loss of equity and future equity, damage to

their credit and reputations and other actual, general, incidental and consequential damages to be proven at trial.

<div align="center">

**COUNT IV**
**(Conversion)**

</div>

387. The allegations of the preceding and subsequent paragraphs of Plaintiffs' Complaint are incorporated herein by reference as if fully set forth herein.

388. As set forth above, Plaintiff tendered trial payments to BOA based on BOA's false assertions that BOA had approved Plaintiff's HAMP application.

389. BOA had no intention of applying the trial payments to Plaintiffs' loans or mortgages.

390. Instead, BOA converted and otherwise assumed and exercised ownership of the Plaintiff's funds sent to BOA as trial payments for its own use rather than rightfully applying it to Plaintiff's mortgage and loan balance.

391. Among other things, BOA wrongfully converted the funds by applying them to fraudulent inspection fees.

392. As a result of the conduct of Defendant, Plaintiffs have suffered actual damages, including but not limited to the loss of trial payments placed in an unapplied account, as set forth above.

<div align="center">

**COUNT V**
**(Unjust Enrichment)**

</div>

393. The allegations of the preceding and subsequent paragraphs of Plaintiffs' Complaint are incorporated herein by reference as if fully set forth herein.

394. Plaintiff conferred a benefit on Defendant by tendering trial payments which Defendant retained.

Case 3:18-cv-00288-MOC-DSC   Document 1-1   Filed 06/01/18   Page 93 of 177

395. Plaintiff tendered, and the Defendant retained, the trial payments based on Defendant's false claim that it had approved Plaintiff's HAMP application.

396. BOA was unjustly enriched by retaining the trial payments and, among other things, applying them to fraudulent inspection fees as a false pretense to retain the trial payments rather than rightfully applying the trial payments to Plaintiff's mortgage and loan balance

397. Defendant BOA was also unjustly enriched by using Plaintiffs' HAMP application to make false claims for incentive payments to the United State Department of Treasury in the amount of $1,000.00 or $2,000.00.

398. BOA was also unjustly enriched because it benefitted from not granting HAMP modifications to homeowners. HAMP modifications were purposely favorable to homeowners, as they included lower interest rates. By wrongfully denying HAMP modifications, BOA was unjustly enriched by avoiding the conditions of HAMP that were favorable to homeowners.

399. Plaintiffs are entitled to actual damages as a result of the unjust enrichment BOA received in an amount to be proven at trial.

### COUNT VI
### (Violation of the North Carolina Unfair & Deceptive
### Trade Practices N.C.G.S. § 75-1, *et. seq*)

400. The allegations of the preceding and subsequent paragraphs of Plaintiffs' Complaint are incorporated herein by reference as if fully set forth herein including the causes of action listed above which are per se violations of Chapter 75.

401. BOA's business practices are conducted in trade or commerce as defined by the North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S. § 75-1, *et. Seq*.

402.    Defendant was at all times relevant hereto, engaged in commerce in the State of North Carolina by servicing mortgages, including loan modifications under HAMP, from Defendant's principal place of business in the State of North Carolina.

403.    In addition to loan servicing, BOA also regularly solicits loan modifications of home mortgage loans from borrowers through mailings and customer service calls in the State of North Carolina.

404.    Defendant violated the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§75-1, *et seq*.

405.    Under North Carolina law, BOA's methodical scheme to avoid its responsibilities under the HAMP Agreement, through instruction and paying its employees incentives to make knowing material misrepresentations to borrowers to achieve this goal, all in an effort to increase the BOA's profits is the type of unfair and unscrupulous behavior which the North Carolina Unfair and Deceptive Trade Practices Act seeks to prevent. N.C. Gen. Stat. §§75-1, *et seq*.

406.    BOA's actions, as alleged herein, go beyond any violation of agency directives that implement HAMP, but encompasses a knowing and willful fraudulent scheme that is likely to mislead the consumer who is acting reasonably under the circumstances.

407.    All Plaintiffs are a "consumer" as that term is defined in N.C. Gen. Stat. §75-50 because they are "natural persons who [have] incurred a debt or alleged debtor for personal . . . purposes."

408.    BOA was required to follow the directives under "Servicer Participation Agreement" which it agreed to and executed with the Federal Government requiring it to "use reasonable efforts to remove all prohibitions or impediments to its authority, and use reasonable efforts to obtain all third-party consents and waivers that are required, by contract or in law, in

order to effectuate any modification of a mortgage loan under the Program." See section 2A, **Exhibit 1.**

409. BOA did just the opposite and instituted a scheme to avoid its responsibilities under the HAMP Agreement and paid its employees incentives to make material misrepresentations to borrowers to achieve this goal, all in an effort to increase the BOA's profits.

410. In refusing to follow the directives under the HAMP Agreement, BOA has engaged in unconscionable acts or practices and has engaged in unfair or deceptive acts in the conduct of its trade and/or commerce in the State of North Carolina. BOA's actions resulted in material misrepresentations and omissions to the Plaintiffs.

411. The acts and conduct on the part of BOA, all of which was condoned by BOA, constitute unfair and deceptive trade practices in that:

        a. BOA's methodical scheme of dishonest representations to Plaintiffs concerning the receipt of their HAMP loan modification application documents was a deceptive act within the meaning of North Carolina UDTPA as the misrepresentations were deliberate acts to mislead and did in fact mislead Plaintiffs;

        b. BOA's methodical scheme of dishonest representations to Plaintiffs concerning the receipt of their HAMP loan modification application documents was "unfair" within the meaning of North Carolina UDTPA as the misrepresentations were unethical and unscrupulous;

        c. BOA's methodical scheme of dishonest representations to Plaintiffs concerning their HAMP application, the purpose of which was to deceive the Federal Government in order to increase the BOA's profits was "unfair" and "deceptive" and in violation of North Carolina UDTPA in that the practice is likely to mislead consumers acting under reasonable circumstances to the consumer's detriment;

        d. BOA's acts of fraud, intentional misrepresentation, and conversion, as set forth in the preceding causes of action;

        e. The acts of BOA complained of herein violate public policy, amount to an inequitable assertion of its power and position, are immoral, unethical,

oppressive, unscrupulous, and/or substantially injurious to Plaintiffs and other consumers;

f. The acts of BOA complained of herein are unconscionable; and

g. The actions of BOA complained of herein were committed willfully.

412. The policies, acts, and practices by BOA alleged herein were intended to result and did result in the loss of money for mail, fax, Fed Ex and hand delivery and time spent by Plaintiffs in sending applications and financial documents to BOA, when BOA had no intention of processing the applications, damage to their credit, the loss of their home and the equity in that home, the loss of future equity in the home as well as the loss of some or all of the funds paid to BOA for trial payments for which BOA applied to fraudulent inspection fees, late fees and other wrongful fees for which BOA applied their trial payments and profited. These losses were a direct result of BOA's purposeful scheme to deceive the Federal Government in order to increase the BOA's profits by avoiding the directives and requirements of HAMP.

413. Pursuant to N.C. Gen. Stat § 75-16, Plaintiffs are entitled to recover, and herby request actual damages, general damages, consequential and incidental damages all to be trebled by operation of law;

414. Plaintiffs are further entitled to recover and hereby requests, an award of their reasonable attorneys' fees and all costs of this action pursuant to N.C. Gen. Stat § 75-16.1.

## COUNT VII
### (Punitive Damages Pursuant to N.C.G.S. §1D-1 et. seq.)

415. The allegations of the preceding and subsequent paragraphs of Plaintiffs' Complaint are incorporated herein by reference as if fully set forth herein.

416. The conduct of Defendant BOA was wanton, willful, gross, reckless, malicious, fraudulent and in complete disregard for the rights of Plaintiffs and others.

This the 30 day of April 2018.

ROBINSON ELLIOTT & SMITH

BY:

William C. Robinson (NC State Bar 17584)
Dorothy M. Gooding (NC State Bar 46058)
*Attorneys for Plaintiffs*
P.O. Box 36098
Charlotte, NC 23236
Telephone (704) 343-0061


Samantha Katen (NC State Bar #39143)
**AYLSTOCK, WITKIN, KREIS &
OVERHOLTZ**
*Attorneys for Plaintiffs*
17 E. Main Street, Suite 200
Pensacola, FL 32502
Telephone (850) 916-7449


Aaron C. Hemmings (NC Bar #29810)
**HEMMINGS & STEVENS, PLLC**
*Attorneys for Plaintiffs*
5540 McNeely Drive, Suite 202
Raleigh, NC 27612
Telephone (919) 277-0161

## TABLE OF CONTENTS FOR EXHIBITS

| | | |
|---|---|---|
| **Exhibit 1** | | **BOA Servicer Participation Agreement** |
| **Exhibit 2** | | **Declaration of Rodrigo W. Heinle** |
| **Exhibit 3** | | **Declaration of William E. Wilson** |
| **Exhibit 4** | | **Declaration of Simone Gordon** |
| **Exhibit 5** | | **Declaration of Theresa Terrelonge** |
| **Exhibit 6** | | **Declaration of Steven Cupples** |
| **Exhibit 7** | | **SIGTARP Report** |
| **Exhibit 8** | | *Goldman v. Bank of America, NA, et al.*, 2013 WL 4759649. |

# EXHIBIT NO. 1

# COMMITMENT TO PURCHASE FINANCIAL INSTRUMENT
## and
## SERVICER PARTICIPATION AGREEMENT
### for the
### HOME AFFORDABLE MODIFICATION PROGRAM
#### under the
### EMERGENCY ECONOMIC STABILIZATION ACT OF 2008

This Commitment to Purchase Financial Instrument and Servicer Participation Agreement (the "Commitment") is entered into as of the Effective Date, by and between Federal National Mortgage Association, a federally chartered corporation, as financial agent of the United States ("Fannie Mae"), and the undersigned party ("Servicer"). Capitalized terms used, but not defined contextually, shall have the meanings ascribed to them in Section 12 below.

### Recitals

WHEREAS, the U.S. Department of the Treasury (the "Treasury") has established a Home Affordable Modification Program (the "Program") pursuant to section 101 and 109 of the Emergency Economic Stabilization Act of 2008 (the "Act"), as section 109 of the Act has been amended by section 7002 of the American Recovery and Reinvestment Act of 2009;

WHEREAS, the Program includes loan modification and other foreclosure prevention services;

WHEREAS, Fannie Mae has been designated by the Treasury as a financial agent of the United States in connection with the implementation of the Program;

WHEREAS, Fannie Mae will, in its capacity as a financial agent of the United States, fulfill the roles of administrator, record keeper and paying agent for the Program, and in conjunction therewith must standardize certain mortgage modification and foreclosure prevention practices and procedures as they relate to the Program, consistent with the Act and in accordance with the directives of, and guidance provided by, the Treasury;

WHEREAS, Federal Home Loan Mortgage Corporation ("Freddie Mac") has been designated by the Treasury as a financial agent of the United States and will, in its capacity as a financial agent of the United States, fulfill a compliance role in connection with the Program; all references to Freddie Mac in the Agreement shall be in its capacity as compliance agent of the Program;

WHEREAS, all Fannie Mae and Freddie Mac approved servicers are being directed through their respective servicing guides and bulletins to implement the Program with respect to mortgage loans owned, securitized, or guaranteed by Fannie Mae or Freddie Mac (the "GSE Loans"); accordingly, this Agreement does not apply to the GSE Loans;

WHEREAS, all other servicers, as well as Fannie Mae and Freddie Mac approved servicers, that wish to participate in the Program with respect to loans that are not GSE Loans (collectively, "Participating Servicers") must agree to certain terms and conditions relating to the respective roles and responsibilities of Program participants and other financial agents of the government; and

WHEREAS, Servicer wishes to participate in the Program as a Participating Servicer on the terms and subject to the conditions set forth herein.

Accordingly, in consideration of the representations, warranties, and mutual agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Fannie Mae and Servicer agree as follows.

## Agreement

### 1. Services

**A.** Subject to Section 10.C., Servicer shall perform the loan modification and other foreclosure prevention services (collectively, the "Services") described in (i) the Financial Instrument attached hereto as Exhibit A (the "Financial Instrument"), (ii) the Program guidelines and procedures issued by the Treasury, including, without limitation, the net present value assessment requirements of the Program (the "Program Guidelines") and (iii) any supplemental documentation, instructions, bulletins, letters, directives, or other communications, including, but not limited to, business continuity requirements, compliance requirements, performance requirements and related remedies, issued by the Treasury, Fannie Mae, or Freddie Mac in order to change or further describe or clarify the scope of, the rights and duties of the Participating Servicers in connection with the Program (the "Supplemental Directives" and, together with the Program Guidelines, the "Program Documentation"). The Program Documentation will be available to all Participating Servicers at www.financialstability.gov. The Program Documentation, as the same may be modified or amended from time to time in accordance with Section 10 below, is hereby incorporated into the Commitment by this reference.

**B.** Servicer's representations and warranties, and acknowledgement of and agreement to fulfill or satisfy certain duties and obligations, with respect to its participation in the Program and under the Agreement are set forth in the Financial Instrument. Servicer's certification as to its continuing compliance with, and the truth and accuracy of, the representations and warranties set forth in the Financial Instrument will be provided annually in the form attached hereto as Exhibit B (the "Annual Certification"), beginning on June 1, 2010 and again on June 1 of each year thereafter during the Term (as defined below).

**C.** The recitals set forth above are hereby incorporated herein by this reference.

### 2. Authority and Agreement to Participate in Program

**A.** Servicer shall perform the Services for all mortgage loans it services, whether it services such mortgage loans for its own account or for the account of another party, including any holders of mortgage-backed securities (each such other party, an "Investor"). Servicer shall use reasonable efforts to remove all prohibitions or impediments to its authority, and use reasonable efforts to obtain all third party consents and waivers that are required, by contract or law, in order to effectuate any modification of a mortgage loan under the Program.

**B.** Notwithstanding subsection A., if (i) Servicer is unable to obtain all necessary consents and waivers for modifying a mortgage loan, or (ii) the pooling and servicing agreement or other similar servicing contract governing Servicer's servicing of a mortgage loan prohibits Servicer from performing the Services for that mortgage loan, Servicer shall not be required to perform the Services with respect to that mortgage loan and shall not receive all or any portion of the Purchase Price (as defined below) otherwise payable with respect to such loan.

**C.** Notwithstanding anything to the contrary contained herein, the Agreement does not apply to GSE Loans. Servicers are directed to the servicing guides and bulletins issued by Fannie Mae and Freddie Mac, respectively, concerning the Program as applied to GSE Loans.

**D.** Servicer's performance of the Services and implementation of the Program shall be subject to review by Freddie Mac and its agents and designees as more fully set forth in the Agreement.

### 3. Set Up; Prerequisite to Payment

Servicer will provide to Fannie Mae: (a) the set up information required by the Program Documentation and any ancillary or administrative information requested by Fannie Mae in order to process Servicer's participation in the Program as a Participating Servicer on or before the Effective Date of the Commitment; and (b) the data elements for each mortgage eligible for the Program

- 2 -

as land, which described in the Program Documentation and the Financial Instrument. Purchase Price payments will not be remitted pursuant to Section 4 with respect to any modified mortgage for which the required data elements have not been provided.

**4. Agreement to Purchase Financial Instrument; Payment of Purchase Price**

A. Fannie Mae, in its capacity as a financial agent of the United States, agrees to purchase, and Servicer agrees to sell to Fannie Mae, in such capacity, the Financial Instrument that is executed and delivered by Servicer to Fannie Mae in the form attached hereto as Exhibit A. In consideration for the payment by Fannie Mae, as agent, of the Purchase Price (defined below). The conditions precedent to the payment by Fannie Mae of the Purchase Price are: (a) the execution and delivery of the Commitment and the Financial Instrument by Servicer to Fannie Mae; (b) the execution and delivery by Fannie Mae of the Commitment to Servicer; (c) the delivery of copies of the fully executed Commitment and Financial Instrument to Treasury on the Effective Date; (d) the performance by Servicer of the Services described in the Agreement, in accordance with the terms and conditions thereof, to the reasonable satisfaction of Fannie Mae and Freddie Mac; and (e) the satisfaction by Servicer of such other obligations as are set forth in the Agreement.

B. Solely in its capacity as the financial agent of the United States, and subject to subsection C. below, Fannie Mae shall: (i) remit compensation payments to Servicer; (ii) remit incentive payments to Servicer for the account of Servicer and for the credit of borrowers under their respective mortgage loan obligations; and (iii) remit payments to Servicer for the account of investors, in each case in accordance with the Program Documentation (all such payments, collectively, the "Purchase Price"). All payments remitted to Servicer for the credit of borrowers or for the account of investors under the Program Documentation shall be applied by Servicer to the borrowers' respective mortgage loan obligations, or remitted by Servicer to investors, as required by the Program Documentation. Fannie Mae shall have no liability to Servicer with respect to the payment of the Purchase Price unless and until: (a) Servicer and all other interested parties have satisfied all the requisites set forth herein and in the Program Documentation relating to the Program payment structure, including, but not limited to, the delivery of all data elements required by Section 3 of this Commitment; and (b) the Treasury has provided funds to Fannie Mae for remittance to Servicer, together with written direction to remit the funds to Servicer in accordance with the Program Documentation.

C. The Purchase Price will be paid to Servicer by Fannie Mae as the financial agent of the United States as and when described herein and in the Program Documentation in consideration for the execution and delivery of the Financial Instrument by Servicer on or before the Effective Date of this Agreement, upon the satisfaction of the conditions precedent to payment described in subsections A. and B. above.

D. The value of the Agreement is limited to $796,200,000 (the "Program Participation Cap"). Accordingly, the aggregate Purchase Price payable to Servicer under this Agreement may not exceed the amount of the Program Participation Cap. For each loan modification that becomes effective, the aggregate remaining Purchase Price available to be paid to Servicer under the Agreement will be reduced by the maximum Purchase Price potentially payable with respect to that loan modification. In the event the Purchase Price actually paid with respect to that loan modification is less than the maximum Purchase Price potentially payable, the aggregate remaining Purchase Price available to be paid to Servicer under the Agreement will be increased by the difference between such amounts. Notwithstanding the foregoing, no agreements with borrowers that would result in new loan modifications, will be effected under the Agreement, and no payments will be made with respect to any new loan modifications, from and after the date on which the aggregate Purchase Price paid or payable to Servicer under the Agreement equals the Program Participation Cap. Treasury may, from time to time in its sole discretion, adjust the amount of the Program Participation Cap. Servicer will be notified of all adjustments to the Program Participation Cap in writing by Fannie Mae.

E. Servicer shall maintain complete and accurate records of, and supporting documentation for, the borrower payment, including, but not limited to, PITIA (principal, interest, taxes, insurance (including homeowner's insurance and hazard and flood insurance) and homeowner's association and/or condo fees), and delinquency information and data provided to Fannie Mae regarding each agreement relating to a trial modification period and each loan modification agreement executed under the Program, which will be relied upon by Fannie Mae when calculating, as financial agent for the United States, the Purchase Price to be paid by the Treasury through Fannie Mae or any other financial agent. Servicer agrees to provide Fannie Mae and Freddie Mac with documentation and

- 3 -

other information with respect to any amounts paid by the Treasury as may be reasonably requested by such parties. In the event of a discrepancy or error in the amount of the Purchase Price paid hereunder, at Fannie Mae's election, (x) Servicer shall remit to Fannie Mae the amount of any overpayment within thirty (30) days of receiving a refund request from Fannie Mae, or (y) Fannie Mae may immediately offset the amount of the overpayment against other amounts due and payable to Servicer by Fannie Mae, or (z) financial agent of the United States, upon written notice to Servicer. Servicer shall still be obligated to credit to the respective mortgage loan obligations of borrowers, and to the respective accounts of Investors, any portion of the Purchase Price which they are entitled (if any) notwithstanding such offset unless otherwise directed by Fannie Mae.

F. At the election and upon the direction of the Treasury and with prior written notice to Servicer, Fannie Mae may deduct from any amount to be paid to Servicer any amount that Servicer, Investor, or borrower is obligated to reimburse or pay to the United States government, provided, however, that any amount withheld under this subsection F. will be withheld only from the amounts payable to, or for the account or credit of, the party which is liable for the obligation to the United States government.

G. In the event that the Agreement expires or is terminated pursuant to Section 3 or Section 5, and subject to Fannie Mae's rights under Section 6, Fannie Mae shall, solely in its capacity as the financial agent of the United States, continue to remit all amounts that are properly payable pursuant to subsection A. above to Servicer in accordance with the Program Documentation until paid in full, provided, however, that Purchase Price payments will be made only with respect to qualifying mortgage loan modifications that were submitted by Servicer and accepted by Fannie Mae for inclusion in the Program in accordance with the Program Documentation prior to the date of expiration or termination and that do not exceed the Program Participation Cap.

H. Notwithstanding anything to the contrary contained in subsection G. above, in the event that the Agreement is terminated pursuant to Section 6 B. in connection with an Event of Default by Servicer under Section F A., no compensation with respect to any loan will be paid to Servicer for the account of the Servicer subsequent to termination; subject to Fannie Mae's rights under Section 6, Fannie Mae's only continuing obligations as financial agent of the United States subsequent to termination will be to remit payments to Servicer (or, at Fannie Mae's alteration, an alternative provider) for the account of borrowers and Investors, as provided in the Agreement.

I. Notwithstanding anything to the contrary contained in subsection F. above, in the event that the Agreement is terminated pursuant to Section 6 C. in connection with an Event of Default by an Investor under Section 6 A., no compensation with respect to any loan will be paid to Servicer for the credit of account of the defaulting party subsequent to termination; subject to Fannie Mae's rights under Section 6, Fannie Mae's only continuing obligations as financial agent of the United States subsequent to termination will be to remit payments to Servicer for the credit or account of non-defaulting parties as described in the Program Documentation.

J. Notwithstanding anything to the contrary contained herein, Fannie Mae, in its capacity as the financial agent of the United States, may reduce the amounts payable to Servicer under Section 4 B., or obtain repayment of prior payments made under Section 4 B., in connection with an Event of Default by Servicer or in connection with an evaluation of performance that includes any specific findings by Freddie Mac that Servicer's performance under any performance criteria established pursuant to the Program Documentation is materially insufficient, provided, however, Fannie Mae will seek to obtain repayment of prior payments made under Section 4 B. only with respect to loan modifications that are determined by Fannie Mae or Freddie Mac to have been impacted by, or that Fannie Mae or Freddie Mac believes may have been, or may be, impacted, by the Event of Default or findings giving rise to this remedy. These remedies are not exclusive; they are available in addition to, and not in lieu of, any other remedies available to Fannie Mae at law or in equity.

K. Notwithstanding anything to the contrary contained herein, Fannie Mae, in its capacity as the financial agent of the United States, may reduce the amounts payable to Servicer for the credit or account of an Investor or a borrower under Section 4 B., or obtain repayment of prior payments made for the credit or account of such parties under Section 4 B., in connection with an Event of Default by an Investor or a borrower. Servicer will reasonably cooperate with, and provide reasonable support and assistance to, Fannie Mae and Freddie Mac in connection with their respective roles and, in Fannie Mae's case, in connection with its efforts to obtain repayment of prior payments made to Investors and borrowers as provided in this subsection. These remedies are not

- 4 -

exclusive; they are available in addition to, and not in lieu of, any other remedies available to Fannie Mae at law or in equity.

**3. Term**

A. Qualifying mortgage loans may be submitted by Servicer and accepted by Fannie Mae as described in the Financial Instrument and the Program Documentation from and after the Effective Date until December 31, 2012 (the "Initial Term"), subject to Program extension by the Treasury or earlier termination of the Agreement by Fannie Mae pursuant to the provisions hereof for suspension or termination of the Program by that Treasury provided, however, no new qualifying mortgage loans may be submitted by Servicer or accepted by Fannie Mae from and after the date on which the Program Participation Cap is reached.

B. Servicer shall perform the Services described in the Program Documentation in accordance with the terms and conditions of the Agreement during the Initial Term and any extensions thereof (the Initial Term, together with all extensions thereof, if any, the "Term"), and during such additional period as may be necessary to (i) comply with all data collection, retention and reporting requirements specified in the Program Documentation during and for the periods set forth therein; and (ii) complete all Services that were initiated by Servicer, including, but not limited to, mortgage modifications and the completion of all documentation relating thereto, during the Term. Servicer agrees that it will work diligently to complete all Services as soon as reasonably possible after the End of the Term or after termination.

C. The Agreement may be terminated by Fannie Mae or Servicer prior to the end of the Term pursuant to Section 6 below.

**5. Defaults and Early Termination**

A. The following constitute events of default under the Agreement (each, an "Event of Default" and, collectively, "Events of Default"):

(1) Servicer fails to perform or comply with any of its material obligations under the Agreement, including, but not limited to, circumstances in which Servicer fails to ensure that all eligibility criteria and other conditions precedent to modifications specified in the Program Documentation are satisfied prior to effectuating modifications under the Program.

(2) Servicer: (i) ceases to do business as a going concern; (b) makes a general assignment for the benefit of, or enters into any arrangement with creditors in lieu thereof; (c) admits in writing its inability to pay its debts as they become due; (d) files a voluntary petition under any bankruptcy or insolvency law or files a voluntary petition under the reorganization or arrangement provisions of the laws of the United States or any other jurisdiction; (e) authorizes, applies for or consents to the appointment of a trustee or liquidator of all or substantially all of its assets; (f) has any substantial part of its property subjected to any levy, seizure, assignment or sale for or by any creditor or governmental agency; or (g) enters into an agreement or resolution to take any of the foregoing actions;

(3) Servicer, any employee or contractor of Servicer, or any employee or contractor of Servicers' contractors, or any investor or borrower, commits a grossly negligent, willful or intentional, or reckless act (including, but not limited to, fraud) in connection with the Program or the Agreement.

(4) Any representation, warranty, or covenant made by Servicer in the Agreement or any Annual Certification is or becomes materially false, misleading, incorrect, or incomplete.

(5) An evaluation of performance that includes any specific findings by Freddie Mac, in its sole discretion, that Servicer's performance under any performance criteria established pursuant to the Program Documentation is materially insufficient, or any failure by Servicer to comply with any

- 5 -

directive issued by Fannie Mae or Freddie Mac with respect to documents or data required, findings made, or remedies established, by Fannie Mae and/or Freddie Mac in conjunction with such performance criteria or other Program requirements.

B. Fannie Mae may take any, all, or none of the following actions upon an Event of Default by Servicer under the Agreement:

(1) Fannie Mae may: (i) withhold some or all of the Servicer's portion of the Purchase Price until, in Fannie Mae's determination, Servicer has cured the default, and (ii) choose to utilize alternative means of paying any portion of the Purchase Price for the benefit of account of borrowers and investors and delay paying such portion pending adoption of such alternative means.

(2) Fannie Mae may: (i) reduce the amounts payable to Servicer under Section 4.B, and/or (ii) require repayment of prior payments made to Servicer under Section 4.B, provided, however, Fannie Mae will seek to obtain repayment of prior payments made under Section 4.B. only with respect to loan modifications that are determined by Fannie Mae or Freddie Mac to have been impacted, or that Fannie Mae or Freddie Mac believes may have been, or may be, impacted, by the Event of Default giving rise to the remedy.

(3) Fannie Mae may require Servicer to submit to additional Program administrator oversight, including, but not limited to, additional compliance controls and quality control reviews.

(4) Fannie Mae may terminate the Agreement and cease its performance hereunder as to some or all of the mortgage loans subject to the Agreement.

(5) Fannie Mae may require Servicer to submit to information and reporting with respect to its financial condition and ability to continue to meet its obligations under this Agreement.

C. Fannie Mae may take any, all, or none of the following actions upon an Event of Default involving an Investor or a borrower in connection with the Program:

(1) Fannie Mae may withhold all or any portion of the Purchase Price payable to, or for the credit or account of, the defaulting party until, in Fannie Mae's determination, the default has been cured or otherwise remedied to Fannie Mae's satisfaction.

(2) Fannie Mae may: (i) reduce the amount payable to Servicer for the credit, or account of, the defaulting party under Section 4.B; and/or (ii) require repayment of prior payments made to the defaulting party under Section 4.B. Servicer will reasonably cooperate with, and provide reasonable support and assistance to, Fannie Mae and Freddie Mac in connection with their respective roles and, in Fannie Mae's case, in connection with its efforts to obtain repayments of prior payments made to investors and borrowers as provided in this subsection.

(3) Fannie Mae may require Servicer to submit to additional Program administrator oversight, including, but not limited to, additional compliance controls and quality control reviews.

(4) Fannie Mae may cease its performance hereunder as to some or all of the mortgage loans subject to the Agreement that relate to the defaulting investor or borrower.

D. In addition to the termination rights set forth above, Fannie Mae may terminate the Agreement immediately upon written notice to Servicer:

- 6 -

Exhibit 1| Page 7
Case 3:18-cv-00288-MOC-DSC   Document 1-1   Filed 06/01/18   Page 106 of 177

(1) at the direction of the Treasury;

(2) in the event of a merger, acquisition, or other change of control of Servicer;

(3) in the event that a receiver, liquidator, trustee, or other custodian is appointed for the Servicer; or

(4) in the event that a material term of the Agreement is determined to be prohibited or unenforceable as referred to in Section 11.C.

E. This Agreement will terminate automatically:

(1) in the event that the Financial Agency Agreement, dated February 18, 2009, by and between Fannie Mae and the Treasury is terminated; or

(2) upon the expiration or termination of the Program.

F. The remedies available to Fannie Mae upon an Event of Default under this Section are cumulative and not exclusive; further, these remedies are in addition to, and not in lieu of, any other remedies available to Fannie Mae in law or in equity.

G. In the event of termination of this Agreement under any circumstances, Servicer and Fannie Mae agree to cooperate with one another on an ongoing basis to ensure an effective and orderly transition or resolution of the Services, including the provision of any information, reporting, records and data required by Fannie Mae and Freddie Mac.

H. If an Event of Default under Section 6.A.1., Section 6.A.4., or Section 6.A.5. occurs and Fannie Mae determines, in its sole discretion, that the Event of Default is curable and elects to exercise its right to terminate the Agreement, Fannie Mae will provide written notice of the Event of Default to Servicer and the Agreement will terminate automatically thirty (30) days after Servicer's receipt of such notice, if the Event of Default is not cured by Servicer to the reasonable satisfaction of Fannie Mae prior to the end of such thirty (30) day period. If Fannie Mae determines, in its sole discretion, that an Event of Default under Section 6.A.1., Section 6.A.4. or Section 6.A.5. is not curable, or if an Event of Default under Section 6.A.2. or Section 6.A.3. occurs, and Fannie Mae elects to exercise its right to terminate the Agreement under Section 6.D.A., Fannie Mae will provide written notice of termination to the Servicer on or before the effective date of the termination.

## 7. Disputes

Fannie Mae and Servicer agree that it is in their mutual interest to resolve disputes by agreement. If a dispute arises under the Agreement, the parties will use all reasonable efforts to promptly resolve the dispute by mutual agreement. If a dispute cannot be resolved informally by mutual agreement at the lowest possible level, the dispute shall be referred up the respective chain of command of each party in an attempt to resolve the matter. This will be done in an expeditious manner. Servicer shall continue diligent performance of the Services pending resolution of any dispute. Fannie Mae and Servicer reserve the right to pursue any legal or equitable rights they may have concerning any dispute. However, the parties agree to take all reasonable steps to resolve disputes internally before commencing legal proceedings.

## 8. Transfer or Assignment

A. Servicer must provide written notice to Fannie Mae and Freddie Mac pursuant to Section 9 below of: (i) any transfers or assignments of mortgage loans subject to this Agreement; and (ii) any other transfers or assignments of Servicer's rights and obligations under this Agreement. Such notice must include payment instructions for payments to be made to the transferee or assignee of the mortgage loans subject to the notice (if applicable), and evidence of the assumption by such transferee or assignee of the mortgage loans or other rights and obligations that are transferred, in the form of Exhibit C (the "Assignment and

- 7 -

Assumption Agreement ("). Servicer acknowledges that Fannie Mae will continue to remit payments to Servicer in accordance with Section 4.15, with respect to mortgage loans that have been assigned or transferred, and that Servicer will be liable for underpayments, overpayments and misdirected payments, unless and until such notice and an executed Assignment and Assumption Agreement are provided to Fannie Mae and Freddie Mac. Any purported transfer or assignment of mortgage loans or other rights or obligations under the Agreement in violation of this Section is void.

D. Servicer shall notify Fannie Mae as soon as legally possible of any proposed merger, acquisition, or other change of control of Servicer, and of any financial and operational circumstances, which may impair Servicer's ability to perform its obligations under this Agreement.

## 7. Notices

All legal notices under the Agreement shall be in writing and referred to each party's point of contact identified below at the address listed below, or to such other point of contact and such other address as may be designated in writing by such party. All such notices under the Agreement shall be considered received: (a) when personally delivered; (b) when delivered by commercial over-night courier with verification receipt; (c) when sent by confirmed facsimile; or (d) three (3) days after having been sent, postage prepaid, via certified mail, return receipt requested. Notices shall not be made or delivered in electronic form, except as provided in Section 12-B, below, provided, however, that the party giving the notice may send an e-mail to the party receiving the notice advising that party that a notice has been sent by means permitted under this Section.

To Servicer:

Bank of America
1900 Madera Road
Mail Code: CA6-930-01-07
Simi Valley, CA 93065
email:

Facsimile:

With copy to:

Bank of America
Bank of America Plaza
101 S. Tryon Street
Mail Code: NC1-002-29-01
Charlotte, NC 28255-0001
email:
Facsimile:

- 8 -

To Fannie Mae:

Fannie Mae
3900 Wisconsin Avenue, NW
Washington, DC 20016
Attention: General Counsel
Facsimile: [redacted]
email: [redacted]

To Treasury:

Chief
Office of Homeownership Preservation
Office of Financial Stability
Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC 20220
Facsimile: (202) 622-9219

To Freddie Mac:

Freddie Mac
8100 Jones Branch Drive
McLean, VA 22102
Attention: Vice President, Making Home Affordable — Compliance
Facsimile: (703) 903-2544
Email to: MHA_Compliance@freddiemac.com

10. Modifications

A. Subject to Sections 10.B. and 10.C., modifications to the Agreement shall be in writing and signed by Fannie Mae and Servicer.

B. Fannie Mae and the Treasury each reserve the right to unilaterally modify or supplement the terms and provisions of the Program Documentation that relate (as determined by Fannie Mae or the Treasury, in their reasonable discretion) to the compliance and performance requirements of the Program, and related remedies established by Freddie Mac, and/or to technical, administrative, or procedural matters or compliance and reporting requirements that may impact the administration of the Program.

C. Notwithstanding Sections 10.A. and 10.B., any modification to the Program Documentation that materially impacts the borrower eligibility requirements, the amount of payments of the Purchase Price to be made to Participating Servicers, Investors and borrowers under the Program, or the rights, duties, or obligations of Participating Servicers, Investors or borrowers in connection with the Program (each, a "Program Modification" and, collectively, the "Program Modifications") shall be effective only on a prospective basis; Participating Servicers will be afforded the opportunity to opt-out of the Program when Program Modifications are published with respect to some or all of the mortgage loans sought to be modified under the Program on or after the effective date of the Program Modification, at Servicer's discretion. Opt-out procedures, including, but not limited to, the time and process for notification of election to opt-out and the window for such election, will be set forth in the Program Documentation describing the Program Modification, provided, however, that Servicer will be given at least thirty (30) days to elect to opt-out of a Program Modification. For the avoidance of doubt, during the period during which Servicer may elect to opt-out of a Program Modification

and after any such opt-out is elected by Servicer, Servicer will continue to perform the Services described in the Financial Instrument and the Program Documentation (as the Program Documentation existed immediately prior to the publication of the Program modification prompting the opt-out) with respect to qualifying mortgage loan modifications that were submitted by Servicer and accepted by Fannie Mae prior to the opt-out.

## 11.  Miscellaneous

A.  The Agreement shall be governed by and construed under Federal law and not the law of any state or locality, without reference to or application of the conflicts of law principles.  Any and all disputes between the parties that cannot be settled by mutual agreement shall be resolved solely and exclusively in the United States Federal courts located within the District of Columbia.  Both parties consent to the jurisdiction and venue of such courts and irrevocably waive any objections thereto.

B.  The Agreement is not a Federal procurement contract and is therefore not subject to the provisions of the Federal Property and Administrative Services Act (41 U.S.C. §§ 251-260), the Federal Acquisition Regulations (48 CFR Chapter 1), or any other Federal procurement law.

C.  Any provision of the Agreement that is determined to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of the Agreement, and no such prohibition or unenforceability in any jurisdiction shall invalidate such provision in any other jurisdiction.

D.  Failure, on the part of Fannie Mae to insist upon strict compliance with any of the terms hereof shall not be deemed a waiver, nor will any waiver hereunder at any time be deemed a waiver at any other time.  No waiver will be valid unless in writing and signed by an authorized officer of Fannie Mae.  No failure by Fannie Mae to exercise any right, remedy, or power hereunder will operate as a waiver thereof.  The rights, remedies, and powers provided herein are cumulative and not exhaustive of any rights, remedies, and powers provided by law.

E.  The Agreement shall inure to the benefit of and be binding upon the parties to the Agreement and their permitted successors-in-interest.

F.  The Commitment and the Assignment and Assumption Agreement (if applicable) may be executed in two or more counterparts (and by different parties on separate counterparts), each of which shall be an original, but all of which together shall constitute one and the same instrument.

G.  The Commitment, together with the Financial Instrument, the Annual Certifications, the Assignment and Assumption Agreement (if applicable) and the Program Documentation, constitutes the entire agreement of the parties with respect to the subject matter hereof.  In the event of a conflict between any of the foregoing documents and the Program Documentation, the Program Documentation shall prevail.  In the event of a conflict between the Program Guidelines and the Supplemental Directives, the Program Guidelines shall prevail.

H.  Any provisions of the Agreement (including all documents incorporated by reference thereto) that contemplate their continuing effectiveness, including, but not limited to, Sections 4, 5 B, 5 F, 6 G, 9, 11 and 12 of the Commitment, and Sections 2, 3, 5, 7, 8, 9 and 10 of the Financial Instrument, and any other provisions (or portions thereof) in the Agreement that relate to, or may impact, the ability of Fannie Mae and Freddie Mac to fulfill their responsibilities as agents of the United States in connection with the Program, shall survive the expiration or termination of the Agreement.

## 12.  Defined Terms; Incorporation by Reference

A.  All references to the "Agreement" necessarily include, in all instances, the Commitment and all documents incorporated into the Commitment by reference, whether or not so noted contextually, and all amendments and modifications thereto.  Specific references

Exhibit 1| Page 11
Case 3:18-cv-00288-MOC-DSC   Document 1-1   Filed 06/01/18   Page 110 of 177

throughout the Agreement to include (final) documents that are incorporated by reference into the Commitment and (as inclusive of any other documents that are incorporated by reference, unless provided contextually).

B. The term "Effective Date" means the date on which Fannie Mae transmits a copy of the fully executed Commitment and Financial Instrument to Treasury and Servicer with a completed cover sheet in the form attached hereto as Exhibit E (the "Cover Sheet"). The Commitment and Financial Instrument and accompanying Cover Sheet will be faxed, emailed, or made available through other electronic means to Treasury and Servicer in accordance with Section 2.

C. The Program Documents (are and Exhibit A – Form of Financial Instrument, Exhibit B – Form of Annual Certification, Exhibit C – Form of Assignment and Assumption Agreement and Exhibit D – Form of Cover Sheet (in each case, in form and, upon completion, in substance), including all amendments and modifications thereto, are incorporated into this Commitment by this reference and given the same force and effect as though fully set forth herein.

[SIGNATURE PAGE FOLLOWS/REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

- 11

In Witness Whereof, Servicer and Fannie Mae by their duly authorized officials hereby execute and deliver this Commitment to Purchase Financial Instrument and Servicer Participation Agreement as of the Effective Date.

SERVICER: Bank of America, N.A.

By: _____
Name: _____
Title: Senior Vice President
Date: April 17, 2009

FANNIE MAE, solely as Financial Agent of the United States

By: _____
Name: Leslie Peelo
Title: Vice President
Date: 4/17/09

**EXHIBITS**

Exhibit A    Form of Financial Instrument

Exhibit B    Form of Annual Certification

Exhibit C    Form of Assignment and Assumption Agreement

Exhibit D    Form of Cover Sheet

- 12 -

**EXHIBIT A**

**FORM OR FINANCIAL INSTRUMENT**

# FINANCIAL INSTRUMENT

This Financial Instrument is delivered as provided in Section 1 of the Commitment to Purchase Financial Instrument and Servicer Participation Agreement (the "Commitment"), entered into as of the Effective Date, by and between Federal National Mortgage Association ("Fannie Mae"), a federally chartered corporation, acting as financial agent of the United States, and the undersigned party ("Servicer"). This Financial Instrument is effective as of the Effective Date. All of the capitalized terms that are used but not defined herein shall have the meanings ascribed to them in the Commitment.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Servicer agrees as follows:

1. **Purchase Price Consideration; Services.** This Financial Instrument is being purchased by Fannie Mae pursuant to Section 1 of the Commitment in consideration for the payment by Fannie Mae, in its capacity as a financial agent of the United States, of various payments detailed in the Program Documentation and referred to collectively in the Commitment as the "Purchase Price." The conditions precedent to the payment by Fannie Mae of the Purchase Price are: (a) the execution and delivery of this Financial Instrument and the Commitment by Servicer to Fannie Mae; (b) the execution and delivery by Fannie Mae of the Commitment to Servicer; (c) the delivery of copies of the fully executed Commitment and Financial Instrument to Treasury on the Effective Date; (d) the performance by Servicer of the Services described in the Agreement; and (e) the satisfaction by Servicer of such other obligations as are set forth in the Agreement. Servicer shall perform all Services in consideration for the Purchase Price in accordance with the terms and conditions of the Agreement, to the reasonable satisfaction of Fannie Mae and Freddie Mac.

2. **Authorized to Participate in Program.** Subject to the limitations set forth in Section 2 of the Agreement, Servicer shall use reasonable efforts to remove all prohibitions or impediments to its authority and to obtain all third party consents and waivers that are required, by contract or law, in order to effectuate any loan modification under the Program.

3. **Audits, Reporting and Data Retention.**

   (a) Freddie Mac, the Federal Housing Finance Agency and other parties designated by the Treasury or applicable law shall have the right during normal business hours to conduct unannounced, informal on-site visits and to conduct formal on-site and off-site physical, personnel and information technology testing, security review, and audits of Servicer and to examine all books, records and data related to the Services provided and Purchase Price received in connection with the Program on thirty (30) days' prior written notice.

   (b) Servicer will collect, record, retain and provide to Treasury, Fannie Mae and Freddie Mac all data, information and documentation relating to the Program and borrowers, loans and loan modifications implemented, or potentially eligible for modification, under the Program and any trials conducted in connection with the Program, as required by the Program Documentation. All such data, information and documentation must be provided to the Treasury, Fannie Mae and Freddie Mac, when and in the manner specified in the Program Documentation. In addition, Servicer will provide copies of executed contracts and tapes of loan pools related to the Program for review upon request.

   (c) Servicer shall promptly take corrective and remedial actions associated with reporting and reviews as directed by Fannie Mae or Freddie Mac and provide to Fannie Mae and Freddie Mac such evidence of the effective implementation of corrective and remedial actions as Fannie Mae and Freddie Mac shall reasonably require. Freddie Mac may conduct additional reviews based on its findings and the corrective actions taken by Servicer.

- 1 -

(d) In addition to any other obligation to retain financial and accounting records that may be imposed by Federal or state law, Servicer shall retain all information described in Section 3(b), and all data, books, reports, documents, audit logs and records, including electronic records, related to the performance of Servicer in connection with the Program. In addition, Servicer shall make a copy of all computer systems and application software necessary to review and analyze these electronic records. Unless otherwise directed by Fannie Mae or Freddie Mac, Servicer shall retain these records for at least 7 years from the date the data or record was created, or for such longer period as may be required pursuant to applicable law. Fannie Mae or Freddie Mac may also notify Servicer from time to time of any additional record retention requirements resulting from litigation and regulatory investigations to which the Treasury or any agents of the United States may have an interest, and Servicer agrees to comply with these litigation and regulatory investigations requirements.

4.  Internal Control Program.

   (a) Servicer shall develop, enforce and review on a quarterly basis for effectiveness an internal control program designed to: (i) ensure effective delivery of Services in connection with the Program and compliance with the Program Documentation; (ii) effectively monitor and detect loan modification fraud and (iii) effectively monitor compliance with applicable consumer protection and fair lending laws. The internal control program must include documentation of the control objectives for Program activities, the associated control techniques, and mechanisms for testing and validating the controls.

   (b) Servicer shall provide Freddie Mac with access to all internal control reviews and reports that relate to Services under the Program performed by Servicer and its independent auditing firm to enable Freddie Mac to fulfill its duties as a compliance agent of the United States; copies of the reviews and reports will be provided to Fannie Mae for record keeping and other administrative purposes.

5.  Representations, Warranties and Covenants. Servicer makes the following representations, warranties and covenants to Fannie Mae, Freddie Mac and the Treasury, the truth and accuracy of which are continuing obligations of Servicer. In the event that any of the representations, warranties, or covenants made herein cease to be true and correct, Servicer agrees to notify Fannie Mae and Freddie Mac immediately.

   (a) Servicer is established under the laws of the United States or any state, territory, or possession of the United States or the District of Columbia, and has significant operations in the United States. Servicer has full corporate power and authority to enter into, execute, and deliver the Agreement and to perform its obligations hereunder and has all licenses necessary to carry on its business as now being conducted and as contemplated by the Agreement.

   (b) Servicer is in compliance with, and covenants that all Services will be performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, rules and regulations, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq., the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices and all applicable laws governing tenant rights. Subject to the following sentence, Servicer has obtained or made, or will obtain or make, all governmental approvals or registrations required under law and has obtained or will obtain all consents necessary to authorize the performance of its obligations under the Program and the Agreement. The performance of Services under the Agreement will not conflict with, or be prohibited in any way by, any other agreement or statutory restriction by which Servicer is bound,

-2-

provided, however, that Fannie Mae acknowledges and agrees that this representation and warranty is qualified solely by and to the extent of any contractual limitations established under applicable servicing contracts to which Servicer is subject. Servicer is not aware of any other legal or financial impediment to its performing its obligations under the Program or the Agreement and shall promptly notify Fannie Mae of any financial and/or operational impediment which may impair its ability to perform its obligations under the Program or the Agreement. Servicer is not delinquent on any Federal tax obligation or any other debt owed to the United States or collected by the United States for the benefit of others, excluding any debt or obligation that is being contested in good faith.

(b) Servicer covenants that: (i) it will perform its obligations in accordance with the Agreement and will promptly provide such performance reporting as Fannie Mae may reasonably require; (ii) all portfolio modifications and all trial period modifications will be offered to borrowers, fully documented and reviewed in accordance with the Program Documentation; and (iii) all data, collection information and other information reported by Servicer to Fannie Mae and Freddie Mac under the Agreement, including, but not limited to, information that is relied upon by Fannie Mae or Freddie Mac in calculating the Purchase Price or in performing any compliance review will be true, complete and accurate in all material respects, and consistent with all relevant records kept, as and when provided.

(c) Servicer covenants that it will: (i) perform the Services required under the Program Documentation and the Agreement in accordance with the practices, high professional standards of care, and degree of skill used by well-managed operators, and no less than that which the Servicer exercises for itself under similar circumstances; and (ii) use qualified individuals with suitable training, education, experience and skills to perform the Services. Servicer acknowledges that Program participation may require changes to, or the implementation of, its systems, staffing and procedures, and covenants and agrees to take all actions necessary to ensure it has the capacity to implement the Program in accordance with the Agreement.

(d) Servicer covenants that it will comply with all regulations on conflicts of interest that are applicable to Servicer in connection with the conduct of its business and all conflict of interest and non-disclosure obligations and restrictions and related mitigation procedures set forth in the Program Documentation (if any).

(f) Servicer acknowledges that the provision of false or misleading information to Fannie Mae or Freddie Mac in connection with the Program or pursuant to the Agreement may constitute a violation of: (a) Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code, or (b) the civil False Claims Act (31 U.S.C. §§ 3729-3733). Servicer covenants to disclose to Fannie Mae and Freddie Mac any credible evidence, in connection with the Services, that a management official, employee, or contractor of Servicer has committed, or may have committed, a violation of the referenced statutes.

(g) Servicer covenants to disclose to Fannie Mae and Freddie Mac any other facts or information that the Treasury, Fannie Mae or Freddie Mac should reasonably expect to know about Servicer and its contractors to help protect the reputational interests of the Treasury, Fannie Mae and Freddie Mac in managing and monitoring the Program.

(h) Servicer covenants that it will timely inform Fannie Mae and Freddie Mac of any anticipated Event of Default.

- 3 -

(i) Servicer acknowledges that Fannie Mae or Freddie Mac may be required to assist the Treasury with respect to the Privacy Act of 1974 (the "Privacy Act"), 5 USC § 552a, inquiries from borrowers and Freedom of Information Act, 5 USC § 552, inquiries from other parties, as well as, formal inquiries from Congressional committees and members, the Government Accounting Office, Inspectors General and other government entities, as well as media and consumer advocacy group inquiries about the Program and its effectiveness. Servicer covenants that it will respond promptly and accurately to all search requests made by Fannie Mae or Freddie Mac, comply with any related procedures which Fannie Mae or Freddie Mac may establish, and provide related training to employees and contractors. In connection with Privacy Act inquiries, Servicer covenants that it will provide updated and corrected information as appropriate about borrowers' records to ensure that any system of records maintained by Fannie Mae on behalf of the Treasury is accurate and complete.

(ii) Servicer acknowledges that Fannie Mae is required to develop and implement customer service call centers to respond to borrowers' and other parties' inquiries regarding the Program, which may require additional support from Servicer. Servicer covenants that it will provide such additional customer service call support as Fannie Mae reasonably determines is necessary to support the Program.

(iii) Servicer acknowledges that Fannie Mae and Freddie Mac are required to develop and implement practices to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws. Servicer covenants that it will fully and promptly cooperate with Fannie Mae's inquiries about loan modification fraud and legal compliance and comply with any anti-fraud and legal compliance procedures which Fannie Mae and/or Freddie Mac may require. Servicer covenants that it will develop and implement an internal control program to monitor and detect loan modification fraud and to ensure compliance with applicable consumer protection and fair lending laws, among other things, as provided in Section 4 of this Financial Instrument and acknowledges that the internal control program will be monitored, as provided in such Section.

(iv) Servicer shall also deliver an Annual Certification to Fannie Mae and Freddie Mac beginning on June 1, 2010 and again on June 1 of each year thereafter during the Term, in the form attached as EXHIBIT B to this Agreement.

6. Use of Contractors. Servicer is responsible for the supervision and management of any contractor that assists in the performance of Services in connection with the Program. Servicer shall remove and replace any contractor that fails to perform. Servicer shall ensure that all of its contractors comply with the terms and provisions of the Agreement. Servicer shall be responsible for the acts or omissions of its contractors as if the acts or omissions were by the Servicer.

7. Data Rights.

(a) For purposes of this Section, the following definitions apply:

(i) "Data" means any recorded information, regardless of form or the media on which it may be recorded, regarding any of the Services provided in connection with the Program;

(ii) "Limited Rights" means non-exclusive rights to, without limitation, use, copy, maintain, modify, enhance, disclose, reproduce, prepare derivative works, and distribute, in any manner, for any purpose related to the administration, activities, review, or audit of, or public reporting regarding, the Program and to permit others to do so in connection therewith.

- 6 -

(iii) "NPI" means nonpublic personal information, as defined under the GLB.

(iv) "GLB" means the Gramm-Leach-Bliley Act, 15 U.S.C. 6801-6809.

(b) Subject to Section 7(c) below, Treasury, Fannie Mae and Freddie Mac shall have Limited Rights, with respect to all Data produced, developed, or obtained by Servicer or a subcontractor of Servicer in connection with the Program, provided, however, that NPI will not be maintained by Fannie Mae in violation of the GLB and, provided, further, that Servicer acknowledges and agrees that any use of NPI by the distribution of NPI to or the transfer of NPI among Federal, state and local government organizations shall not constitute a violation of the GLB for purposes of the Agreement. If requested, such Data shall be made available to the Treasury, Fannie Mae or Freddie Mac upon request, as is and when directed by the Program Documentation, in industry standard usable format.

(c) Servicer expressly consents to the publication of its name as a participant in the Program, and the use and publication of Servicer's Data, subject to applicable state and Federal laws regarding confidentiality, in any form and or any media utilized by Treasury, Fannie Mae or Freddie Mac, including but not limited to, on any website or web page hosted by Treasury, Fannie Mae, or Freddie Mac. In connection with the Program, provided that no Data placed in the public domain will (i) contain the name, social security number, or other address of any Borrower or other information that would allow the borrower to be identified; or (ii) if presented in a form that links the Servicer with the Data, include information other than program performance and participation, such as the number and type of modifications, performance of modifications, characteristics of the modified loans, or program compliance, or fees, with any information about any borrower limited to creditworthiness characteristics such as debt, income, and credit score. In any Data provided to an enforcement or supervisory agency with jurisdiction over the Servicer, these limitations on borrower information do not apply.

8. Publicity and Disclosure

(a) Servicer shall not make use of any Treasury name, symbol, emblem, program fabric, or product name, in any advertising, displays, promotional material, press release, Web page, publication, or media interview, without the prior written consent of the Treasury.

(b) Servicer shall not publish, or cause to have published, or make public use of Fannie Mae's name, logos, trademarks, or any information about its relationship with Fannie Mae without the prior written permission of Fannie Mae, which permission may be withdrawn at any time in Fannie Mae's sole discretion.

(c) Servicer shall not publish, or cause to have published, or make public use of Freddie Mac's name (i.e., "Freddie Mac" or "Federal Home Loan Mortgage Corporation"), logos, trademarks, or any information about its relationship with Freddie Mac without the prior written permission of Freddie Mac, which permission may be withdrawn at any time in Freddie Mac's sole discretion.

9. Limitation of Liability. IN NO EVENT SHALL FANNIE MAE, THE TREASURY, OR FREDDIE MAC, OR THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR AFFILIATES BE LIABLE TO SERVICER WITH RESPECT TO THE PROGRAM OR THE AGREEMENT, OR FOR ANY

-5-

ACT OR OMISSION OCCURRING IN CONNECTION WITH THE FOREGOING, FOR ANY DAMAGES OF ANY KIND, INCLUDING, BUT NOT LIMITED TO DIRECT DAMAGES, INDIRECT DAMAGES, LOST PROFITS, LOSS OF BUSINESS, OR OTHER INCIDENTAL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES OF ANY NATURE OR UNDER ANY LEGAL THEORY WHATSOEVER, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND REGARDLESS OF WHETHER OR NOT THE DAMAGES WERE REASONABLY FORESEEABLE; PROVIDED, HOWEVER, THAT THIS PROVISION SHALL NOT LIMIT FANNIE MAE'S OBLIGATION TO REMIT PURCHASE PRICE PAYMENTS TO SERVICER IN ITS CAPACITY AS FINANCIAL AGENT OF THE UNITED STATES IN ACCORDANCE WITH THE AGREEMENT.

10. Indemnification. Servicer shall indemnify, hold harmless, and pay for the defense of Fannie Mae, the Treasury, and Freddie Mac, and their respective officers, directors, employees, agents and affiliates against all claims, liabilities, costs, damages, judgments, suits, actions, losses and expenses, including reasonable attorneys' fees and costs of suit, arising out of or resulting from (a) Servicer's breach of Section 6 (Representations, Warranties and Covenants) of this Financial Instrument; (b) Servicer's negligence, willful misconduct or failure to perform its obligations under the Agreement; or (c) any injuries to persons (including death) or damages to property caused by the negligent or willful acts or omissions of Servicer or its contractors. Servicer shall not be liable for any suit or claim relating to or arising out of any action which Fannie Mae's prior written agreement, which agreement would be adverse to Fannie Mae's interest, or the interest of the Treasury, or Freddie Mac. Servicer agrees to pay or reimburse all costs that may be incurred by Fannie Mae and Freddie Mac in enforcing this indemnity, including attorneys' fees.

IN WITNESS WHEREOF, Servicer hereby executed this Financial Instrument on the date set forth below.

Bank of America, N.A.

[signature]

Senior Vice President, Mortgage Servicing Executive

APRIL 17, 2009
Date

5

**EXHIBIT B**

**FORM OF ANNUAL CERTIFICATION**

## ANNUAL CERTIFICATION

This Annual Certification is delivered as provided in Section 1.8. of the Commitment to Purchase Financial Instrument and Servicer Participation Agreement (the "Commitment"), effective as of [INSERT], by and between Federal National Mortgage Association ("Fannie Mae", a federally chartered corporation, acting as financial agent of the United States; and the undersigned party ("Servicer"). All terms used, but not defined herein, shall have the meanings ascribed to them in the Commitment.

Servicer hereby confirms, as of [INSERT DATE ON WHICH CERTIFICATION IS GIVEN], that:

1.  Servicer is established under the laws of the United States or any state, territory, or possession of the United States or the District of Columbia or has designated operations in the United States. Servicer has full corporate power and authority to execute, and deliver the Agreement and to perform its obligations hereunder and has all licenses necessary to carry on its business as now being conducted and as contemplated by the Agreement.

2.  Servicer is in compliance with, and certifies that all Services have been performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 et seq., the Home Ownership and Equity Protection Act, 15 USC 1639, the Federal Trade Commission Act, 15 USC 41 et seq., the Equal Credit Opportunity Act, 15 USC 701 et seq., the Fair Credit Reporting Act, 15 USC 1681 et seq., the Fair Housing Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices and all applicable laws governing tenant rights. Subject to the following sentence, Servicer has obtained or made all governmental approvals or registrations required under law and has obtained all consents necessary to enable it to enter into the performance of its obligations under the Program and the Agreement. The performance of Servicer's under the Agreement had not conflicted with, or been prohibited in any way by, any other agreement or statutory restriction by which Servicer is bound, except to the extent of any governmental limitation under applicable law taking exception to which Servicer is subject. Servicer is not aware of any other legal or factual impediment to performing its obligations under the Program or the Agreement and has promptly notified Fannie Mae of any financial and/or operational impediment which may impair its ability to perform its obligations under the Program or the Agreement. Servicer is not delinquent on any Federal tax obligation or any other debt owed to the United States or collected by the United States for the benefit of others, excluding any debts or obligations that are being contested in good faith.

3.  (i) Servicer has performed its obligations in accordance with the Agreement and has promptly provided such performance reporting as Fannie Mae and Freddie Mac have reasonably required; (ii) all mortgage modifications and loss mitigation activities have been offered by Servicer to borrowers, fully documented and serviced by Servicer in accordance with the Program Documentation; and (iii) all data, collection information and other information reported by Servicer to Fannie Mae and Freddie Mac under the Agreement, including, but not limited to, information that was relied upon by Fannie Mae and Freddie Mac in calculating the Purchase Price and in performing any compliance review, was true, complete and accurate in all material respects, and consistent with all relevant servicing records, as and when provided.

4.  Servicer has (i) performed the Services required under the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well-managed operation, and no less than that which the Servicer exercises for itself under similar circumstances; and (ii) used qualified individuals with suitable training, education, experience and skills to perform the Services. Servicer acknowledges that Program participation required changes to, or the augmentation of, its systems, staffing and procedures; Servicer took all actions necessary to ensure that it had the capacity to implement the Program in accordance with the Agreement.

5.  Servicer has complied with all regulations on conflicts of interest that are applicable to Servicer in connection with the conduct of its business and all conflicts of interest and non-disclosure obligations and restrictions and related mitigation procedures set forth in the Program Documentation (if any).

6.  Servicer acknowledges that the provision of false or misleading information to Fannie Mae or Freddie Mae in connection with the Program or pursuant to the Agreement may constitute a violation of (a) Federal criminal law involving fraud, conflicts of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or (b) the civil False Claims Act (31 U.S.C. §§ 3729-3733). Servicer has disclosed to Fannie Mae and Freddie Mae any credible evidence, in connection with the Services, that a management official, employee, or contractor of Servicer has committed, or may have committed, a violation of the referenced statutes.

-2-

7. Servicer has disclosed to Fannie Mae and Freddie Mac any objections to information by the Treasury, Fannie Mae or Freddie Mac should reasonably expect to know about Servicer and its contractors to help protect the reputational interests of the Treasury, Fannie Mae and Freddie Mac in managing and monitoring the Program.

8. Servicer acknowledges that Fannie Mae and Freddie Mac may be required to assist the Treasury with complying with the Privacy Act of 1974 (the "Privacy Act"), 5 USC § 552a. Inquiries from borrowers and Freedom of Information Act, 5 USC § 552, inquiries from other parties, as well as formal inquiries from Congressional committees and members, the Government Accounting Office, Inspectors General and other government entities, as well as media and other non-government inquiries about the Program and its requirements. Servicer has responded promptly and accurately to all search requests made by Fannie Mae and Freddie Mac, complied with any related procedures which Fannie Mae and Freddie Mac have established, and provided related training to employees and contractors. In connection with Privacy Act inquiries, Servicer shall provide updated and corrected information as appropriate to borrowers' records to ensure that any system of record maintained by Fannie Mae on behalf of the Treasury is accurate and complete.

9. Servicer acknowledges that Fannie Mac is required to develop and implement customer service call centers to respond to borrowers' and other parties' inquiries regarding the Program, which may require additional support from Servicer. Servicer has provided such additional customer service as may reasonably be requested to support the Program.

10. Servicer acknowledges that Fannie Mae and/or Freddie Mac are required to develop and implement practices to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws. Servicer has fully and promptly cooperated with Fannie Mae's inquiries about loan modification fraud and legal compliance and has complied with any anti-fraud and legal compliance procedures which Fannie Mae may require. Freddie Mac have required, Servicer has developed and implemented an internal control program to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws, among other things, as provided in Section 4 of the Financial Instrument.

In the event that any of the certifications made herein are discovered not to have been true and correct, Servicer agrees to notify Fannie Mae and Freddie Mac immediately.

[INSERT FULL LEGAL NAME OF SERVICER]

_____      _____
[Name of Authorized Official]        Date
[Title of Authorized Official]

-3-

**EXHIBIT C**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "Assignment and Assumption Agreement") is entered into as of [INSERT DATE] by and between [INSERT FULL LEGAL NAME OF ASSIGNOR] ("Assignor") and [INSERT FULL LEGAL NAME OF ASSIGNEE] ("Assignee"). All terms used, but not defined, herein shall have the meanings ascribed to them in the Underlying Agreement (defined below).

WHEREAS, Assignor and Federal National Mortgage Association, a federally-chartered corporation, as financial agent of the United States ("Fannie Mae"), are parties to a Commitment to Purchase Financial Instrument and Servicer Participation Agreement, a complete copy of which (including all exhibits, amendments and modifications thereto) is attached hereto and incorporated herein by this reference (the "Underlying Agreement");

WHEREAS, Assignor has agreed to Assign to Assignee: (i) all of its rights and obligations under the Underlying Agreement with respect to the mortgage loans identified on the schedule attached hereto as Schedule 1 ("Schedule 1") and/or (ii) certain other rights and obligations under the Underlying Agreement that are identified on Schedule 1; and

WHEREAS, Assignee has agreed to assume the mortgage loans and other rights and obligations under the Underlying Agreement identified on Schedule 1.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Assignment. Assignor hereby assigns to Assignee all of Assignor's rights and obligations under the Underlying Agreement with respect to the mortgage loans identified on Schedule 1 and each other rights and obligations under the Underlying Agreement that are identified on Schedule 1.

2. Assumption. Assignee hereby accepts the foregoing assignment and assumes all of the rights and obligations of Assignor under the Underlying Agreement with respect to the mortgage loans identified on Schedule 1 and such other rights and obligations under the Underlying Agreement that are identified on Schedule 1.

3. Effective Date. The date on which the assignment and assumption of rights and obligations under the Underlying Agreement is effective is [INSERT EFFECTIVE DATE OF ASSIGNMENT/ASSUMPTION].

4. Successors. All future transfers and assignments of the mortgage loans, rights and obligations transferred and assigned hereby are subject to the transfer and assignment provisions of the Underlying Agreement. This Assignment and Assumption Agreement shall inure to the benefit of, and be binding upon, the permitted successors and assigns of the parties hereto.

5. Counterparts. This Assignment and Assumption Agreement may be executed in counterparts, each of which shall be an original, but all of which together constitute one and the same instrument.

-1-

IN WITNESS WHEREOF, Assignor and Assignee, by their duly authorized officials, hereby execute and deliver this Assignment and Assumption Agreement, together with Schedule 1, effective as of the date set forth in Section 3 above.

ASSIGNOR: [INSERT FULL LEGAL NAME OF ASSIGNOR]

ASSIGNEE: [INSERT FULL LEGAL NAME OF ASSIGNEE]

By: _____

By: _____

Name: _____

Name: _____

Title: _____

Title: _____

Date: _____

Date: _____

-2-

**SCHEDULE 1**

**To**

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

-1-

## EXHIBIT D

## FORM OF COVER SHEET

## Cover Sheet for Transmission of

### Commitment to Purchase Financial Instrument and Servicer Participation Agreement

**To:** [INSERT FULL LEGAL NAME OF SERVICER] ("Servicer"), [INSERT SERVICER CONTACT]

**From:** Federal National Mortgage Association, a federally chartered corporation, as financial agent of the United States ("Fannie Mae")

**Copy To:** The U.S. Department of the Treasury, [INSERT TREASURY CONTACT]

**Date:** [INSERT DATE OF TRANSMISSION]

**Method of Transmission:** [Facsimile to [INSERT FAX NUMBER OF SERVICER]] [Email with PDF file attachment to [INSERT SERVICER EMAIL ADDRESS]] [specify other method of electronic delivery]]

### NOTICE

This transmission constitutes notice to Servicer that the Commitment to Purchase Financial Instrument and Servicer Participation Agreement, by and between Fannie Mae and Servicer (the "Commitment") and the Financial Instrument attached thereto have been fully executed and are effective as of the date of this transmission. The date of this transmission shall be the "Effective Date" of the Commitment and the Financial Instrument.

Copies of the fully executed Commitment and Financial Instrument are attached to this transmission for your records.

-1-

# EXHIBIT NO. 2

EXHIBIT
2

| IN RE BANK OF AMERICA HOME | : | DECLARATION OF |
| AFFORDABLE MODIFICATION | : | RODRIGO W. HEINLE |
| PROGRAM (HAMP) LITIGATION | : | |
| | : | |
| | : | |

I, Rodrigo W. Heinle, declare as follows:

1.      I am over the age of 18 and I am otherwise competent to testify to the following based
on my own personal knowledge.

2.      From December 2011 through September 2012 I was employed by Bank of America in
Charlotte, North Carolina through APC Workforce Solutions, LLC, an employment agency.
During my employment, I held the title of "Customer Relationship Manager" ("CRM") and was
under the direct supervision of Bank of America Employees, and in particular, Mr. Jamal
Brown. My work primarily involved working with files of homeowners seeking loan
modifications as part of the Home Affordable Modification Program (HAMP).

3.      My job included working with homeowners to complete their HAMP modification
applications and prepare the applications for review by underwriting. In my position as a CRM,
I was required to use several computer programs, including HomeBase, HomeSaver, AS400, I-
Portal and Salesforce.

4.      Bank of America employed a common strategy of delaying HAMP applications. Delay
was achieved using tactics including claiming that documents were incomplete and/or missing
when they were not, or simply claiming files were "under review" when they were not.

5.      During my employment, I was instructed by my manager Jamal Brown, to participate in
what Bank of America called a "blitz." Approximately twice a month, Bank of America would
order CRMs and underwriters "clean out" the backlog of HAMP applications by denying any
file in which the financial documents were more than 60 days old. These included files in which
the homeowner provided all required financial documents and fully complied with the terms of
a Trial Period Plan. During a blitz, a single team would decline thousands of modification files
at a time for no reason other than the documents were more than 60 days old.

6.      During my employment, I personally witnessed my manager Jamal Brown, and other
managers and employees physically destroy packages of documents sent by homeowners to our
office via Fed Ex and other means, for their HAMP modification applications. Homeowner
applications were routinely shredded with no review by Bank of America and at times taken
home by managers in order to conceal the fact they had been received by Bank of America.
Shredding of HAMP applications took place using shredders in our offices and via a company
called "Shred It," a third-party vendor of Bank of America. Because these packages were

1

shredded without review, I have sufficient reason to believe borrower checks, money orders and other forms of payment were shredded along with the HAMP modification applications.

7.     During my employment, and in particular during procedures Bank of America called the "blitz," I was also instructed by my manager Jamal Brown, and other managers, to delete thousands of homeowner HAMP application files from Bank of America computer databases. Upon the instruction of my manager Jamal Brown, and other managers, I deleted thousands of homeowner HAMP application files from Bank of America computer databases, as many as six thousand (6,000) in one day.

8.     Employees who challenged or questioned the ethics of Bank of America's practices described herein and the resulting practice of declining modifications for false and fraudulent reasons, were often fired.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

EXECUTED this 22 day of February, 2017 at Charlotte, North Carolina

By _____
   Rodrigo W. Heinle

Sworn to and subscribed before me this the 22 day of Feb , 2017.

_____
Notary Public
My Comm. Exp.

My Commission Expires: 3.30.21

2

# EXHIBIT NO. 3

EXHIBIT

3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE BANK OF AMERICA HOME AFFORDABLE MODIFICATION PROGRAM (HAMP) CONTRACT LITIGATION | MDL NO. 2193<br><br>Centralized before the Honorable Rya W. Zobel |
| This Document Relates To:<br><br>All Actions | |

### DECLARATION OF William E. Wilson Jr.

I, William E. Wilson Jr., declare as follows:

1.    I am over the age of 18 and I am otherwise competent to testify to the following based on my own personal knowledge.

2.    From June 2010 through August 2012 I was employed by Bank of America in Charlotte, North Carolina. I was first employed as an underwriter. In July, 2011, I was promoted to Case Management Team Manager where I supervised a team of thirteen employees known as "Customer Relationship Managers" ("CRMs"). In both positions, my work primarily involved working with files of homeowners seeking loan modifications as part of the Home Affordable Modification Program (HAMP).

3.    As an underwriter, I worked with a team of approximately 100 other underwriters. Each underwriter in our Charlotte location carried a load of approximately 400 HAMP modification files in their pipeline at any given time. This volume was many times the normal workload for an underwriter. It was impossible to sustain and Bank of America had a significant backlog of applications for HAMP loan modifications.

4.    In July, 2011, Bank of America created a new department it termed the "Case Management Department" in response to reports that it was not meeting its HAMP

obligations. I was among those that opened the Charlotte division of this new department when it was created. This department was staffed by CRM's. Each was supposed to be a "single point of contact" for customers seeking HAMP modifications. I supervised a team of thirteen CRMs. I regularly reviewed the files each CRM was working on using electronic databases and computer systems. I also regularly spoke with customers inquiring about the status of their loan modification when calls were escalated to me.

5.    As both an underwriter and as a Case Management Team Manager, I used Bank of America's computer systems to review the status of loans in the modification process. The computer systems I regularly used included HomeBase, HomeSaver, AS400, I-Portal, LMA, LMP, and Seibel. I primarily used HomeSaver and AS400. Using these systems, I was able to fully review terms of a homeowner's Trial Period Plan and the process that homeowner had undergone to that point. I could determine the payments due from the homeowner, the date and amount of each payment made, the documents requested from the homeowner, the documents provided and the dates the homeowner provided those documents. If needed, I could view the actual using Bank of America's "I-portal" system. Essentially, I could review any borrower's modification process from the start to the time I was reviewing the file on the computer system.

6.    From the start of its participation in HAMP, Bank of America determined whether each applicant would receive a Trial Period Plan based on written financial documentation. Bank of America calculated each borrower's debt to income ratio ("DTI"), performed the HAMP Net Present Value ("NPV") test, and determined the amount of each borrower's trial payment by reviewing documents such as tax returns, pay stubs, bank statements, credit reports and other financial information the borrower provided. Bank of America required HAMP applicants to document their assets and income and would not issue a Trial Period Plan without a borrower first providing extensive financial documentation. Bank of America did not issue Trial Period Plans based on verbal estimates of income, debt, or assets at any time.

7. Though Bank of America required that applicants immediately provide financial documents – often on short notice, Bank of America allowed these documents to sit for months without ever reviewing them. I regularly received calls from homeowners and reports from CRM's stating that the homeowner had sent in documents months earlier, often multiple times, made payments under a Trial Period Plan, but had not gotten a permanent modification or even a decision regarding their modification. I was able to confirm that homeowners had indeed sent in documents and made their payments using the HomeSaver and AS400 systems. I was able to actually view the documents using the I-Portal system. It was clear that Bank of America was regularly receiving time sensitive financial documents from homeowners seeking HAMP modifications and not acting on the documents for months on end.

8. Bank of America employed a common strategy of delaying HAMP applications. Delay was achieved using tactics including claiming that documents were incomplete or missing when they were not, or simply claiming the file was "under review" when it was not. We were instructed to delay and then push homeowners to accept an internal refinance so that Bank of America would profit. Once an applicant was finally rejected after a long delay, the bank would offer them an in-house alternative. Bank of America would charge a higher interest rate, ranging up to 5%, as compared to the 2% if the loan had been modified under HAMP. The unfortunate truth is that many and possibly most of these people were entitled to a HAMP loan modification, but had little choice but to accept a more expensive and less favorable in-house modification.

9. Upon joining the newly formed Case Management Department, I began to experience what Bank of America termed a "blitz." Approximately twice a month, Bank of America would order that case managers and underwriters "clean out" the backlog of HAMP applications by denying any file in which the financial documents were more than 60 days old. These included files in which the homeowner had provided all required financial documents and fully complied with the terms of a Trial Period Plan.

10. During a blitz, a single team would decline between 600 and 1,500 modification files at a time for no reason other than that the documents were more than 60 days old. Bank of America instructed its CRMs, underwriters and other employees to enter a reason that would justify declining the modification to the Treasury Department. Justifications commonly included claiming that the homeowner had failed to return requested documents or had failed to make payments. In reality, these justifications were untrue. I personally reviewed hundreds of files in which the computer systems showed that the homeowner had fulfilled a Trial Period Plan and was entitled to a permanent loan modification, but was nevertheless declined for a permanent modification during a blitz.

11. On many occasions, homeowners who did not receive the permanent modification that they were entitled to, ultimately lost their homes to foreclosure.

12. The delay and rejection programs within Bank of America were methodically carried out under the overall direction of Patrick Kerry, a Vice President who oversaw the entire eastern region's loan modification process. Discussions took place in meetings, some of which I attended, in which Mr. Kerry outlined how certain percentages to reduce the backlog had to be met by certain dates -- no matter what.

13. Employees who challenged or questioned the ethics of Bank of America's practice of declining modifications for false and fraudulent reasons were often fired. There was an extremely high level of turnover in every HAMP related Bank of America department that I saw. Employees worked in fear of losing their jobs if they called any of Bank of America's practices into question.

14. I told my supervisors that these practices were ridiculous and immoral. People who had done everything that Bank of America had asked of them were losing their homes to foreclosure because Bank of America had chosen not to hire enough underwriters and was reducing its backlog with unethical and even fraudulent methods. I raised these concerns several times in 2011 and 2012. These practices did not change. Eventually I was fired despite having excellent performance results.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

EXECUTED this ___ day of *June 5*, 2013 at Charlotte, North Carolina

By _William R. Wilson_

William R. Wilson, Jr.

# EXHIBIT NO. 4

EXHIBIT

4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE BANK OF AMERICA HOME AFFORDABLE MODIFICATION PROGRAM (HAMP) CONTRACT LITIGATION | MDL NO. 2193 |
| | Centralized before the Honorable Rya W. Zobel |
| This Document Relates To: | |
| All Actions | |

DECLARATION OF SIMONE GORDON

I, Simone Gordon, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.     I am over the age of 18, am otherwise competent to testify, and would testify if called upon to the following facts that are based on my own personal knowledge.

2.     I was employed by Bank of America from July 2007 until February 2012. I was a Senior Collector of Loss Mitigation / Mortgage. Beginning in 2009 a significant portion of my job duties and my time consisted of dealing with homeowners that had applied for a loan modification as part of the Home Affordable Modification Program ("HAMP").

3.     From the start of the HAMP program, Bank of America calculated the amount of the trial payment in a Trial Period Plan based on a borrower's monthly income and other factors including the borrower's debt to income ratio ("DTI") and to performed the Net Present Value ("NPV") test that HAMP required. Before issuing a Trial Period Plan, Bank of America calculated the borrower's DTI and performed the NPV test by reviewing documents such as tax returns, pay stubs, bank statements, a credit report and other financial information the borrower provided. Bank of America required people applying for a HAMP modification to document their assets and income and would not issue a trial period plan without full documentation. Throughout the time I worked there, including in 2009 and 2010, Bank of America did not issue Trial Period Plans based on oral representations or estimates regarding income, assets, or debts. All such information had to be fully documented.

4.     In the course of my work, I regularly spoke to homeowners who were inquiring about the status of their HAMP loan modification. I regularly pulled up the information regarding the borrower on Bank of America computer systems such as HomeSaver and AS400. These computer systems allowed me to view terms of a Trial Period Plan including amounts of trial payments and the dates they were due, the date and amount of each payment the homeowner made to Bank of America, and the date each payment was logged as having been received. The computer systems also allowed me to view each document that had been requested from the borrower and the date the borrower had sent each document to Bank of America. If needed, I

could also view the actual document the borrower had sent electronically using Bank of America's "Iportal" computer system.

5.      Beginning in 2009, I regularly spoke to people who had received HAMP Trial Period Plans, made their trial payments, and who were calling to inquire about the status of their expected permanent loan modification. Using the Bank of America computer systems I saw that hundreds of customers had made their required trial payments, sent the documents requested of them, but had not received permanent modifications. I also saw records showing that Bank of America employees had told people that documents had not been received when, in fact, the computer system showed that Bank of America had received the documents. This was consistent with the instructions my colleagues and I were given. We were told to lie to customers and claim that Bank of America had not received documents it had requested, and that it had not received trial payments (when in fact it had). We were told that accounts that were missing documents would "fall out of review" since the Bank was required to underwrite the loan modification within 30 days of receiving those documents, and it did not have sufficient underwriting staff to complete the underwriting in that time.

6.      My colleagues and I were supervised by "Team Leaders" who were in turn supervised by "Site Leaders." Site leaders regularly told us that the more we delayed the HAMP modification process, the more fees Bank of America would collect. We were regularly drilled that it was our job to maximize fees for the Bank by stalling and extending delay of the HAMP modification process by any means we could – this included by lying to customers. For example, we were instructed by our supervisors at Bank of America to delay modifications by telling homeowners who called in that their documents were "under review," when, in fact, there had been no review or any other work done on the file.

7.      Bank of America Site Leaders specifically ordered my colleagues and me to hold financial documents borrowers submitted for at least thirty days. Once thirty days passed, Bank of America would consider many of these documents, such as pay stubs or bank statements to be "stale" and the homeowner would have to re-apply for a modification.

8. These and other similar instructions often came in monthly meetings that were conducted by Site Leaders and attended by 60-70 employees. At these meetings, my colleagues and I were also given performance "goals" and quotas. Employees were rewarded by meeting a quota of placing a specific number of accounts into foreclosure, including accounts in which the borrower fulfilled a HAMP Trial Period Plan. For example, a Collector who placed ten or more accounts into foreclosure in a given month received a $500 bonus. Bank of America also gave employees gift cards to retail stores like Target or Bed Bath and Beyond as rewards for placing accounts into foreclosure.

9. Bank of America Collectors and other employees who did not meet their quotas by not placing a sufficient number of accounts into foreclosure each month were subject to termination. Several of my colleagues were terminated on that basis.

10. Bank of America monitored my colleagues and me very closely. Team Leaders and Site Leaders walked the call room floor throughout the day warning headsets that they would use to plug in and listen into a call without warning. Employees who were caught not carrying out the delay strategies that Bank of America instructed were subject to discipline including termination. Employees who were caught admitting that Bank of America had received financial documents or that the borrower was actually entitled to a permanent loan modification were disciplined and often terminated without warning.

EXECUTED May 23 2013, at Orange, New Jersey

By _____
Simone Gordon

# EXHIBIT NO. 5



## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| IN RE BANK OF AMERICA HOME AFFORDABLE MODIFICATION PROGRAM (HAMP) CONTRACT LITIGATION | MDL NO. 2193 <br><br> **Centralized before the Honorable Rya W. Zobel** |
|---|---|
| **This Document Relates To:** <br><br> **All Actions** | |

### DECLARATION OF Theresa Terrelonge

I, Theresa Terrelonge, declare as follows:

1.      I am over the age of 18 and I am otherwise competent to testify to the following based on my own personal knowledge.

2.  ·     From June 2009 through June 2010 I was employed by Bank of America as a "collector." Most of my job consisted of speaking on the telephone with homeowners who were calling regarding a loan modification that they had applied for as part of Home Affordable Modification Program (HAMP). My job could be accurately described as a loan level servicing representative. .

3.      I regularly reviewed the HAMP requirements and procedures on the U.S. Treasury Department website (http://makinghomeaffordable.gov). I did this on my own as Bank of America provided no training or information regarding HAMP and I wanted to know what I was talking about to homeowners calling in. Most, if not all of my colleagues and supervisors did not have suitable training, education, or experience in modifying mortgages, and certainly not regarding HAMP requirements and procedures. Loan level service representatives had to undergo some kind of training at least every six weeks. Almost all of these trainings included written materials. Most of the training I recall involved the use of systems and other ministerial work. Bank of America did not provide me or anyone I knew with training regarding HAMP requirements, applicable mortgage or lending laws, or the substance of what we were talking to homeowners about.

4.      In the course of my work, I regularly spoke to homeowners who were inquiring about the status of their HAMP loan modification. I reviewed information regarding the borrower on Bank of America computer systems such as HomeSaver and AS400. These computer systems allowed me to view terms of a Trial Period Plan including amounts of trial payments and the dates they were due, the date and amount of each payment the homeowner made to Bank of America, and the date each payment was logged as having been received. The computer systems also allowed me to view the date the borrower had sent each financial

document to Bank of America. If needed, I could also view the actual document the borrower had sent electronically using Bank of America's "i-portal" computer system.

5.  Although HAMP allowed a servicer to issue a Trial Period Plan based on "unverified" verbal representations from applicants, this was not Bank of America's practice. Throughout the time I worked there in 2009 and 2010, Bank of America determined whether applicants would receive a HAMP Trial Period Plan and calculated the amount of the trial payment based on the borrower's monthly income and other factors including the borrower's debt to income ratio. Bank of America also performed the Net Present Value test that HAMP required before deciding whether to issue the borrower a Trial Period Plan. Bank of America calculated the borrower's debt to income ration and performed the Net Present Value test by reviewing financial documents the borrower provided. Bank of America required HAMP applicants to document their assets and income and would not issue a Trial Period Plan without a borrower providing extensive financial documentation.

6.  Based on what I observed, Bank of America was trying to prevent as many homeowners as possible from obtaining permanent HAMP loan modifications while leading the public and the government to believe that it was making efforts to comply with HAMP. It was well known among managers and many employees that the overriding goal was to extend as few HAMP loan modifications to homeowners as possible.

7.  Much of my job consisted of speaking to people who received HAMP Trial Period Plans, made their trial payments, and who were calling to inquire about the status of their expected permanent loan modification. Using the Bank of America computer systems I saw that hundreds of customers had made their required trial payments and sent in the required documents, but had not received permanent modifications.

8.  My colleagues and I were called into group meetings with our supervisors on a regular basis. The information we received in group meetings showed me that Bank of America's deliberate practice was to string homeowners along with no intention of providing permanent modifications. We were instructed to inform every homeowner who called in that

their file was "under review" – even where the computer system showed that the file had not been accessed in months or when the homeowner had been rejected for a modification.

9. My colleagues and I were instructed to inform homeowners that modification documents were not received on time, not received at all, or that documents were missing, even when, in fact, all documents were received in full and on time.

10. One tactic Bank of America used to delay the modification process involved telling homeowners who applied for a HAMP modification or who were in a Trial Period Plan to resubmit financial information each time they called to inquire about a pending modification. Bank of America then treated any change in financial information as justification for considering the homeowner to have restarted the HAMP process. Even a small change to financial information or correcting an error that Bank of America made will cause Bank of America to restart the application process under the pretext of changed financial information.

11. When Bank of America purchased loans from other servicers, including when it bought the servicer itself – as it did with Wilshire Credit, Bank of America forced the homeowners to restart the modification process. When a homeowner called regarding a modification started with another servicer, my co-workers and I were instructed to say that Bank of America had no record of the modification or of the payments the homeowner already made under the modification. We were instructed to make this statement even when Bank of America's system showed the homeowners' modification and previous payments, and even when the system showed that the homeowner had completed the trial process with the previous servicer and should have received a permanent modification.

12. Bank of America regularly ignored completed loan modifications and did not treat the loan as having been modified in its computer system. Even after a homeowner signed and returned modification documents (both trial modifications and permanent modifications), Bank of America's system continued to show the loan as delinquent. Bank of America continued to send delinquency notices, continued to report homeowners as delinquent to credit reporting

agencies, and pursued foreclosure. I saw multiple instances of people who had lost their homes
to foreclosure despite having fulfilled all requirements of their Trial Period Plans.

13.     When an account or attempted modification was considered "closed" it meant that
the homeowner would not be receiving a modification and would often be facing collections or
foreclosure. The production goals Bank of America placed on its managers were based on how
many accounts they could "close" – meaning how many homeowners they could reject for the
loan modifications rather than how many modifications they could successfully complete.
Managers received bonuses if their teams met or exceeded production goals.

14.     Managers, in turn, pushed their production goals on the loan level employees.
Employees were awarded incentives such as $25 in cash, or as a restaurant gift card based on the
number of accounts they could close in a given day or week – meaning how many applications
for loan modifications they could decline.

15.     I personally witnessed employees and managers close loan accounts based on
information that was obviously wrong. This included closing accounts, and declining loan
modifications based on the homeowner's failure to provide certain documents or information
when, in fact, it was apparent from the loan file and from the electronic system of record
(electronic databases including AS400, HomeSaver, HomeBase, and others) that the homeowner
had provided the very information claimed to be missing.

16.     I witnessed employees and managers change and falsify information in the
systems of record, and remove documents from homeowners' files to make the account appear
ineligible for a loan modification. This included falsifying electronic records so that the records
would no longer show that the homeowner had sent in required documents or had made required
payments. This was done so that the file could be closed, the homeowner's effort to obtain a
loan modification could be rejected, and the manager could meet Bank of America's production
goal for the given week or month.

17.     Bank of America often avoided extending HAMP modifications by sending non-
HAMP modifications to homeowners who had applied for a HAMP modification. These non-

HAMP modifications were typically on worse terms for the homeowner than what they were eligible to receive under HAMP – but they were at higher interest rates and more profitable for Bank of America. I fielded dozens of calls from homeowners who had waited months for a HAMP modification and were confused, and often in tears, when they received a modification that appeared nothing like what they were led to expect.

18.     Bank of America used group meetings to convey production goals, adjustments to protocol for speaking to homeowners, adjustments to information we were expected to give (or not give) homeowners, and other information regarding the jobs of loan level representatives. These group meetings were conducted by a manager. The agenda and itinerary for the meetings were sent to the manager via e mail. The manager, in turn, conveyed the information to loan level representatives verbally, but often showed us the E mail he received with a summary of the content he was supposed to convey in the meeting. In addition to group meetings, loan level service representatives received information regarding general policies and procedures, new programs, and certain clarifications to programs via e mail.

19.     Throughout my tenure at Bank of America, loan level servicing representatives were constantly being evaluated. We received written evaluations known as "scorecards" on a weekly basis via e mail. These scorecards evaluated employees based on criteria including the number of customer calls they took each day, the number of minutes they spent on each call, and whether they gave the homeowner too much information. Employees received negative evaluations and negative comments if they spent too much time on the phone with a particular homeowner in an effort to answer their questions or if they gave what Bank of America considered to be too much information about the modification process.

20.     Loan level servicing representatives regularly conducted much of their work via e mail and used e mail extensively both regarding general policies and procedures and regarding particular loan files. We regularly e mailed with supervisors and managers, other departments, and customers regarding particular loans. While some information that was contained in some of the E mails could be reflected in electronic systems such as AS400, HomeSaver, or HomeBase, it

is not accurate to say all E-mail or the full content of virtually any E mail was captured on the electronic systems. These systems would not capture the entire content of an e mail or all the e mails loan level representatives sent regarding a particular file. I do not know what Bank of America's policy was regarding deleting e-mail. But I regularly looked back over e mails that were several months old. Toward the end of my tenure, I recall that I was able to look back over e mails that were nearly a year old.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

EXECUTED this 15 day of May, 2013 at Grand Prairie, Texas.

By: ______________________

Theresa Terelonge

# EXHIBIT NO. 6

CANNON

6

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

| IN RE BANK OF AMERICA HOME AFFORDABLE MODIFICATION PROGRAM (HAMP) CONTRACT LITIGATION | MDL NO. 2193 Centralized before the Honorable Rya W. Zobel |
|---|---|
| This Document Relates To: All Actions | |

Declaration of Steven Cupples.

I, Steven Cupples, declare as follows:

    1.    I am over the age of 18 and I am otherwise competent to testify to the following based on my own personal knowledge.

    2.    I was employed by Bank of America until June, 2012. I worked for Countrywide Home Loans as a Loan Originator and a Loan Officer and became a Bank of America employee when Bank of America acquired Countrywide.

    3.    Beginning in 2009, my work involved Bank of America's efforts to modify mortgages under the Home Affordable Modification Program (HAMP). I was titled an Underwriter throughout the time I was employed by Bank of America. In June, 2011 I was promoted to a Team Leader where I supervised a team of 11 to 15 underwriters. At various times, my job included certain special projects regarding Bank of America's efforts under HAMP.

    4.    In April, 2009, I was assigned to a special project in which a team of employees identified customers who were in default on their mortgage and solicited them for internal Bank of America refinances. I worked on this project for approximately five months. .

    5.    In September, 2009 I was among a team of underwriters to receive training to underwrite HAMP loan modifications. This training lasted for a week. It covered basic underwriting topics such as the documents used to verify income and basic methods to calculate a borrower's monthly income. This training did not cover substantive HAMP requirements, or basic information needed to underwrite a HAMP application. The other underwriters and I did not receive even basic training on how to use the HAMP waterfall formula, how or when to use the NPV test, the guidelines set out in Treasury directives, or other basic aspects of HAMP.

6.      Beginning in September, 2009, my job consisted of underwriting HAMP loan modifications. I learned the guidelines on the job. Underwriters could access document images using Bank of America's IPortal document system. However, all pertinent information was recorded as data points in one of Bank of America's computer systems. Using these computer systems, I was able to view virtually all relevant information regarding a borrower's loan and loan modification including the modified payments due under a Trial Period Plan, the dates payments were due, all documents the borrower sent in an effort to obtain a HAMP modification, and all information needed to determine whether a borrower was eligible for a HAMP Trial Period plan, and whether they fulfilled a Trial Period Plan and should be receiving a permanent loan modification.

7.      At the time I was underwriting loans, it was clear that Bank of America had not dedicated sufficient underwriters, staff, or even basic supplies like the printers or hardware needed to keep up with the volume of HAMP loan modifications. Bank of America executives including Rebecca Mairone, John Berens, and Patricia Feltch were made aware of some of the most obvious shortcomings, but Bank of America made no substantial effort that I saw to fulfill its obligations under HAMP in anything that could be described as a good faith or honest effort.

8.      An obvious problem I noticed almost immediately was that Bank of America had not changed its regular loan servicing programs to account for HAMP. A delinquent loan would progress from regular servicing, to collections, loss mitigation, and to foreclosure, just as it had before HAMP started. If Bank of America intended to use HAMP to reduce the number of defaults and foreclosures as it claimed, it would have inserted HAMP as a mandatory step in the loan servicing program across the board. Instead, Bank of America was running HAMP as an ad-hoc, parallel program. Loans that were eligible to be considered under HAMP, and even loans in which the borrowers fulfilled Trial Period Plans, were still sent to the foreclosure department. The system

Bank of America used either made no sense, or was nothing more than an effort to give a false appearance of complying with HAMP requirements when it was not.

9.      From the start, Bank of America determined whether an applicant would receive a HAMP Trial Period Plan based on written financial documentation. Bank of America calculated each borrower's debt to income ratio, performed the HAMP Net Present Value test, and determined the amount of the trial payments due by reviewing a borrower's tax returns, pay stubs, credit reports and other financial documents. Bank of America would not issue a Trial Period Plan without a borrower first providing extensive financial documentation, and it did not issue Trial Period Plans based on verbal estimates of income, debt, or assets at any time.

10.     Bank of America retained outside vendors to manage the documents being sent to and received from borrowers applying for HAMP modifications. Urban Lending Solutions was one of the vendors tasked to receive and upload financial documents from borrowers. I quickly realized that if the loan had documents that were sent to Urban, those documents would be scattered over various links in the computer systems. The documents were present, but they often could not be viewed using a single system. An underwriter would need to know to go to other systems such as IPORTAL, LMA, LMF, or HomeSaver to review documents the borrower had sent. Most underwriters did not know that they needed to look for documents in multiple systems and often assumed documents had not been sent. As a result, many borrowers were declined loan modifications they should have received.

11.     For approximately six months in the first half of 2010, I was placed on a special project to help analyze Bank of America's performance under HAMP. This involved generating a variety of reports to measure various facets of Bank of America's HAMP processes. Much of this analysis involved trial and error to generate the types of reports that would be most useful. For example, we had reports generated that would measure the number of HAMP applications received, number of loans in stages of

delinquency, how long loans sat in each stage of the HAMP process, the number of trial payments customers had returned, the number of loans assigned to each underwriter, the particular types of documents customers had been asked to return and the documents they had returned, performance by region, department, and by individual employee, and a host of other topics. Information could be tracked by region, subject matter, individual loan number, and by dozens of other categories. I regularly submitted requests to Bank of America's offices in Plano, Texas for reports to be generated regarding any of these topics. Typically the reports were returned in a matter of hours or days – depending on how busy the Plano office was at a particular time. I found that Bank of America's systems captured and stored the data needed to perform just about any report I could think of and was able to generate reports quickly by putting all sorts of data points on excel spreadsheets.

12.     I observed that Bank of America reported to the Treasury department and made public statements regarding the volume of loans it was successfully modifying, and the efforts it was making to catch up with the volume. Often this involved double counting loans that were in different stages of the modification process. It also involved counting loans that were entitled to modifications as having been modified – only to foreclose on those same loans later. It was well known among Bank of America employees that the numbers Bank of America was reporting to the government and to the public were simply not true.

13.     Employees who challenged or questioned the ethics of Bank of America's practice for any reason were often fired. There was an extremely high level of turnover in every HAMP related Bank of America department that I saw. Employees worked in fear of losing their jobs if they called any of Bank of America's practices into question.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

EXECUTED this 15 day of May, 2013 at Fort Worth, Texas

By _____

Steven Cupples

# EXHIBIT NO. 7

EXHIBIT
7

# SIGTARP



OFFICE OF THE SPECIAL
INSPECTOR GENERAL FOR
THE TROUBLED ASSET
RELIEF PROGRAM

QUARTERLY REPORT TO CONGRESS
JANUARY 27, 2017



# SIGTARP BY THE NUMBERS





## 374
**Criminally Charged**

## 269*
**Convicted**

## 192**
**Sentenced to Prison**

Including

## 88

Bankers criminally charged with fraud

Wall Street brokers criminally charged with securities fraud



Borrowers criminally charged with defrauding banks

Defendants criminally charged with scamming homeowners


## $10 Billion
**Recovered from JP Morgan, General Motors, Goldman Sachs, Morgan Stanley + Others**



## $2 Billion
**In Government Cost Savings if SIGTARP Recommendations Are Implemented**

Recoveries include homeowner relief
Charges are not evidence of guilt | Many defendants await trial and sentencing

# LETTER FROM THE SPECIAL INSPECTOR GENERAL



## SIGTARP IS A 40 TIMES RETURN ON INVESTMENT

# SIGTARP makes Government better and our nation's banking, housing, automobile, and securities industries safer and stronger

*[body text illegible]*

# As a result of SIGTARP investigations 88 bankers criminally charged, including 2 this quarter

## 44 bankers\* already sentenced to prison

*[body text illegible]*

○ [illegible] president [illegible] failed TARP bank [illegible] bank [illegible] [illegible]

[illegible paragraph]

> With our new investigative method of finding bank fraud, prosecutions are moving quickly compared to the past, and we recoup Treasury and FDIC lost funds – money then available for the government to spend or reduce the federal budget.

[illegible paragraph]

[illegible signature block]

15,000 applications and a process rate of only 2,575 applications per month, JPMorgan will be rushing to review applications through the September 2017 deadline, which could lead to improper evaluation of homeowner applications.[66]

One rule that JPMorgan has been breaking is the Treasury rule to provide homeowners the opportunity to re-amortize their mortgage which could lower their mortgage payment after six years to bring their monthly payment goes down. Treasury has found that JPMorgan failed to notify homeowners in HAMP that they were eligible to re-amortize their mortgage and lower their payments.

# Bank of America.



| 79% Homeowners denied for HAMP | 111,138 People in HAMP now or before | 36,632 Homeowners fell out of HAMP (33%) costing taxpayers $129 million |
|---|---|---|

Source: Treasury, 1MP Program Volumes - December 2016, accessed 1/19/2017; Treasury, Response to SIGTARP data call 1/17/2017; SIGTARP analysis of Treasury HAMP data.

Bank of America also has one of the worst track records in HAMP. SIGTARP's investigation of Bank of America defrauding HAMP led to a 2012 Department of Justice agreement with Bank of America.[67] Treasury found that Bank of America needed substantial improvement in complying with HAMP's rules in 5 of the last 6 quarters. This should be unacceptable given that Bank of America has already received about $2 billion from Treasury for HAMP.[68]

- *Risk of Waste — Overcharging Treasury*: In 2016, Treasury found that Bank of America has overcharged Treasury by hundreds of thousands of dollars found in Treasury's sample. Bank of America reported incorrect information about the delinquency status of several second liens that were extinguished through the HAMP Second Lien program, resulting in more than $400,000 in wasted tax dollars, including almost $150,000 on a single loan. Treasury requested that Bank of America perform a lookback analysis to determine whether there were other instances of misreporting.
- *Wrongfully denying homeowners admission into HAMP*: Bank of America denied 79% of all who applied for HAMP, which requires deeper Treasury scrutiny on whether Bank of America is properly evaluating homeowners. In the second quarter 2016, Treasury found more instances of Bank of America wrongfully denying homeowners for HAMP. With a backlog of 29,075

applications and a process rate of only 3,285 applications per month, Bank of America will be rushing to review applications through the September 2017 deadline, which could lead to improper evaluation of homeowner applications.[69]

- *Miscalculation of income:* Bank of America has one of the worst track records of any large servicer on miscalculating homeowner income. Miscalculation can lead to Bank of America denying a qualified homeowner for HAMP or set a higher mortgage payment for people in HAMP.
- *Risk of waste—Failing to reduce principal despite being paid by Treasury to do so:* In the HAMP principal reduction program, Treasury pays servicers typically several thousand tax dollars per loan to reduce the outstanding balance of underwater mortgages. Treasury found that Bank of America failed to reduce the principal despite being paid by Treasury about $4,500 on average to do so. Bank of America did not reduce these homeowners' underwater balances until Treasury later inquired about the status of these loans, showing the risk of waste, and the power of oversight.



| 53%<br>Homeowners<br>denied for HAMP | 209,262<br>People in HAMP<br>now or before | 58,133<br>Homeowners fell<br>out of HAMP (28%)<br>costing taxpayers<br>$168 million |
|---|---|---|

Source: Treasury, 1MP Program Volumes - December 2016, accessed 1/19/2017; Treasury, Response to SIGTARP data call 1/17/2017; SIGTARP analysis of Treasury HAMP data.

Nationstar also has one of the worst track record in HAMP. Nationstar's violations of Treasury rules have been widespread spanning multiple quarters. Nationstar has shown little improvement and, even appears to be getting worse.

- *Wrongful denying or failing to offer homeowners HAMP admission:* Of all large HAMP servicers, Nationstar has the worst recent track record in wrongfully denying or failing to offer homeowners admission into HAMP.
- *Wrongful cancellation of homeowners out of HAMP:* More than 58,000 homeowners whose mortgages are serviced by Nationstar have fallen out of HAMP, representing taxpayer payments of $168 million to Nationstar. Nationstar has wrongfully cancelled homeowners out of HAMP. This has serious consequences, as 47% of homeowners who have fallen out of HAMP through Nationstar have gone into foreclosure or otherwise lost their homes

# EXHIBIT NO. 8



EXHIBIT
8

In re Bank of America Home Affordable Modification Program..., Slip Copy (2013)
2013 WL 4759649

KeyCite Yellow Flag - Negative Treatment
Distinguished by Parker v. Bank of America, N.A., D.D.C., April 16, 2015

2013 WL 4759649
Only the Westlaw citation is currently available.
United States District Court,
D. Massachusetts.

In re BANK OF AMERICA HOME AFFORDABLE
MODIFICATION PROGRAM (HAMP)
CONTRACT LITIGATION.

M.D.L. No. 10-2193-RWZ.
|
Sept. 4, 2013.

*MEMORANDUM OF DECISION*

ZOBEL, District Judge.

*1 In this consolidated litigation, individual borrowers from around the country claim that Bank of America' mismanaged their requests for loan modifications under the Home Affordable Modification Program ("HAMP"). Plaintiffs now seek to resolve the issue of liability on a classwide basis. They move to certify twenty-six classes, one for each state in which named plaintiffs reside.

**I. Background**
HAMP is a federal government program designed to prevent mortgage foreclosures. Through HAMP, the government has encouraged mortgage lenders and servicers to provide loan modifications for eligible borrowers. The U.S. Department of the Treasury has administered HAMP by issuing regulations in the form of HAMP Guidelines and Supplemental Directives. See Program Guidance, *Home Affordable Modification Program*, https://
www.hmpadmin.com/portal/programs/guidance.jsp (last visited Aug. 22, 2013).

The HAMP modification process begins with a preliminary evaluation by the mortgage servicer of the borrower's eligibility. From April 2009 through early 2010, under the Treasury Department's Supplemental Directive 09-01, the servicer could use a borrower's

unverified statements about her financial situation to do that preliminary evaluation. See U.S. Dep't of the Treasury, Supplemental Directive 09-01, at 5 (Apr. 6, 2009), available at https:// www.hmpadmin.com/po rtal/programs/docs/hamp_servicer/sd0901.pdf. If the preliminary evaluation indicated the borrower was eligible for a HAMP modification, the servicer would then offer the borrower a Trial Period Plan ("TPP"). Each TPP established a trial modification period, usually lasting three months. During that trial period, the borrower was obligated to make reduced monthly payments, provide any required financial documents, and meet other stated conditions. If the borrower complied with the required terms and remained otherwise eligible, then (according to each TPP) the servicer would provide a permanent HAMP modification. That permanent modification would become effective on the Modification Effective Date, the first day of the month after the last trial period payment was due.

Bank of America is one of many mortgage lenders and servicers that participated in HAMP and issued TPPs. Plaintiffs are a number of individual borrowers who claim that they entered into TPPs serviced by Bank of America and made all the required trial payments, but did not receive either a permanent loan modification or a written denial of eligibility by the Modification Effective Date. They assert claims for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, and unfair and deceptive acts and practices.

The named plaintiffs include forty-three individuals and couples from twenty-six different states. They now seek to certify twenty-six different classes, one from each state they represent,[2] on the issue of liability. They propose the following class definition:

*2 All individuals with home mortgage loans on properties in [state] whose loans have been serviced by Bank of America and who, since April 13, 2009, have entered into a Trial Period Plan Agreement with Bank of America and made all trial payments required by their Trial Period Plan Agreement, other than borrowers to whom Bank of America tendered either:

(a) A Home Affordable Mortgage Agreement sent to the borrower prior to the Modification Effective Date specified in the Trial Period Plan Agreement; or

(b) A written denial of eligibility sent to the borrower prior to the Modification Effective Date specified in the Trial Period Plan Agreement.

© 2016 Thomson Reuters. No claim to original U S Government Works.

1

Docket # 208 (Mot.) at 1. The term "Trial Period Plan Agreement" is defined to include only TPPs issued under Supplemental Directive 09-01. *Id.* at 2.[3]

## II. Legal Standard

Federal Rule of Civil Procedure 23 governs class certification. The district court may only certify a class after a "rigorous analysis of the prerequisites established by Rule 23." *Smilow v. Sw. Bell Mobile Tel. Sys.*, 323 F.3d 32, 38 (1st Cir.2003); *see also Wal–Mart Stores, Inc. v. Dukes*, — U.S. —, —, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011). Under Rule 23(a), a party seeking class certification must show that:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). These four requirements are known as numerosity, commonality, typicality, and adequacy. *See Smilow*, 323 F.3d at 38.

In addition, the party seeking certification must show that one of the requirements of Rule 23(b) is met. Plaintiffs seek to proceed under Rule 23(b)(3), which allows a class action if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3)

"When appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed.R.Civ.P. 23(c)(4). Here, plaintiffs seek to certify their twenty-six classes only as to liability; they propose that damages should be resolved separately in subsequent proceedings. *Cf. Smilow*, 323 F.3d at 41 ("[E]ven if individualized determinations were necessary to calculate damages, Rule 23(c)(4) ... would still allow the court to maintain the class action with respect to other issues.").

## III. Analysis

To achieve certification, plaintiffs must "affirmatively demonstrate" that they have met the requirements of Rule 23. *Wal–Mart*, 131 S.Ct. at 2551. "[T]hat is, [they] must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.*

## A. Ascertainability

"[3] Although not explicitly mentioned in Rule 23, one essential prerequisite for class certification is that any proposed class must be ascertainable. In other words, the class must be defined by objective criteria that make it "administratively feasible for the court to determine whether a particular individual is a member." 7A Charles Alan Wright et al., *Federal Practice & Procedure* § 1760 (West 2013); *Matamoros v. Starbucks Corp.*, 699 F.3d 129, 139 (1st Cir.2012); *Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1, 9 (D.Mass.2010). Plaintiffs' proposed classes are defined by objective criteria—primarily the state where the individual's property was located, the identity of the servicer, the type of TPP the individual received, whether the individual made trial payments, and whether Bank of America sent a loan modification or a written denial by the specified date. Plaintiffs have presented expert testimony showing that individuals meeting these objective criteria can be identified by relatively efficient searches on a Bank of America internal database called "MHA Summary." *See* Docket # 240, Ex. 13 (Ayres Report), ¶¶ 69–80. The information in the MHA Summary database can apparently be supplemented by and cross-checked against other internal Bank of America databases. *See id.* ¶¶ 85–100.

Bank of America notes that plaintiffs' class definition depends on when Bank of America *sent* permanent loan modification offers, but the MHA Summary database only shows when permanent loan modifications were *implemented.* That distinction would make a difference in cases where Bank of America sent an individual borrower a permanent loan modification offer before the Modification Effective Date, but the borrower did not accept it (or Bank of America did not implement it) until after that date. *See* Docket # 224, Ex. 14 (Ayres Dep.) at 80. Plaintiffs' expert testified, however, that it appeared there were relatively few borrowers in that situation, and that they could be identified and removed from the proposed classes by adjusting the search algorithm. *See id.* In any case, "the class does not have to be so ascertainable that every potential member can be identified at the commencement of the action." Wright et al., *supra*, § 1760; *see Donovan*, 268 F.R.D. at 9. The criteria that plaintiffs have set forth are sufficiently stable

Exhbit 8 Page 2
Case 3:18-cv-00288-MOC-DSC   Document 1-1   Filed 06/01/18   Page 168 of 177

and objective that "the general outlines of the membership of the class are determinable." Wright et al., *supra*, § 1760. Plaintiffs have therefore satisfied the threshold requirement of ascertainability.

**B. Rule 23(a)**

As described above, Rule 23(a) sets forth four mandatory requirements for class certification. I discuss each in turn.

**1. Numerosity**

The numerosity requirement is met if "the class is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). This standard "does not impose a precise numerical requirement," but classes of forty or more are generally considered sufficiently numerous. *Connor B. ex rel. Vigurs v. Patrick*, 272 F.R.D. 288, 292 (D.Mass.2011).

*4 Plaintiffs' expert examined a random sample of 3,000 loans out of approximately 375,000 that were given trial modifications by Bank of America. Within that sample, 2,264 loans (about 75%) received TPPs meeting the class definition (i.e., TPPs issued under Supplemental Directive 09–01). Out of those 2,264 loans, plaintiffs' expert found that 1,814 (about 80%) met the class definition assuming a uniform three-month trial period length. By state, the number of observed class members in the 3,000-loan sample ranged from 26 in Alaska to 298 in California, with a median value of 62 observed class members per state. Ayres Report at app. 4. Extrapolating from that sample, the smallest expected class (Alaska's) should have some 123 borrowers in it.[1] I conclude that plaintiffs' showing is sufficient to satisfy the "relatively 'low threshold' " of the numerosity requirement. *Connor B.*, 272 F.R.D. at 292 (quoting *Garcia-Rubiera v. Calderon*, 570 F.3d 443, 460 (1st Cir.2009)).

**2. Commonality**

Commonality asks whether there are "questions of law or fact common to the class." Fed.R.Civ.P 23(a)(2) It requires the party seeking certification to show a "common contention" that is "capable of classwide resolution-which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 131 S.Ct. at 2551. Even a single common question can be enough to satisfy Rule 23(a)(2), as long as answering that question will "drive the resolution of the litigation." *Id.* (quoting Richard A. Nagareda, *Class Certification in the*

*Age of Aggregate Proof*, 84 N.Y.U. L.Rev. 97, 132 (2009)); *see also Id.* at 2556.

The primary common question that plaintiffs advance is whether Bank of America breached the TPPs it issued to each class member by failing to send either a permanent modification offer or a written denial of eligibility by the Modification Effective Date. Plaintiffs argue that the TPPs contractually required Bank of America to send either a permanent modification or a written denial by that date; Bank of America argues they did not.

While each individual class member had a separate TPP, it appears the relevant terms of each TPP were essentially the same; only the amount of the trial payments and the timing of the trial period changed. *See* Docket # 240, Ex. 20 (named plaintiffs' TPPs). The court could therefore interpret the common terms of these form contracts on a classwide basis. *See Smilow*, 323 F.3d 32, 39 (1st Cir.2003) ("The common factual basis is found in the terms of the contract, which are identical for all class members. The common question of law is [how to interpret that contract]."); *see also Schumacher v. AK Steel Corp. Ret. Accumulation Pension Plan*, 711 F.3d 675, 684 (6th Cir.2013) ("The determination of the scope and validity of the agreements involved common questions of law that lend themselves well for class certification.").

*5 Bank of America argues there is no common question because plaintiffs cannot succeed on their breach of contract claim without prevailing on other individualized questions, such as each plaintiff's own performance and damages. But Rule 23(a)(2) "does not require that all questions of law or fact raised in the litigation be common." *George v. Nat'l Water Main Cleaning Co.*, 286 F.R.D. 168, 174 (D.Mass.2012); *see also* Wright et al., *supra*, § 1763. While plaintiffs' case certainly raises a number of individualized questions, it also raises at least one common one: how to interpret the TPPs. That is enough to satisfy Rule 23(a)(2).

Likewise, Bank of America argues that interpreting the TPPs will not "drive the resolution of the litigation," *Wal-Mart*, 131 S.Ct. at 2551 (quoting Nagareda, *supra*, at 132), because individual questions about plaintiffs' performance and damages will remain even if plaintiffs establish their interpretation of the TPPs' terms is correct. That argument fails for two reasons. First, if Bank of America's interpretation of the TPPs prevails, then the entire breach of contract claim fails, which would surely drive the resolution of the litigation. Second, and more importantly, plaintiffs need not show that answering their common question will completely end the litigation; they

Exhbit 8| Page 3
Case 3:18-cv-00288-MOC-DSC   Document 1-1   Filed 06/01/18   Page 169 of 177

need only show that it will "resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* The correct interpretation of the TPPs is surely central to the validity of each class member's contract claims, and it can be resolved for each class member in a single decision. It therefore presents a sufficient common issue. *See Gaudin v. Saxon Mortg. Servs.*, Civil Action No. 11-1663-JST, 2013 WL 4029043; at *5 (N.D.Cal. Aug.5, 2013) ("By determining whether the TPP is an enforceable contract and whether the parties' performance obligations are fully contained within it, the Court can resolve an issue central to the viability of the Proposed Class Members' claims."). *But see Compuasro v. BAC Home Loans Servicing LP*, 2013 WL 2302676, at *6 (C.D.Cal. Apr.29, 2013) (finding a lack of commonality in part because interpreting the contracts at issue might not completely resolve the parties' dispute).

This same issue of how the TPPs should be interpreted is also central to the validity of plaintiffs' other claims. Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing depends on their contention that the contract required Bank of America to provide either a permanent modification or a written denial by the Modification Effective Date, since the implied covenant "may not ... be invoked to create rights and duties not otherwise provided for in the existing contractual relationship." *Lazos v. Plaza Home Mortg.*, 703 F.3d 324, 326 (1st Cir.2013) (omission in original) (quoting *Uno Resta. v. Boa. Kenmore Realty Corp.*, 441 Mass. 376, 805 N.E.2d 957, 964 (Mass.2004)).[5] Their alternative claim for promissory estoppel insists that Bank of America promised in each TPP to provide a permanent modification or a written denial by the Modification Effective Date—the same interpretive question raised in the breach of contract claim. As for plaintiffs' claim of unfair and deceptive acts and practices, it is not entirely clear what acts and practices form the basis for that claim; but to the extent plaintiffs claim that Bank of America acted unfairly by breaching their TPPs intentionally and in bad faith, they raise the same common interpretive issue of what Bank of America's duties were under the TPPs.[6]

[6] Bank of America also argues that differences among the laws of the twenty-six different states at issue defeat commonality. But plaintiffs seek to certify a separate class for each state, meaning that the same state law applies to all persons within each class. Of course, "a court must be careful not to certify too many groups ." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1262 (11th Cir.2004). The problems that arise from certifying many different classes in a single case, however, are problems of class adjudication that are more appropriately

addressed under the superiority requirement of Rule 23(b)(3). *Cf. In re Am. Med. Sys.*, 75 F.3d 1069, 1085 (6th Cir.1996) (finding plaintiff had failed to show superiority for a nationwide class because "[i]f more than a few of the laws of the fifty states differ, the district judge would face an impossible task of instructing a jury on the relevant law"); 7AA Wright et al., *supra*, § 1780.1. The asserted differences in state law across the different proposed classes do not prevent commonality within each class.

I therefore conclude plaintiffs have shown their proposed classes meet Rule 23(a)(2)'s commonality requirement.

### 3. Typicality

The typicality requirement is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). "The claims of the entire class need not be identical, but the class representatives must generally 'possess the same interests and suffer the same injury' as the unnamed class members." *Connor B.*, 272 F.R.D. at 296 (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 156, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). In general, a representative plaintiff is sufficiently typical if his claims and the class members' claims (1) arise from the same event, practice, or course of conduct, and (2) are based on the same legal theory. *See Garcia-Rubiera v. Calderon*, 570 F.3d 443, 460 (1st Cir.2009)

At the broadest level, all of the named plaintiffs' claims arise from the same allegedly wrongful practice—Bank of America's failure to provide a permanent modification or a written denial by the Modification Effective Date—and are based on the same legal theories. However, Bank of America raises a number of particular issues with respect to certain named plaintiffs.

First, Bank of America argues that plaintiff Kimberley George and plaintiffs Matthew Nelson and Angelica Huerto-Nelson ("the Nelsons") are not actually members of the proposed classes. Specifically, it claims they did not make all of their trial period payments in a timely fashion. *See* Mot. at 1 (defining the classes to include only borrowers who "made all trial payments required by their Trial Plan Period Agreement"). Bank of America's argument plainly fails as to George, who timely made all three of the trial payments required by her TPP. Bank of America only holds George with nonpayment because she fell behind after Bank of America granted her a "Trial Offer Extension," which extended her trial plan by an additional month beyond the Modification Effective Date specified in her TPP. Docket # 223 (Schockin Decl.), ¶ 10

Exhbit 8| Page 4
Case 3:18-cv-00288-MOC-DSC   Document 1-1   Filed 06/01/18   Page 170 of 177

& Ex. 24. But George asserts—like the other members of her proposed class—that she had fully complied with her TPP by making the three payments it specified. Any subsequent late or missed payment is not directly relevant to her claim. As for the Nelsons, the record shows a disputed issue of fact over whether they made their third trial payment in a timely fashion. Compare Schoolitz Decl., ¶ 31 & Exs. 127-128 (indicating the Nelsons' first three trial payments were those that posted on June 18, July 10, and September 15, 2009, making the third trial payment late), with Docket # 248, Ex. 65 (Ayres Decl.), ¶ 12 & n. 16 (indicating the Nelsons' first three trial payments were those that posted on May 5, June 18, and July 10, 2009, making all three payments timely). Plaintiffs' evidence on this disputed question is sufficient to show the Nelsons' typicality for present purposes. If further factual development were to demonstrate that the Nelsons did not make their third trial payment on time, the Nelsons could be replaced by a different class representative.[7]

[7] Bank of America next argues that named plaintiffs Magali and Manuel Alvarenga, Donald and Maria Hall, Marie Freeman, and Jason Volpe are not typical because they entered into TPPs with Wilshire Credit Corporation ("Wilshire"), not Bank of America. Wilshire is described in the complaint as a "subsidiary or sister company" of Bank of America. Third Am. Compl., ¶ 167. Loans previously serviced by Wilshire are apparently now serviced by Bank of America, and the standard terms of the TPPs issued by Wilshire are apparently identical to those issued by Bank of America. However, the Modification Effective Date on the Alvarengas' TPP, the Halls' TPP, and Freeman's TPP had already passed before Bank of America began servicing their loans. (The Modification Effective Date on Volpe's TPP occurred about a month after Bank of America began servicing his loan.)

Although the typicality requirement "may be satisfied even though varying fact patterns support the claims or defenses of individual class members." Wright et al., supra, § 1764, I conclude Bank of America is correct to argue that named plaintiffs whose TPPs were issued by Wilshire are not typical of the proposed classes. In the first place, they are outside the plain meaning of the class definition, which explicitly limits the proposed classes to individuals who "have entered into a Trial Plan Period Agreement with Bank of America." Mot. at 1. The Alvarengas, the Halls, Freeman, and Volpe entered into TPPs with Wilshire, not with Bank of America. And this issue cannot be avoided by simply redefining the classes: To pursue their claims, these plaintiffs would have to explain the relationship between Wilshire and Bank of

America, and show why Bank of America should be liable for the alleged breach of Wilshire's TPPs. That showing may be simple, but it may not—especially where the alleged breach was committed by Wilshire (which failed to send a permanent modification or a written denial before the Modification Effective Date) well before Bank of America began servicing the loan. These individual issues frustrate any confidence in the ability of these named plaintiffs to represent the proposed classes. See Swanson v. Lord & Taylor LLC, 278 F.R.D. 36, 41 (D.Mass.2011) ( "[T]ypicality and adequacy may be defeated where the class representatives are subject to unique defenses which threaten to become the focus of the litigation." (quoting In re Credit Suisse-AOL Sec. Litig., 253 F.R.D. 17, 23 (D.Mass.2008)). I therefore find the Alvarengas, the Halls, Freeman, and Volpe do not meet Rule 23(a)(3)'s typicality requirement.

Finally, Bank of America argues that most of the remaining named plaintiffs are unique in various ways. For instance, Bank of America asserts that many named plaintiffs themselves failed to perform as required by their TPPs: some because they made untrue representations in their TPPs, others because they failed to provide documents as required by their TPPs, and still others because they failed to complete credit counseling as required by their TPPs. Likewise, Bank of America asserts that some named plaintiffs have no damages or have failed to mitigate their damages. It also argues that some named plaintiffs have other unique circumstances: for instance, one named plaintiff filed for bankruptcy during her trial period, and another named plaintiff claims he had an oral agreement with Bank of America in addition to his TPP. Because of these individual issues, Bank of America argues, most of the named plaintiffs are not typical of the proposed classes.

[8] Bank of America's arguments do cast substantial doubt on whether class action treatment is appropriate here. Nevertheless, I conclude that the remaining named plaintiffs have adequately shown typicality. No two individual class members in any class are exactly identical; the typicality requirement may be satisfied despite some variation in the individual situations of the named plaintiffs and the class members. Wright et al., supra, § 1764. At bottom, the typicality requirement seeks to illuminate "whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff['s] claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Wal-Mart, 131 S.Ct. at 2551 n. 5 (quoting Falcon, 457 U.S. at 158 n. 13). Here, the claim that the named plaintiffs seek to advance on behalf of their respective

Exhibit 8| Page 5
Case 3:18-cv-00288-MOC-DSC  Document 1-1  Filed 06/01/18  Page 171 of 177

classes is that the TPPs required Bank of America to provide a permanent modification or a written denial by the Modification Effective Date, and that Bank of America is liable for damages if and when it failed to do so. As regards that claim, the remaining named plaintiffs are typical of their classes; they each received a TPP from Bank of America with terms like those of the other class members, and Bank of America failed to send them either a permanent modification or a written denial by their respective Modification Effective Dates. Beyond that, any individual differences between the remaining named plaintiffs and the class members are primarily relevant to the predominance requirement of Rule 23(b)(3) rather than the typicality requirement of Rule 23(a)(3). *See Gaudin,* 2013 WL 4029043 at *5–6 (finding typicality satisfied in a similar case).

I therefore find that the named plaintiffs other than the Alverenges, the Halls, Freeman, and Volpe raise claims that are typical of the proposed classes.

**4. Adequacy**

Adequacy of representation requires that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). This prerequisite has two parts: "(1) the attorneys representing the class must be qualified and competent; and (2) the class representatives must not have interests antagonistic to or in conflict with the unnamed members of the class." *Connor B.,* 272 F.R.D. at 297 (citing *Andrews v. Bechtel Power Corp.,* 780 F.2d 124, 130 (1st Cir.1985)). Plaintiffs' counsel here are experienced litigators with years of experience in class action work; I have no difficulty concluding that they can adequately represent the proposed classes. I also see no conflict of interest, and Bank of America has identified none, between the remaining named plaintiffs and the other members of the proposed classes. The adequacy requirement is thus satisfied.

**C. Rule 23(b)(3)**

Plaintiffs seek to certify their proposed classes under Rule 23(b)(3), which authorizes a class action where "the questions of law or fact common to class members predominate over any questions affecting only individual members, and ... a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3).[1] Certifying a class under Rule 23(b)(3) requires "a close look at the case before it is accepted as a class action." *In re New Motor Vehicles Canadian Export Antitrust Litig.,* 522

F.3d 6, 18 (1st Cir.2008) (quoting *Amchem Prods. v. Windsor,* 521 U.S. 591, 615, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)).

**1. Predominance**

[9] The predominance requirement determines "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521 U.S. at 623. Common questions may predominate despite the existence of individual differences, as long as "a sufficient constellation of common issues binds class members together." *Waste Mgmt. Holdings v. Mowbray,* 208 F.3d 288, 296 (1st Cir.2000). However, the predominance standard is "far more demanding" than the commonality requirement of Rule 23(a)(2). *In re New Motor Vehicles,* 522 F.3d at 20 (quoting *Amchem,* 521 U.S. at 624). Deciding what questions predominate requires the court to "formulate some prediction as to how specific issues will play out." *Waste Mgmt.,* 208 F.3d at 298

The predominance analysis is somewhat nuanced in this case because plaintiffs seek to certify their proposed classes only for adjudication of liability. *See* Fed.R.Civ.P 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues."). The Second and Ninth Circuits have held that when plaintiffs seek to certify a class on a particular issue, they need only show that common questions predominate as to that issue. *See In re Nassau Cnty. Strip Search Cases,* 461 F.3d 219, 226–27 (2d Cir.2006); *Valentino v. Carter–Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir.1996) The Fifth Circuit, on the other hand, has held that "a cause of action, as a whole, must satisfy the predominance requirement" in order for plaintiffs to certify a class on any issue. *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 745 n. 21 (5th Cir.1996). I need not decide which position is correct. Even assuming plaintiffs need only show common questions predominate on the specific issue of liability, not the entire cause of action, they have failed to make that showing.

**a. Breach of Contract**

Plaintiffs' primary theory of liability is that each TPP represented an enforceable contract between the individual borrower and Bank of America, and Bank of America breached those contracts by failing to send either a permanent modification or a written denial by the modification effective date. I have previously determined that plaintiffs' TPPs were enforceable contracts supported by consideration. *See* Docket # 66 (Mem. of Decision) at

Exhbit 8| Page 6
Case 3:18-cv-00288-MOC-DSC   Document 1-1   Filed 06/01/18   Page 172 of 177

8–11. That decision is supported by a number of recent circuit court cases. *See Corvello v. Wells Fargo Bank,* Nos. 11–16234 & 11–16242, 2013 WL 4017279, at *4–6 (9th Cir. Aug.8, 2013); *Young v. Wells Fargo Bank,* 717 F.3d 224, 233–36 (1st Cir.2013); *Wigod v. Wells Fargo Bank,* 673 F.3d 547, 560–66 (7th Cir.2012).

The TPPs do not explicitly state that Bank of America is required to send either a permanent modification agreement or a written denial by the Modification Effective Date. Nevertheless, plaintiffs argue that the contracts implicitly impose that obligation on Bank of America. The First Circuit recently accepted a similar argument; in *Young v. Wells Fargo Bank,* it held that another TPP could plausibly be read to require the servicer to offer a permanent modification by the Modification Effective Date if the borrower met her obligations under the agreement. *Young,* 717 F.3d at 233–36. That TPP used somewhat different language from the TPPs at issue here, *see id.* at 234–35, so *Young*'s holding is not directly applicable. Still, *Young* indicates that plaintiffs have raised a plausible common question about Bank of America's duties under the TPPs.

*10 But that common question is outweighed by the numerous individual questions affecting liability. In order to show that Bank of America is liable for a breach of contract, each plaintiff must show that a contract existed, that he performed as required by that contract, and that Bank of America breached the contract." *See, e.g., Amtcas, Inc. v. GMG Health Sys.,* 676 F.3d 227, 231 (1st Cir.2012).[11] The second element—plaintiffs' own performance—poses the difficulty here. The TPPs placed numerous obligations on borrowers who sought a modification. Each borrower had to "provid[e] confirmation of the reasons I cannot afford my mortgage payment and documents to permit verification of all of my income." Docket # 240, Ex. 20 ("TPP") at 1. Each borrower had to "certify, represent ... and agree" that he was "unable to afford his mortgage payments," *id.* § 1.A; that he "live[d] in the Property" and it was his "principal residence," *id.* § 1.B; that there had been no change in the ownership of the property, *id.* § 1.C; that he would "provide [ ] documentation for all income," *id.* § 1.D; that all the documents and information he had provided were true and correct, *id.* § 1.E; and that he would obtain credit counseling if required to do so, *id.* § 1.F. In addition, each borrower had to make the required trial payments on a timely basis. *Id.* § 2. The new obligations imposed on plaintiffs by their TPPs are the consideration that they provided to Bank of America. *See Mem. of Decision* at 9–10; Third Am. Compl., ¶ 328; *see also Bosque v. Wells Fargo Bank,* 762 F.Supp.2d 342, 351–52 (D.Mass.2011); *Durmic v. J.P. Morgan Chase Bank,* Civil Action No.

10–10380–RGS, 2010 WL 4825632, at *3 (D.Mass. Nov.24, 2010) (noting that similar TPPs required plaintiffs to "provide documentation of their current income, make legal representations about their personal circumstances, and agree to undergo credit counseling if requested to do so").[12]

Deciding whether each plaintiff fulfilled his obligations under his TPP depends on a nearly endless series of individual questions: "Did Plaintiff A provide accurate documents permitting verification of all his income? Did Plaintiff A live in the property as his principal residence? Did Plaintiff A obtain credit counseling if required to do so? Did Plaintiff A make his trial payments on a timely basis? Did Plaintiff B provide accurate documents permitting verification of all his income? Did Plaintiff B live in the property as his principal residence? ..." And so on, and so on, and so on, for each obligation of each member of each of the twenty-six classes.

Of course, the mere existence of these individual questions is not enough to show that they predominate. Predominance is not "determined simply by counting noses: that is, by determining whether there are more common issues or more individual issues." *Butler v. Sears, Roebuck & Co.,* Nos. 11–8029 & 12–8030, 2013 WL 4478200, at *4 (7th Cir. Aug.22, 2013). Common questions may still predominate over numerous individual questions where "individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria—thus rendering unnecessary an evidentiary hearing on each claim." *Smilow,* 323 F.3d at 40. But the present record shows that the individual questions presented in this case are not susceptible to simple, routine resolution. They will instead require separate factual inquiries that will overwhelm any common questions.

*11 A brief survey of the named plaintiffs' claims shows how individual questions will predominate. Borrowers entering a TPP were required to make their trial payments in a timely fashion; the class definition purportedly eliminates any individual questions here, since the proposed classes include only borrowers who met that requirement. But we have already seen an individual factual question arise over whether two named plaintiffs, the Nelsons, actually met that obligation. *See supra* Part III.B.3. *Compare* Schoolitz Decl., ¶ 31 & Exs. 127–128, with Docket # 248, Ex. 65 (Ayres Decl.), ¶ 12 & n. 16. Borrowers were also required to certify that they were unable to afford their mortgage payments; the record shows an individual factual question over whether named plaintiff Heather Grimes could in fact afford her mortgage payments before beginning her TPP. *Compare*

Docket # 224, Ex. 4 at 71–72, 76–77, 135 (indicating Galasso had the financial ability to make her full mortgage payments), with Docket # 248, Ex. 79 (indicating Galasso's credit card debt was excessive). Borrowers were required to certify that they lived in the mortgaged property as their principal residence. Bank of America's records indicate that named plaintiff Darren Kunsky did not live in the mortgaged property as his principal residence, see Docket # 223, Ex. 92; but Kunsky himself has testified that he did live in the property at the relevant time, see Docket # 248, Ex. 84. Borrowers were required to obtain credit counseling if Bank of America asked them to do so; named plaintiff Aissatou Balde was asked to obtain credit counseling, but never did, because (she testified) the phone number that Bank of America gave her did not work. See Docket # 224, Ex. 15. Finally, borrowers were required to provide documents permitting verification of all of their income. This is the individual question that arises most frequently, given the Kalsmoyars' bureaucracy that decided which documents were required of which borrowers. Bank of America asserts that more than a quarter of the proposed class representatives failed to return the necessary documents, and has produced some evidence in each case to back its assertions. Plaintiffs dispute Bank of America's assertions with respect to each borrower. But those disputes, like all the others discussed above, can only be decided by individual inquiries into each plaintiff's performance. Factual questions like these cannot be resolved by just "computer records, clerical assistance, and objective criteria." Sniffen, 323 F.3d at 40. Instead, they will require separate evidentiary hearings for many if not all of the proposed class members. These individual factual disputes will predominate in determining Bank of America's liability as to each plaintiff.

Plaintiffs raise several arguments that seek to avoid these individual questions. First, they argue that Bank of America would only issue a TPP when it was satisfied that the borrower receiving the TPP already met the criteria set out in Section 1 of the agreement (financial hardship, residence in the mortgaged property, documentation of income, etc.). According to plaintiffs, the fact that each class member received a TPP is itself enough to show they had each satisfied all obligations under Section 1; the only remaining obligation was to make the trial payments. But that argument plainly fails. The TPPs explicitly contemplate that borrowers may be required to provide documentation or meet other obligations after they enter into their TPPs. See, e.g., TPP, publ. ("If I have not already done so, I am providing confirmation of the reasons I cannot afford my mortgage payment and documents to permit verification of all my income ..."); id. ¶ 1.D ("I am providing or already have

provided documentation for all income that I receive ..."); id. ¶ 1.F ("If Servicer requires me to obtain credit counseling, I will do so."). Moreover, the first sentence of each TPP indicates that Bank of America is only required to provide a permanent modification if the borrower's "representations in Section 1 continue to be true in all material respects." Id. publ. In other words, each borrower had ongoing obligations that continued after she entered into her TPP.[5] The mere fact that each class member received a TPP is not enough to show that they each complied with all obligations under the TPPs—especially since Bank of America has adduced some evidence indicating that many class members did not in fact comply with their obligations.

*12 Next, plaintiffs claim Bank of America has waived any objection to individual borrowers' nonperformance, thereby obviating any relevant individual questions. Plaintiffs rest largely on Section 2.F of the TPPs, which states (as relevant): "If prior to the Modification Effective Date ... the Servicer [Bank of America] determines that [the borrower's] representations in Section 1 are no longer true and correct, this Loan Documents will not be modified and this Plan will terminate." TPP, § 2.F. Plaintiffs characterize this provision as placing a duty on Bank of America to verify the borrower's representations, and to raise any objections to those representations, before the Modification Effective Date. Another federal district court recently accepted a similar argument regarding a similar TPP, holding that under this provision the court was not required to consider whether the individual borrowers actually performed but only whether the defendant mortgage servicer determined that they performed. See Gaudin, 2015 WL 4029043 at *7–8.

I do not find that argument persuasive. Plaintiffs' individual performance is a necessary part of their breach of contract claim; unless plaintiffs actually performed, Bank of America is not liable under the contract. See TPP, publ. (stating Bank of America will provide a permanent modification only if the borrower is "in compliance with this [TPP]"). Section 2.F does nothing to change that. It says that if Bank of America does determine the borrower's representations are false before the Modification Effective Date, the borrower will not receive a permanent modification. But it nowhere explicitly requires Bank of America to object to a borrower's nonperformance before the Modification Effective Date or else waive that objection forever.[6]

Moreover, plaintiffs' interpretation would "render large swaths of the TPP nugatory," Young, 717 F.3d at 235. It would mean plaintiffs were not actually required to perform any of their obligations under Section 1, as long

Exhbit 8| Page 8
Case 3:18-cv-00288-MOC-DSC Document 1-1 Filed 06/01/18 Page 174 of 177

an Bank of America failed to discover the nonperformance before the Modification Effective Date. While I need not conclusively interpret this provision of the contract now, I consider plaintiffs' interpretation of Section 2.F so unlikely to succeed that it does not cause common questions to predominate. See Waste Mgmt., 208 F.3d at 298 (deciding predominance requires "some prediction as to how specific issues will play out"). I reach the same conclusion with respect to plaintiffs' alternative argument that Bank of America waived plaintiffs' nonperformance by simply accepting plaintiffs' trial payments. Cf. Basque, 762 F.Supp.2d at 351–52 (noting borrowers' trial payments were already required by "their undisputed pre-existing mortgage loan obligations").

In sum, whether Bank of America is liable for breach of contract depends on numerous individual questions about each class member's performance. Those individual questions predominate over the questions common to the proposed classes. Plaintiffs' breach of contract claim therefore cannot be certified under Rule 23(b) (3) [19]

### b. Breach of the Implied Covenant

"15 Individual questions will likewise predominate in the adjudication of plaintiffs' claim for breach of the implied covenant of good faith and fair dealing. That implied covenant "may not ... be invoked to create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." Lawton, 708 F.3d at 326 (omission in original) (quoting Uno Restn., 805 N.E.2d at 964). As discussed above, each TPP makes clear that Bank of America's duties are predicated on plaintiffs' performance of their own obligations. See, e.g. TPP, publ. ("If I am in compliance with this [TPP] and my representations in Section 1 continue to be true in all material respects, then [Bank of America] will provide me with a [permanent modification]."). If plaintiffs did not perform, then Bank of America did not violate the intended and agreed expectations of the parties by failing to perform in turn. Moreover, insofar as plaintiffs base their implied covenant claim on other misdeeds beyond the failure to provide a permanent modification or a written denial by the Modification Effective Date, they raise further individual questions as to which of those alleged misdeeds affected which individual class members. See supra note 5; cf. Third Am. Compl., ¶ 530.

### c. Promissory Estoppel

For their promissory estoppel claim (pled in the alternative), plaintiffs allege that Bank of America "by way of its TPP Agreements, made representations to Plaintiffs that if they returned the TPP Agreements executed and with supporting documentation, and made their TPP payments, they would receive permanent HAMP modifications." Third Am. Compl., ¶ 543. In other words, the alleged promise was a conditional one—that if plaintiffs complied with their obligations under their TPPs, Bank of America would provide them permanent loan modifications. Like the breach of contract claim and the implied covenant claim, then, this promissory estoppel claim raises the same individual questions as to whether each plaintiff performed under her TPP. Once again, these individual performance questions predominate over the relevant common questions.

### d. Unfair and Deceptive Acts and Practices

Finally, individual questions also predominate on plaintiffs' claims regarding Bank of America's allegedly unfair and deceptive acts and practices. To the extent these claims are based on Bank of America's alleged breach of the TPPs, they raise the same individual questions of plaintiffs' performance discussed above. See Campusano, 2013 WL 2302676, at *7 ("Whether [Bank of America's] conduct was unfair depends on whether the conduct breached the loan modification agreements. Because plaintiffs have not shown that there are questions capable of classwide resolution relating to the breach of the modification agreements, neither is the alleged fairness of those supposed breaches.") To the extent these claims are based on other unfair practices, there are individual factual issues as to whether each plaintiff was actually affected by the same alleged practices. See supra notes 5 & 6; cf. Wal-Mart, 131 S.Ct. at 2551 (no commonality where plaintiffs did not suffer the same injury from the same practice).

### 2. Superiority

"24 As well as failing the predominance requirement, plaintiffs' proposed classes also fail the superiority requirement. Superiority looks to whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). Plaintiffs argue that liability can be more efficiently determined on a classwide basis rather than on an individual basis. See Swack v. Credit Suisse First Boston, 230 F.R.D. 250, 273 (D.Mass.2005) (superiority is met where "the piecemeal adjudication of numerous separate lawsuits covering the same or substantially

U.S. Government Works

similar issues ... would be an inefficient allocation of limited court resources"). Likewise, plaintiffs argue that many class members would lack "the financial incentives or wherewithal to seek legal redress for their injuries." *Id.; cf. Ginūs v. Bouchard Transp. Co.,* 596 F.3d 64, 67–68 (noting "the very reason for Rule 23(b)(3)" is "to make room for claims that plaintiffs could never afford to press one by one"). These arguments are certainly forceful; but they are outweighed by the unmanageable difficulty that would attend plaintiffs' twenty-six proposed class actions. As described above, plaintiffs' claims depend predominantly on individual factual questions. A class action cannot sensibly adjudicate those individual questions. It would either ignore them, denying the parties a fair trial on the merits of each plaintiff's claim; or it would attempt to resolve them all, and wind up hopelessly entangled in each plaintiff's idiosyncratic facts. Neither option is acceptable. *See Wal-Mart,* 131 S.Ct. at 2560–61 (defendant is entitled to litigate its defenses to individual claims); Fed.R.Civ.P. 23(b)(3)(D) (superiority depends in part on "the likely difficulties in managing a class action"). Moreover, as the many mortgage-related cases in the federal courts attest, individual plaintiffs are normally well-motivated to bring any claims they might have in order to save their homes. This is not a case where class action treatment is required "to vindicate the claims of consumers and other groups of people whose individual claims would be too small to warrant litigation." *Smilow,* 323 F.3d at 41; *see* Fed.R.Civ.P. 23(b)(3)(B) (superiority depends in part on "the extent and nature of any litigation concerning the controversy already begun by or against class members"). Under these circumstances, separate individual actions

would more fairly and efficiently resolve the liability issues that plaintiffs seek to certify for classwide adjudication.

**IV. Conclusion**

This case demonstrates the vast frustration that many Americans have felt over the mismanagement of the HAMP modification process. Plaintiffs have plausibly alleged that Bank of America utterly failed to administer its HAMP modifications in a timely and efficient way; that in many cases it lost documents, or pretended it had not received them, or arbitrarily denied permanent modifications. *See* Third Am. Compl., ¶¶ 135–473 (describing the different experiences of each named plaintiff). Plaintiffs' claims may well be meritorious; but they rest on so many individual factual questions that they cannot sensibly be adjudicated on a classwide basis. Because plaintiffs have failed to meet the predominance and superiority requirements of Rule 23(b)(3), their motion for class certification (Docket # 208) is DENIED.

*[15 Plaintiffs' motions to compel discovery (Dockets 91 & 126) and their motions to strike (Dockets 242 & 263) are also DENIED.

**All Citations**

Slip Copy, 2013 WL 4759649

**Footnotes**

1   I use "Bank of America" to refer collectively to defendant Bank of America, N.A. and its subsidiary, defendant BAC Home Loans Servicing, LP.

2   The states involved are Alabama, Alaska, Arizona, California, Colorado, Connecticut, Florida, Georgia, Illinois, Kentucky, Maryland, Massachusetts, Michigan, Missouri, Nevada, New Jersey, New York, North Carolina, Ohio, Oregon, Pennsylvania, Rhode Island, Texas, Virginia, Washington, and Wisconsin. Plaintiffs seek to certify their breach of contract claim and their implied covenant claim in every state listed, either separately or as a single claim. They seek to certify their promissory estoppel claim in every state listed except for North Carolina and Virginia, and their unfair and deceptive acts and practices claim in every state listed except for Alabama, Georgia, Ohio, Texas, and Virginia. *See* Docket # 210, Ex. 10.

3   Supplemental Directive 09-01 was superseded by Supplemental Directive 10-01, which required servicers to obtain fully verified financial information to determine eligibility before issuing any TPP with an effective date after June 1, 2010. See U.S. Dep't of the Treasury, Supplemental Directive 10-01 (Jan. 28, 2010), *available at* https://www. hmpadmin.com/portal/programs/docs/hamp_servicer/sd1001.pdf.

4   Expanding the mathematics somewhat: Plaintiffs' expert reports that there are 241 mortgage loans in Alaska to which Bank of America provided trial modifications. The random sample produced a total of 51 such loans from Alaska, of which 35 (about 69%) received TPPs under Supplemental Directive 09-01. Out of those 35 loans, according to plaintiffs' expert, 26 (about 74%) were class loans (i.e., their borrowers did not receive either a permanent modification or a written denial before the Modification Effective Date). The best available inference, then, is that about 241 x 69% x

74% 123 Alaska loans belong to borrowers meeting the class definition.

Of course, these statistics rest on a number of questionable assumptions. For example, the sample of 3,000 loans, which the parties describe as "random," included 51 loans from Alaska (about 21% of the asserted total of 241 such loans) but only 516 loans from California (about 0.5% of the asserted total of 99,854 such loans). That distribution would be highly unlikely in a truly random sample. I nevertheless conclude plaintiffs have produced sufficient evidence to meet their burden.

5    Plaintiffs allege a number of unscrupulous practices by Bank of America that they claim are evidence of bad faith. For instance, they describe deliberate delays in reviewing borrowers' documents, lies about whether required documents had been received, lies about whether borrowers' modifications were actually under review, baseless denials intended only to reduce the TPP backlog, etc. Plaintiffs' claim for breach of the implied covenant, however, only allows them to recover insofar as they were denied their intended and expected benefits from the contract. The only such benefit that plaintiffs claim all class members were denied is the right to either a permanent modification or a written denial by the Modification Effective Date. To the extent plaintiffs claim some class members were harmed in other ways by Bank of America's unscrupulous practices, they have failed to show—indeed, they do not even attempt to show—that any one of those unscrupulous practices affected each class member individually and so raises an issue common to each proposed class. See Wal–Mart, 131 S.Ct. at 2551 ("Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.' This does not mean merely that they have all suffered a violation of the same provision of law." (citation omitted) (quoting Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147 157 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)).

6    Plaintiffs' currently active complaint, the third amended complaint, refers only to Bank of America's "conduct as set forth herein and as alleged in the underlying complaints" and its "lies, deceptive and misleading statements and omissions" in describing the grounds for the claim of unfair and deceptive acts and practices. Docket # 84 (Third Am. Compl.), ¶¶ 555–95, Of course, the third amended complaint describes a wide array of allegedly unfair conduct, much of which was only experienced by some plaintiffs and not by others. See id. at ¶¶ 135–473 (describing the different experiences of each named plaintiff). As with plaintiffs' implied covenant claim, to the extent plaintiffs' unfair and deceptive acts and practices claim rests on the different individual experiences of the named plaintiffs, it does not raise a common issue appropriate for class treatment. See Wal–Mart, 131 S.Ct. at 2551; cf. Smilow, 323 F.3d at 42 (plaintiffs relying on individual oral misrepresentations "risk losing class status").

7    The Nelsons currently represent the proposed California class, which is also represented by Nagel and Manuel Alverange and by Jesus Carillo. Because Carillo appears to meet the typicality requirement, the proposed California class could be certified even without the Nelsons.

8    The Alveranges intended to represent the proposed California class; Freeman intended to represent the proposed New York class; and the Halls and Volpe intended to represent the proposed Pennsylvania class. Each of these proposed state classes is represented by other named plaintiffs who meet the typicality requirement, so the disqualification of these named plaintiffs does not bar certification of any of these classes.

9    In a single footnote, plaintiffs also mention Rule 23(b)(2), which allows certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed.R.Civ.P. 23(b)(2). But plaintiffs' motion explicitly seeks to certify twenty-six classes only on the issue of liability; it does not describe any proposed injunctive relief or corresponding declaratory relief. See 7AA Wright et al., supra, § 1775 ("[A]n action seeking a declaration concerning defendant's conduct that appears designed simply to lay the basis for a damage award rather than injunctive relief would not qualify under Rule 23(b)(2) ."). In any case, classwide declaratory relief would be inappropriate here; given the individualized issues described below, plaintiffs have failed to make the required preliminary showing that Bank of America has acted or refused to act on grounds that apply generally to the proposed classes. See Wal–Mart, 131 S.Ct. at 2557–61 (holding that Rule 23(b)(2) cannot be used to deprive a defendant of individualized defenses).

10    Although plaintiffs bring their contract claims under the laws of several different states, the contract principles at issue here do not vary materially.

11    If a plaintiff seeks damages, he must also show causation and the amount of damages. See Amica, 676 F.3d at 231. But those elements are distinct from the issue of liability, and plaintiffs seek certification only on liability. Cf. In re Nassau Cnty., 461 F.3d at 226–27; Valentino, 97 F.3d at 1234.

12    The parties do not discuss whether the representations in Section .1 constitute duties imposed on the borrower, conditions precedent to Bank of America's duties, or both. See Restatement (Second) of Contracts § 227 (West 2013); 13 Williston on Contracts § 38:7 (West 2013); cf. Mem. of Decision at 9–10 (considering both obligations and

2016 Thomson Reuters No claim to original U.S. Government Works    1'